# EXHIBIT 3

STATE OF MICHIGAN

IN THE COURT FOR THE 52-3 JUDICIAL DISTRICT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

Case No. 21-006651 FY
Case No. 21-006652 FY
Hon. Julie Nicholson

v

JAMES CRUMBLEY,
JENNIFER CRUMBLEY,

Defendants.

_____/

KAREN D. McDONALD (P59083)
MARC A. KEAST (P69842)
Oakland County Prosecuting Attorney
Attorney for Plaintiff
1200 N. Telegraph Rd.
Pontiac, MI 48341
(248) 858-0656

SHANNON M. SMITH (P68683)
MARIELL LEHMAN (P74760)
Attorneys for Defendants
Smith Lehman, PC
1668 South Telegraph Road, Ste 200
Bloomfield Hills, MI 48302
(248) 636-2595

_____/

## THE PEOPLE'S COMBINED RESPONSE AND BRIEF IN RESPONSE TO DEFENDANTS' MOTION TO MODIFY BOND

The People request that the hearing on the Defendants' motion be held in person.

_____

Bond in this case is properly set at $500,000 cash/surety with existing conditions. The most important bond considerations for the court at this time are:

A. Defendants are at a greater risk of flight now than they were at the time of the arraignment. As of October 18, 2021, they were over $11,000 behind on their house payments. Their house is currently for sale. They have sold their horses. They have already shown that

they will flee if they get the opportunity. Those are critically important facts known to defendants but not disclosed to the Court in the defendants' motion.

B. The case against the defendants is strong, and even stronger than it was at the arraignment when this Court properly set the current bond. When defendants left Oxford High School at approximately 10:55 a.m., on November 30, 2021, over an hour before the shooting, they knew that their son was depressed, that he was fascinated with guns, that they had purchased a Sig Sauer 9mm handgun for him just days before, that he had been researching ammunition while at school, and that he was seen watching violent video of shootings that morning. Before they left the school that day, they had also seen the disturbing drawings attached to this response as Exhibits One and Two. Again, these are facts known to the defendants and largely ignored in their motion. In addition, the Court should know that Defendants had information long before November 30 (within the six months prior to the shooting) that their son's only friend moved at the end of October 2021; that the family dog died; that their son was sadder than usual; and that he was sending his mother disturbing texts about his state of mind. Meanwhile, during that same period, Defendants spent their time at the barn caring for their horses (3-4 nights a week for up to 3 hours at a time), and seeking other relationships, including Defendant mother's extramarital affairs. Instead of paying attention to their son and getting him help, they bought him a gun.

Based on those facts, and as further set forth below, the People respectfully request that the Court deny Defendants' Motion and continue the $500,000 bond previously set by the Court.

In further response to the enumerated paragraphs in Defendants' Motion, the People state:

1. The People admit the allegations contained in Paragraph One.

2. The People admit that Defendants' son was criminally charged with twenty-four felonies based on events that occurred on November 30, 2021, at Oxford High School, leaving four dead and seven physically injured and countless others psychologically terrorized.

3. The People admit the allegations contained in Paragraph Three.

4. The People admit the allegations contained in Paragraph Four. There is still outstanding discovery that the defense and People have yet to receive. The People will continue to provide the ongoing discovery as it is received. Importantly, the facts and information the People rely on in this Response were known to Defendants without reference to the discovery exchanged.

4. Defendants' Motion includes two paragraphs labeled four. As to the second Paragraph Four, the People admit that the quoted phrase was used, but **deny** that is supports the proposition for which Defendants cite it. It is not novel to charge a parent for their gross negligence in allowing access to a firearm. See, e.g., *People v Head*, 323 Mich App 526; 917 NW2d 752 (2018) (affirming the defendant's involuntary manslaughter conviction in a case arising out of his child's access to a gun in a readily accessible location in the home); *People v Bryson*, unpublished per curiam opinion of the Court of Appeals, issued January 16, 2018 (Docket No. 333068) (affirming the defendant's involuntary manslaughter conviction in a case arising out of his child's access to a gun kept in the defendant's closet) [attached as Exhibit Three]. What is novel is that such a charge has not been used in the case of a mass shooting at a school. What is also novel is Defendants' purchase of a gun for their son immediately prior to

the shooting. This was not a case where their son retrieved and used ***their*** gun.[1] Instead, he

retrieved and used ***his*** gun, the one they bought for him. This case is also unique in Defendants'

willful disregard of clear evidence on the day of the shooting that their son posed a serious risk

to other students. In school shootings, it is not uncommon to find evidence of intent and planning

***after*** the shooting has occurred. What is novel about this case is that Defendants were made

aware, in graphic form, of the serious risk posed by their son ***prior to the shooting***. This is not a

case of hindsight, where parents later ***wish*** they could have done something. These parents ***could***

have done something. Those facts, unique to this case, meet precisely the definition of gross

negligence set forth in the Jury Instruction cited by Defendants, M Crim JI 16.18.

     5.     The People admit that gross negligence and breach of a legal duty are the crux of

the allegations in this case.

     6.     The People admit that the People have the burden of proving Defendants were

grossly negligent. As to the remaining allegations contained in Paragraph Six, the People deny

them as untrue. The evidence will show that Defendants' son gave numerous warning signs, both

in disturbing statements through text messages, journals, and conversations, and in his actions.

The evidence will show that by the morning of November 30, 2021, before their son committed

the killings, Defendants were aware of his depression, his fascination with guns, the fact that

they had purchased a Sig Sauer 9mm handgun for him just days before, that he had been

researching ammunition while at school, and that he was seen watching violent video of

shootings that morning. Most importantly, their son gave the clearest sign of all that he was intent

---

[1] In the two prior Michigan cases cited above, the gun belonged to the defendant, and was found and used by the shooter. In other words, the facts in this case are significantly more egregious than the facts in those cases. The convictions for involuntary manslaughter in those cases were upheld by the Michigan Court of Appeals.

on violence in his initial drawing on November 30, 2021, and the modifications he made after the drawing was discovered. The initial drawing is attached as Exhibit One, and the modified drawing is attached as Exhibit Two. Despite having all this knowledge, Defendants failed to take even the simplest action that would have prevented the massacre. All they had to do was tell the school that they recently purchased a gun for their son, ask him where the gun was, open his backpack, or just take him home. The evidence will show that the gun was accessible to their son, and by both of their own admissions Defendants kept the gun in an unlocked armoire cupboard. Further, on the very date of the shooting, Defendant Jennifer Crumbley gave inconsistent statements to various individuals regarding the location and accessibility of the gun, including a claim to her boyfriend that she had it in her car. It would only have taken them minutes to ascertain the exact location of their son's gun – their home was only 1.4 miles from the school, and less than a five-minute drive. Indeed, we know that, once motivated to do so, Defendant father was able to quickly do just that – drive home and determine that the gun was missing. Defendants were in a better position than anyone else in the world to prevent this tragedy, but they failed to do so.[2]

The evidence will further show that these Defendants willfully ignored the needs and well-being of their son and the threat he posed to others. Their son was torturing animals, even leaving a baby birds' head in a jar on his bedroom floor, which he later took and placed in a school bathroom. Meanwhile Defendants were focusing on themselves and their own issues, including

---

[2] Defendants' "devastation" is neither surprising nor relevant. Every drunk driver who kills someone is devasted by the result of their gross negligence, but their actions were grossly negligent just the same, and they remain criminally culpable for their actions or inactions.

things like extra-marital affairs, financial issues, and substance abuse issues.[3]

7.   The People deny the allegations as contained in Paragraph Seven. The People's allegations in the Complaint, at the swear-to, at the arraignment, and in this Response are all consistent.[4]

8.   The People admit the allegations contained in Paragraph Eight.

9.   The People admit the allegations contained in Paragraph Nine.

10.   The People admit that pursuant to MCR 6.106(F)(1)(a)-(i), the Court properly considered the bond factors at the initial arraignment. Moreover, MCR 6.106(F)(2) provides that "the court must state the reasons for its decision on the record," but "[t]he court need not make a finding on each of the enumerated factors." In addition, the rules of evidence—other than those regarding privileges—do not apply to proceedings with respect to release on bail or otherwise. MRE 1101(b)(3). The bond set by this Court on December 4, 2021, was appropriate then, and the changes to the most important factors here (the strength of the People's case and the risk of Defendants' flight) both weigh against any modification of their current bond.

a.   The People admit the allegation in subsection (a).

b.   MCR 6.106(F)(1)(b) addresses the "defendant's record of appearance or nonappearance at court proceedings or flight to avoid prosecution." Paragraph

---

[3] Defendants have illustrated that point in their actions and statements after the shooting. They retained attorneys for themselves, but not their son, and Defendant mother stated in both statements to a co-worker and text that her son's destiny is done and she has to take care of herself.

[4] The People's public statements simply reiterate the facts already laid out in open court. Indeed, the quote that the defense references directly matches what Oakland County Sheriff's Lt. Tim Willis swore to in court.  See Hutchinson, Derick, *Father called 911 to report missing gun, say his son might be Oxford High School shooter, police say* < https://www.clickondetroit.com/news/local/2021/12/03/father-called-911-to-report-missing-gun-say-his-son-might-be-oxford-high-school-shooter-police-say/ > (accessed December 22, 2021) (quoting Lt. Tim Willis stating, "Further investigation revealed that the Sig Sauer 9 mm handgun purchased by James Crumbley was stored, unlocked in a drawer in James and Jennifer's bedroom," at Defendants' son's swear-to). Further, and as Defendants note, the People specifically referenced that "these are just allegations."

10(b) of Defendants' Motion ignores that question, and instead focuses on Defense Counsels' schedules and text messages that did not include Defendants. The relevant facts are that Defendants had already retained counsel and knew that they had been charged. Defendants then made a conscious decision not to turn themselves in, and instead to flee and hide. It is important to note that Defendants' actions are inconsistent with, or contradict, the statements made by their attorneys to a Fugitive Apprehension Team Agent ("the FAT Agent"), to the media, and in the present motion. At approximately 5:33 p.m. on December 3, 2021, the FAT Agent told defense counsel, Ms. Smith, that he would be willing to meet the Defendants anywhere in the State to allow them to turn themselves in. Then, at 10:34 p.m., Ms. Smith sent another text to the Agent stating that "[t]he dad's cell phone died and they have no way to charge it so some of the calling issues were due to that. But we have Jennifer's number, and they are coming." See attached Exhibit Four. Ms. Smith also told the media that her clients were "making their way back" to turn themselves in.[5] The suggestion that either of the Defendants did not have access to a phone, or could not get a phone charger is not credible. Defense counsel's reference to "dad's phone," singular, omits the fact that the Defendants had four cell phones when they were found. Two were phones to replace the phones that were taken into evidence on the day of the shooting. The FAT Agent was aware of those two phones, had their numbers, and attempted to use those numbers to

---

[5] Spruill & Clarke, 'They are not hiding from anyone': Attorney says parents of suspected Oxford High School shooter will face involuntary manslaughter charges < https://www.clickondetroit.com/news/local/2021/12/04/they-are-not-hiding-from-anyone-attorney-says-parents-of-suspected-oxford-high-school-shooter-will-face-involuntary-manslaughter-charges/ > (accessed December 23, 2021).

locate Defendants. The other two phones were obtained by Defendants later, presumably for the express purpose of attempting to evade arrest. That presumption is bolstered by the fact that Defendants attempted to destroy one of the phones before they were apprehended. The suggestion that the Defendants could not obtain a phone charger is similarly incredible. Phone chargers are available at every CVS, Walgreens, gas station or corner store. The only thing keeping Defendants from getting a phone charger was their desire not to get caught. That is undoubtedly the same reason they parked their car in such a way that the license plate could not be seen from any angle. Defense counsel's statement on December 3, 2021, that her clients were "making their way back" is simply false. Surveillance video of the building where Defendants were found shows that they entered the building at 11:00 a.m. and never left the premises. In short, all of Defendants' actions contradict any intention to turn themselves in voluntarily, and support that they were fleeing to avoid prosecution.[6]

The Court must also consider the purposeful attempt the Defendants made to evade the authorities:

    a.   They withdrew a large sum of money from their bank account,

    b.   They traveled 30-40 miles to hide inside of an empty commercial building in Detroit;

    c.   They turned off their cell phones and purchased two additional burner

---

[6] The statement in Defendants' Motion that "Prosecutor McDonald . . .launched the fugitive apprehension team, law enforcement, and the US Marshals" is both irrelevant and ridiculous, and any criminal defense attorney knows better. The apprehension of defendants is a law enforcement function, and is not directed by the prosecution. That statement is simply a personal attack meant for media attention.

phones;

    d.  They parked their vehicle in a manner that would make reading license plate less visible;

    e.  They gained access to an empty commercial building and hid inside a locked art studio for several hours. Even after they had been charged and even after they had been advised by the owner that they needed to vacate his property, they remained inside behind locked doors, ceasing all communications with their retained counsel until the Fugitive Apprehension Team apprehended them, and at least one of the four burner phones had been intentionally smashed.

Lastly, both Defendants have substantial contacts with the State of Florida and based on their prior calculated and deliberate attempt, the People believe the Defendants are a serious flight risk.

c.  The People deny the allegations contained in subsection (c). In their written and video recorded statements, several witnesses have stated that both Defendants have substance abuse issues.

d.  The People deny the allegations contained in subsection (d). As set forth above, the discovery tendered thus far confirms that Defendants' themselves had every reason to know that their son was a danger to others.

e.  MCR 6.106(F)(1)(e) expressly makes the seriousness of the charge a relevant consideration, and the People agree with Defendants' statement that this case is "obviously very serious." Further, as explained in the second paragraph four above, the charges against Defendants are appropriate, and the probability of conviction is

high.

f.  The People neither admit nor deny the allegations contained in subsection (f) and leave Defendants' to their proofs.

g.  The People lack sufficient information to either admit or deny the allegations contained in subsection (g). The People request that the defense provide the People and the Court with the name and contact information, as well as an offer of proof, for any individuals who are willing to vouch for these Defendants. To the extent that information is not provided on or before January 4, 2022, the People request that the Court not consider such unidentified supporters when deciding this Motion.

h.  The People deny the allegations contained in subsection (h). Defendants have knowledge of important information contradicting those allegations that they failed to disclose to the Court. For example, as of November 1, 2021, Defendants were over $11,000 in arrearage on their house payments (see Exhibits Five A and B), and they are "working to list" the home at 112 E. Street, Oxford, MI 48371 for sale. See Exhibit Six. Thus, Defendants will have no longer have any "strong ties" to Michigan, nor will they own any real property in Michigan.

It is worth noting that, by maintaining that there is no conflict in joint representation and by making no distinction between themselves in the present motion, Defendants imply that they are tied to each other - that the only risk of flight is that both will flee or neither one will flee. The facts already discovered show that Defendant mother was having at least one intimate affair. When defense counsel shares the explicit videos found on Defendant mother's cell phone, it is possible, even likely, that Defendants will go separate ways. Defendants have

already made it clear that their son's presence will not keep them here.

    i.    The People neither admit nor deny the allegations as contained in subsection (i) and leave Defendants to their proofs.

11.    The People neither admit nor deny the allegations contained in Paragraph Eleven. It is well established that Defendants should not be speaking with any listed witnesses, or potential witnesses, many of whom are as yet unidentified. The People assert that Defendants' prior statements and actions call into question any such promises on their part.

12.    The People admit that there remains outstanding discovery. The People deny the remaining allegations as untrue.

13.    The People admit the allegation contained in Paragraph Thirteen that setting bail is appropriate. The People maintain that the bond previously set by this Court was and is appropriate. As set forth above, to the extent additional facts have come to light or that circumstances have changed since the arraignment, that new information supports the current bond, and recommends denial of the present motion.

Wherefore, the People respectfully request this Honorable Court deny Defendants' Motion to Modify Bond in its entirety for the reasons stated above.

    Respectfully submitted,

    KAREN D. McDONALD
    PROSECUTING ATTORNEY

By:    _____

    Marc A. Keast (P69842)
    Assistant Prosecuting Attorney

DATED:    DECEMBER 23, 2021

- 11 -

.

**EXHIBIT ONE**



Sent from my iPhone

EXHIBIT TWO

# Chapter 5 – Test REVIEW #1

Ethan Crumbley
November 30th 2021
8:59 AM

## 5-7: Using Congruent Triangles

I can use ≅ ∆s.

Given: $\overline{MQ} \cong \overline{NT}$
$\overline{MQ} // \overline{NT}$
Prove: $\overline{MN} \cong \overline{QT}$



Given: $\overline{YX} \cong \overline{WX}$
$\overline{ZX}$ bisects $\angle YXW$.
Prove: $\overline{YZ} \cong \overline{WZ}$

**Reason Bank:**
○ Given
○ Given
○ CPCTC
○ CPCTC
○ SAS
○ SAS
○ Reflexive Property
○ Reflexive Property
○ Def'n of Bisector
○ Alt. Int. ∠s Thm.

1.

2. ∠1 ≅ ∠2

3. $\overline{MT} \cong \overline{MT}$

4. ∆MNT ≅ _____

5.

1.

2. 

3.

4. The thoughts

5. Won't Stop

1.

RMX 808

2. ∠1 ≅ ∠2

3. $\overline{XZ} \cong \overline{XZ}$

4. ∆YXZ ≅ ∆WXZ

5.

1.

2.

3.

4.

5. Video game this is

I can prove ∆s ≅.

## 5.3, 5.5-5.6: Congruent Triangles

k any given information on the diagram.  Are the triangles congruent?  Which theorem proves this?
Write congruent statements for the bottom row.



| ∆PQR ≅ | ∆PQR ≅ | ∆ABC ≅ | ∆WXY ≅ |

EXHIBIT THREE

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CURRY DALE BRYSON,

        Defendant-Appellant.

UNPUBLISHED
January 16, 2018

No. 333068
Wayne Circuit Court
LC No. 15-009938-01-FH

Before: TALBOT, C.J., and MURRAY and O'BRIEN, JJ.

PER CURIAM.

Defendant was convicted by a jury of involuntary manslaughter[1] and possession of a firearm during the commission of a felony (felony-firearm).[2] He appeals as of right. We affirm.

Defendant's convictions arose from the shooting death of three-year-old Elijah Walker at defendant's home by defendant's 11-year-old son, CL, with a gun that defendant kept in his closet. Defendant was at work at the time and Elijah's mother, Denisha Walker, was supervising her own three young children and defendant's two children. On appeal, defendant contends that the evidence was insufficient to convict him, that his trial counsel was ineffective by failing to present his defense, and that his due process rights were violated when he had two preliminary examinations in front of different judges. This Court reviews de novo a challenge to the sufficiency of the evidence.[3] Claims of ineffective assistance of counsel that are unpreserved are limited to review for errors apparent on the record.[4] The constitutional question of whether an attorney's ineffective assistance deprived a defendant of his Sixth Amendment right to counsel is reviewed de novo.[5]

---

[1] MCL 750.321.

[2] MCL 750.227b.

[3] *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010).

[4] *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008).

[5] *Id*. at 242.

-1-

## I. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was not sufficient to convict him. Due process requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction.[6] To determine if the prosecution produced evidence sufficient to support a conviction, this Court considers "the evidence in the light most favorable to the prosecutor" to ascertain " 'whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' "[7] Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction.[8]

In order to demonstrate that defendant was guilty of gross negligence amounting to involuntary manslaughter, the prosecution had to prove beyond a reasonable doubt:

> (1) defendant's knowledge of a situation requiring the use of ordinary care and diligence to avert injury to another, (2) [his] ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) [his] failure to use care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.[9]

Defendant disputes that the third element, causation, was satisfied because his actions were not the factual or proximate cause of Elijah's death. The causation element of criminal negligence amounting to involuntary manslaughter consists of two components: cause-in-fact and proximate cause.[10]

Factual causation is a determination regarding whether a defendant's conduct was a "factual cause of the result," by assessing whether the result would have occurred "but for" the defendant's actions.[11] In other words, "[i]f the result would not have occurred absent the defendant's conduct, then factual causation exists."[12] Here, the parties stipulated that 11-year-old CL used defendant's .45-caliber gun to shoot Elijah, causing his death. Defendant made a

---

[6] *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979).

[7] *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002).

[8] *Hardiman*, 466 Mich at 429.

[9] *People v Albers*, 258 Mich App 578, 582; 672 NW2d 336 (2003).

[10] *People v Tims*, 449 Mich 83, 94-95; 534 NW2d 675 (1995) (referring to common law in the absence of statutory guidance regarding the requisite causation).

[11] *People v Schaefer*, 473 Mich 418, 435-436; 703 NW2d 774 (2005), mod in part on other grounds by *People v Derror*, 475 Mich 316, 320 (2006), overruled in part by *People v Feezel*, 486 Mich 184, 188 (2010).

[12] *Schaefer*, 473 Mich at 436.

statement to Detective Patrick Lane that he kept guns in the closet in his bedroom, and crime scene technician Nathan Johnson observed two weapons in defendant's closet in the hours after the shooting. The .45-caliber firearm was on the top shelf of the closet, 81 inches off the ground, and an assault rifle was in the corner. Furthermore, defendant knew that CL had been caught near his mother's house shooting a different gun mere days before he shot Elijah. Defendant also knew that CL had found, and was playing with, his .45-caliber gun two years earlier. Thus, "but for" defendant keeping a loaded firearm in his closet—while knowing that CL was aware of the gun, had access to it, and had been involved in obtaining and shooting guns on his own, including the one used to shoot Elijah—Elijah would not have been killed. Defendant's actions were a factual cause of Elijah's death.

The prosecution must also establish that defendant's actions were the proximate cause of Elijah's death so that defendant is not convicted based on conduct that is "too remote or unnatural."[13] For defendant's actions to be a proximate cause, "the victim's injury must be a direct and natural result of the defendant's actions."[14] Defendant argues that he used ordinary care to ensure that CL could not acquire the gun by arranging for Walker to supervise CL, coming home from work to confirm that CL was supervised, and checking to see that the bedroom door was locked.

Walker testified that she was at defendant's home when defendant called her from work to ask her to watch his children, SB and CL, who their mother would soon drop off at defendant's home. Walker said that, after defendant's children arrived, she went to the store with her children, her sister, and SB, while CL remained at defendant's house with an adult resident of the home, Donald. Defendant told Detective Lane that SB called him and Walker was not present, so defendant called repeatedly to ensure that CL was monitored. Walker reported that defendant was home when her group returned from the store and she did not see Donald before defendant returned to work. Defendant told Detective Lane that he checked to make sure the bedroom door was locked when he was home around 11:00 a.m. Walker reported that she, too, checked the door to defendant's room after he returned to work and found it locked. Despite some effort by defendant to monitor CL, there was sufficient evidence for the jury to find beyond a reasonable doubt that defendant failed to use care and diligence to prevent CL from obtaining and using his loaded firearm, causing the death of Elijah.

As stated, defendant was aware that CL had a history of unsupervised involvement with guns, including possessing and shooting one without permission in the days before he shot Elijah. Defendant also knew that he had to safeguard his firearms from CL because CL had found the .45-caliber weapon a couple years before the shooting and was playing with the gun, causing defendant to decide to keep his bedroom door locked. Defendant explicitly told Detective Lane that he was concerned about CL on the date of the shooting, because CL had recently obtained a gun and would often snoop around the home. However, defendant could not have ensured that his bedroom door was locked before he went to work that morning because

---

[13] *Id.*

[14] *Id.* (quotation marks and citation omitted).

Walker reported that she slept in defendant's bedroom the night before and she shut, but could not lock, the door when she left the room after defendant had gone to work. Walker reported that defendant's closet door did not have a door knob, and there was no evidence that the closet door had a lock, that the bedroom windows locked, or that the guns were stored in a locked case or equipped with trigger locks. Thus, defendant's failure to secure or disarm the gun while CL was at the house, particularly in light of CL's apparent fascination with firearms, including the one that was used to shoot Elijah, was sufficient for the jury to find beyond a reasonable doubt that Elijah's death was "a direct and natural result" of defendant's actions.

Defendant argues that Walker's and Donald's failure to supervise CL closely enough to prevent him from accessing the gun was an intervening and superseding factor, negating defendant's actions as a proximate cause of Elijah's death. Where an intervening cause supersedes a defendant's actions "as a legally significant causal factor, then the defendant's conduct will not be deemed a proximate cause of the victim's injury."[15] Whether an intervening cause supersedes and severs the causal link is a question of reasonable foreseeability.[16] The Court in *Schaefer* discussed the analysis, as such:

> The linchpin in the superseding cause analysis, therefore, is whether the intervening cause was foreseeable based on an objective standard of reasonableness. If it was reasonably foreseeable, then the defendant's conduct will be considered a proximate cause. If, however, the intervening act by the victim or a third party was not reasonably foreseeable—e.g., *gross* negligence or intentional misconduct—then generally the causal link is severed and the defendant's conduct is not regarded as a proximate cause of the victim's injury or death.[17]

Undoubtedly, as Walker admitted, she lost sight of CL while she was supervising him. However, the fact that the adults who were supervising CL in defendant's absence were unable to prevent CL from obtaining the firearm was reasonably foreseeable. Most notably, neither adult was aware that there was a gun in the home. Further, Walker was asked to supervise defendant's two children while she already had her own three young children with her, and Donald reported that he left for the day shortly after defendant's children arrived, leaving them in Walker's care. It was not clear from the evidence whether CL obtained the gun by entering defendant's room before he returned to lock it, by entering through an unlocked window, or by some other method. However, it was reasonably foreseeable that Walker and Donald could not keep CL away from a gun that they did not know about, particularly when there were four younger children to supervise. Likewise, their failure to fulfill a responsibility of which they were not aware cannot be considered grossly negligent or characterized as intentional misconduct.

---

[15] *Id.* at 437.

[16] *Id.*

[17] *Id.* at 437-438.

-4-

In sum, when viewed in the light most favorable to the prosecution, the evidence was sufficient to find beyond a reasonable doubt that defendant's actions were the cause of Elijah's death and to convict defendant of involuntary manslaughter.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues that his trial counsel provided ineffective assistance by failing to show the jury a portion of surveillance video and not requesting an instruction regarding proximate cause. A defendant's right to counsel is guaranteed by the United States and Michigan Constitutions.[18] This "right to counsel encompasses the right to the 'effective' assistance of counsel."[19] In order to demonstrate an ineffective assistance of counsel claim, a defendant must show "that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense."[20] A counsel's performance is deficient if "it fell below an objective standard of professional reasonableness."[21] "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise."[22] Defendant must also show that the resultant proceedings were fundamentally unfair or unreliable.[23]

Defendant argues that the performance of his trial counsel was deficient because he failed to display evidence or request jury instructions that supported his theory of defense, i.e., that his negligence did not cause Elijah's death. The United States Constitution provides criminal defendants with the right "to present a complete defense."[24] "Few rights are more fundamental than that of an accused to present evidence in his or her own defense."[25] Criminal defendants have the right to submit evidence that could influence the jury's determination of guilt.[26]

Defendant contends that his trial counsel should have presented the home's surveillance video of CL. Defendant asserts that "he watched the videotape of the surveillance cameras and he saw footage of [CL] going toward the back of the house and it was clear that he went in the window and retrieved the gun in the morning while Ms. Walker was at the store with the other children." Defendant submitted an affidavit similarly stating that the surveillance video showed

---

[18] US Const, Am VI; Const 1963 art 1, § 20.

[19] *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007).

[20] *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007) (citation omitted).

[21] *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

[22] *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2002).

[23] *People v Odom*, 276 Mich App 407, 415; 740 NW2d 557 (2007).

[24] *People v King*, 297 Mich App 465, 473; 824 NW2d 258 (2012) (quotation marks and citation omitted).

[25] *Unger*, 278 Mich App at 249.

[26] *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006).

CL walking unsupervised to the back of the house and then into the vehicle where Elijah was shot.

However, defendant's assertion concerning the video was contradicted at trial. Johnson testified that there were four security cameras on the home with the monitors in defendant's bedroom, and that the backyard cameras showed an alley, garage, and a portion of the car where Elijah was shot. Police Sergeant Steven Ford extracted video from the surveillance system for the period between 12:30 and 1:19 p.m. on August 3, 2015, some of which was played for the jury, and Ford reported that none of the cameras pointed at the window to defendant's bedroom. Thus, apart from defendant's unsubstantiated assertion, there is no reason to believe that additional surveillance footage would showed CL entering the house through defendant's bedroom window, and the performance of defendant's trial counsel could not be deficient for not presenting evidence that was unavailable.

Most significantly, defendant's theory that the failure of the other adults to adequately supervise CL allowed CL to obtain and use the gun was presented to the jury. As stated, Walker testified that she could not lock the bedroom door after she left the room in the morning, that she left CL at the home with Donald while she took all the other children to the store, and that she lost sight of CL after returning to the home. Defendant's trial counsel argued in closing that defendant took ordinary care to ensure that adults were supervising CL, including coming home to make sure CL was supervised and the bedroom door was locked. Counsel also emphasized that defendant locked the gun in his bedroom and that it was unknown how CL acquired it. Thus, defendant's closing argument squarely placed the responsibility for supervising CL during the time he was thought to obtain the gun on the adults defendant trusted to supervise his children, and the performance of defendant's trial counsel regarding the presentation of surveillance video did not deprive defendant of presenting this defense.

Counsel's performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different."[27] The parties stipulated that CL used defendant's gun from his closet to shoot Elijah. Defendant argued in closing that the evidence did not demonstrate how CL accessed the closet, just that defendant had locked the door and other adults were supervising CL. However, while acknowledging that it was unknown how CL obtained the gun because he was sneaking, the prosecution maintained that the manner in which CL retrieved the gun was irrelevant because defendant's gross negligence was in failing to adequately secure the gun from CL. Thus, evidence suggesting that CL may have obtained the gun by sneaking through a window would not have exonerated defendant because the jury knew of that possibility and was asked to decide the case based on defendant's level of negligence in failing to properly secure the gun.

Defendant also argues that the performance of his trial counsel was deficient in failing to request a jury instruction regarding proximate cause and intervening and superseding events. A

---

[27] *Jordan*, 275 Mich App at 667.

-6-

defendant has the right to "a properly instructed jury."[28]   "[T]he trial court is required to instruct the jury concerning the law applicable to the case and fully and fairly present the case to the jury in an understandable manner."[29]   "[J]ury instructions must include all the elements of the charged offenses" and cannot exclude "material issues, defenses, and theories" where there is supporting evidence.[30]

The trial court instructed the jury:

> There maybe [sic] more than one cause of death.   It is not enough that defendant's act made it possible for the death though [sic] to occur.   In order to find the defendant caused the death of [the] victim you must find that the death was a natural or necessary result of defendant's act, that is, you must find beyond a reasonable doubt that the harm which resulted from defendant's conduct was to an ordinary person a reasonably foreseeable consequence of the conduct.

As stated, for defendant's actions to be a proximate cause, "the victim's injury must be a direct and natural result of the defendant's actions,"[31] and the trial court instructed the jury accordingly.   Further, by instructing the jury that the resulting harm must have been a reasonably foreseeable consequence of defendant's conduct, the trial court effectively conveyed to the jury the legal significance of intervening and superseding causes because whether an intervening cause supersedes and severs the causal link is a question of reasonable foreseeability.[32] Although the trial court did not specifically use the terms "intervening cause" or "superseding cause," there is no error where the instructions "fairly presented the issues to be tried and sufficiently protected the defendant's rights."[33]   Counsel was not ineffective for failing to make a futile objection to the jury instructions.[34]

### III. PRELIMINARY EXAMINATION

Lastly, defendant argues that his due process rights were violated when he had a second preliminary examination in front of a different judge.   Unpreserved claims are reviewed for plain error affecting substantial rights.[35]   Reversal is warranted only if the plain error resulted in the

---

[28] *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

[29] *Mills*, 450 Mich at 80-81.

[30] *People v McKinney*, 258 Mich App 157, 162-163; 670 NW2d 254 (2003).

[31] *Schaefer*, 473 Mich at 436 (quotation marks and citation omitted).

[32] *Id*. at 437.

[33] *People v McFall*, 224 Mich App 403, 412-413; 569 NW2d 828 (1997) (quotation marks and citation omitted).

[34] *Rodgers*, 248 Mich App at 715 (noting that counsel need not make futile objections).

[35] *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

conviction of an innocent defendant or if the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence."[36] At defendant's first preliminary examination on September 8, 2015, District Court Judge Ronald Giles dismissed the charges against defendant because there was no evidence that demonstrated what gun had been used by CL. A second preliminary examination was later held before District Court Judge Lydia Nance-Adams. Judge Nance-Adams incorporated the record from the first preliminary examination and heard additional evidence in the form of a ballistics report before binding defendant over to circuit court for trial.

With regard to preliminary hearings, MCR 6.110(F) provides:

> If, after considering the evidence, the court determines that probable cause does not exist to believe either that an offense has been committed or that the defendant committed it, the court must discharge the defendant without prejudice to the prosecutor initiating a subsequent prosecution for the same offense or reduce the charge to an offense that is not a felony. Except as provided in MCR 8.111(C), the subsequent preliminary examination must be held before the same judicial officer and the prosecutor must present additional evidence to support the charge.

MCR 8.111(C)(1) provides that the chief judge may reassign a case if a judge is disqualified or for other good cause cannot undertake an assigned case. Thus, because there was no reason of record that Judge Giles was unable to preside over the second preliminary examination, the district court erred in not holding the "subsequent preliminary examination . . . before the same judicial officer."[37]

However, we do not agree that defendant's due process rights were violated as a result of the error. "[S]ubjecting a defendant to repeated preliminary examinations violates due process if the prosecutor attempts to harass the defendant or engage in 'judge-shopping.' "[38] "Among the factors to be considered in determining whether a due process violation has occurred are the reinstitution of charges without additional, noncumulative evidence not introduced at the first preliminary examination, the reinstitution of charges to harass and judge shopping to obtain a favorable ruling."[39]

Here, the later availability of the ballistics report necessitated the subsequent preliminary examination, indicating that the prosecution's motive was not to harass defendant. Additionally, there is no evidence from which we can conclude that the prosecution had any control or

---

[36] *Id.* at 763 (quotation marks and citation omitted) (alteration in original).

[37] MCR 6.110(F).

[38] *People v Robbins,* 223 Mich App 355, 363; 566 NW2d 49 (1997).

[39] *People v Dunbar*, 463 Mich 606, 619; 625 NW2d 1 (2001) (KELLY, J., dissenting), overruled in part on other grounds by *People v Jackson*, 483 Mich 271 (2009), quoting *People v Vargo*, 139 Mich App 573, 578; 362 NW2d 840 (1984).

influence on the assignment of the case to a different judge. Both parties agreed with the procedure set forth by Judge Nance-Adams, as did defendant himself. Further, defendant never requested a transfer of the case or objected to the second judge, and the prosecution never argued for having the case remain before the second judge. These facts suggest that the assignment of defendant's second preliminary examination to Judge Nance-Adams was a procedural error or oversight and not motivated by improper "judge-shopping." Finally, for constitutional purposes, the dismissal of a case by a court following a preliminary examination does not bar a subsequent arrest, examination, and trial for the same offense because the defendant had not been placed in jeopardy.[40]

In any event, the error does not require reversal because defendant cannot demonstrate that it affected the outcome of his trial. Defendant does not argue that the evidence of the second preliminary examination should not have provided probable cause to bind him over. Further, defendant was convicted beyond a reasonable doubt of two of the three counts for which he was bound over.[41] Thus, the jury, in effect, endorsed the decision of the district court by finding that the prosecution's evidence met a higher standard of proof than that required to bind defendant over. As noted in *People v Hall*,[42] MCL 769.26 provides that any error of procedure is not error requiring reversal if the error was harmless.[43] An error does not result in a miscarriage of justice where it had no impact on the outcome of the trial.[44]

Affirmed.

/s/ Michael J. Talbot
/s/ Christopher M. Murray
/s/ Colleen A. O'Brien

---

[40] *Robbins*, 223 Mich App at 362.

[41] The jury acquitted defendant of second-degree child abuse, MCL 750.136b(3).

[42] *People v Hall*, 435 Mich 599, 603-604; 460 NW2d 520 (1990).

[43] "No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or *for error as to any matter of pleading or procedure*, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." MCL 769.26 (emphasis added).

[44] *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

EXHIBIT FOUR

| CR No: 210249546-244 | Report Type: Arrest Report | Officer: OSWILLIST (00213) | 244 |
|---|---|---|---|

## OAKLAND COUNTY SHERIFF OFFICE

1200 N TELEGRAPH ROAD
PONTIAC MI 48341
248-858-5000



### Case Report

**Administrative Details:**

| CR No | Subject |
|---|---|
| 210249546-244 | Supplement from FAT Sgt. Hendrick |
| **Report Date/Time** | **Occurrence Date/Time** |
| 11/30/2021 12:51 | 11/30/2021 12:51 |
| **Location** | **Call Source** |
| 745 N OXFORD RD | 911 |
| **Dispatched Offense** | **Verified Offense** |
| C3336 Assist Citizen | 0903 Murder - Willful Killing - Non-Family - Gun |
| **OIC** | **OIC Contact Number** |
| Willis, Timothy (OSWILLIST-00213) | |
| **County** | **City/Twp/Village** |
| 63 - Oakland | 16 - Oxford Twp |
| **Division** | |
| SIU | |
| **Report Type** | |
| Arrest Report | |
| **Created By** | **Created Date/Time** |
| TIMOTHY WILLIS | 12/23/2021 01:03 PM |
| **Verified By** | **Verified Date/Time** |
| SYSTEM | 12/23/2021 01:08 PM |
| **Approved By** | **Approved Date/Time** |
| TIMOTHY WILLIS | 12/23/2021 01:10 PM |

**Narrative:**

**12/3/21 –1215 hrs.**
Detective Hembree and I (Sgt. D. Hendrick) met with Attorney Shannon Smith at her office in Bloomfield Twp.
Smith indicated that she had been contacted by James Crumbley late in the evening on the night before 12/2/21. She stated that Crumbley was concerned about a phone call that he had missed from D/Sgt. Brian. She indicated that she told him she would reach out to D/Sgt. Brian and find out what he wanted to talk about. Smith stated that she had attempted to contact the Crumbleys multiple times on the morning of 12/3/21, however none of her texts had been returned. She provided me with cell phone numbers for herself and her partner. She then sent me a text with her name so I would have it.
**SYNOPSIS OF TEXT AND CALLS WITH SHANNON SMITH**
**12/3/21 – 1228 hrs.**
Shannon Smith
**12/3/21 – 1719 hrs.**
I just walked out of the circuit court. Got your message. I'm trying to call my partner. I have about 400 texts and calls I haven't looked at
**12/3/21 – 1721 hrs. Sent by Me**
Thanks

| CR No: 210249546-244 | Report Type: Arrest Report | Officer: OSWILLIST (00213) | **244** |
|---|---|---|---|

**12/3/21 – 1724 hrs.**
It's a hell of a day. My house was listed for sale so I have my 4 kids and 4 dogs at my office this afternoon and evening while my house is being shown
So I'll get in touch with my partner and figure out what's going on. I told her to tell them they needed to come back here.

**12/3/21 – 1733 hrs. Sent by Me**
I told Mariel that we would be happy to meet them anywhere in the State so that we can safely and without media take them into custody. If they get pulled over the officers could conduct a felony stop and have the laying face down in the street. I would like to avoid all of that if possible. Feel free to give them my number and I will give them my word that it will go smoothly.

**12/3/21 – 2234 hrs.**
They are terrified because they were expecting me to get info because Karen M told me she'd get back to me this morning. I do not know where they are but they assured me they are heading back and will call me so we can get them arraigned.
I was in trial all day…Mariell was flying back from a family trip to Florida so our whole day ended up being phone tag and at least 100 people texting us blowing up our phones.
My best guess from talking to them is that ill be texting you at 7 am tomorrow. I wish the media would chill out on this because it's terrifying on top of a huge sad awful case. But I'll text you in the AM. I have talked to them by phone several times tonight. The dads cell phone died and they have no way to charge it so some of the calling issues were due to that. But we have Jennifer's number and THEY ARE COMING.

**12/3/21 – 2243 hrs. Sent by Me**
Ok I understand they are scared but there best bet for a quiet surrender is to contact me.

**12/3/21 -2244 hrs.**
Thank you. I've told them it needs to be ASAP and they do get it.

**12/3/21 2247 hrs. Sent by Me**
I'm sure you realize the longer they hide the higher the bond request is going to be

**12/3/21 2247 hrs.**
Absolutely
I would have brought them in today but I couldn't get any info fast enough.
They initially asked if they could go in Monday am and Mariell and I said no.
Today was also insane for me personally. I am selling my house and there was an open house today so my four kids, four dogs, snd cat were at my office while I was in trial.
I'm not normally such a hot mess trying to coordinate things. ¿¿¿¿¿¿
We will get them in. They wouldn't have paid us what they paid if they plan to run.

**12/3/21 2254 hrs. Sent by Me**
Ok you have my number

**12/3/21 2347 hrs.**
I called Smith and advised her that the vehicle had been located and that there were several officers, K9 Units, and helicopter searching for the Crumbleys. I advised her to contact them and tell them to surrender to us.

**12/3/21 2349 hrs.**
I received a call from Smith who stated the Jennifer Crumbleys phone was off and that she was unable to reach her.

**12/4/21 0028 hrs.**
I still can't get through on the wife's phone. Were they apprehended

**12/4/21 0031 hrs. Sent by Me**
Not yet but I bet there getting cold

# EVIDENCE LIST

**Incident No.:  210249546-244**      **Agency:  Oakland County Sheriff Office**

| ITEM | NEEDED | IN-FILE | COMMENTS |
|---|---|---|---|
| Audio/Video Tape and Transcripts | ( ) | ( ) | |
| Autopsy Report | ( ) | ( ) | |
| BAC/Blood/Semen | ( ) | ( ) | |
| Ballistics/Bullets | ( ) | ( ) | |
| Chain of Evidence List | ( ) | ( ) | |
| Clothing/Shoes | ( ) | ( ) | |
| Confession (written, audio, video) | ( ) | ( ) | |
| Controlled Substance (Tox Report) | ( ) | ( ) | |
| Criminal History | ( ) | ( ) | |
| CSC Kit | ( ) | ( ) | |
| Diagram Map | ( ) | ( ) | |
| Finger/Foot Prints | ( ) | ( ) | |
| Hair/Fiber | ( ) | ( ) | |
| Hospital/Medical Records | ( ) | ( ) | |
| Photographs/Slides | ( ) | ( ) | |
| Weapons | ( ) | ( ) | |
| Witness Statements | ( ) | ( ) | |
| CERTIFIED RECORDS | ( ) | ( ) | |
| SOS | ( ) | ( ) | |
| Convictions | ( ) | ( ) | |
| | ( ) | ( ) | |
| | ( ) | ( ) | |
| | ( ) | ( ) | |
| OTHER PHYSICAL EVIDENCE | ( ) | ( ) | |
| VICTIM PROPERTY | | | |
| | ( ) | ( ) | |
| | ( ) | ( ) | |
| | ( ) | ( ) | |

_____
Officer In Charge                    Date                Phone No.

The Prosecuting Attorney's Office certifies that (*) property belonging to the crime victim must be retained by the Law Enforcement Agency for trial purposes in lieu of photograph or other means of memorialization pursuant to 1985 PA 87

_____
Assistant Prosecutor                        Date

EXHIBIT FIVE A

**Flagstar Bank**

Pay by mail
Flagstar Bank · PO Box 660263
Dallas, TX 75266-0263

**DELINQUENT MORTGAGE STATEMENT**

STATEMENT CREATION DATE: 10/18/21

Loan Number: 504959113
Payment Due Date: 11/01/21
Amount Due $11,358.25
$27.51 late fee will be charged after 11/16/21

JENNIFER L CRUMBLEY
112 EAST ST
OXFORD MI 48371-4943

Pay by website:
flagstar.com/MyLoans

Pay by phone:
(866) 837-4529

Customer service:
(800) 968-7700
Monday-Friday 7:30 a.m.-8 p.m. ET
Saturday 7:30 a.m.-4 p.m. ET

## Important Account Messages

At Flagstar, the health and well-being of our customers, employees, and communities is a top priority. To learn more about how we are here to help, as well as information on temporary mortgage relief visit flagstar.com/update.

Wondering the safest way to manage your mortgage, right now? MyLoans is a secure, fast and easy way for you to manage your loans online. Set up paperless statements and electronic payments when you sign up for MyLoans at flagstar.com/myloans.

You recently had an escrow analysis. This may or may not have affected your payment amount. If there was a change, the details can be found by visiting the website referenced above.

## Review Home Loan Activity

### Account Information

| | |
|---|---|
| Property Address | 112 EAST ST |
| Outstanding Principal | $76,828.31 |
| Escrow Balance | ($52,690.82) |
| Interest Rate | 5.13000% |
| Prepayment Penalty | No |

The outstanding principal above is not the total amount required to pay the loan in full. For a payoff quote, please visit flagstar.com/myloans.

### Delinquency Notice

**The mortgage payments are late.** The loan became delinquent on 08/22/20. Failure to bring the loan current may result in fees and foreclosure - the loss of the home. As of 10/18/21 the mortgage loan is 443 days delinquent.

**Recent Account History**
• Payment due 05/01/21 — Unpaid balance of $691.40
• Payment due 06/01/21 — Unpaid balance of $691.40
• Payment due 07/01/21 — Unpaid balance of $691.40
• Payment due 08/01/21 — Unpaid balance of $691.40
• Payment due 09/01/21 — Unpaid balance of $691.40
• Payment due 10/01/21 — Unpaid balance of $691.40
Total Fees & Advances: $500

**Total Due - $11,358.25:** You must pay this amount to bring the loan current. This includes the next regularly scheduled payment.
**Loss Mitigation Program Status** - The mortgage is currently on an active Loss Mitigation option. If you have any questions about this option, please call the Loss Mitigation Department at (800) 393-4887, Monday-Friday, 8:30 a.m.-7 p.m. ET.

**If you are experiencing financial difficulty,** see the reverse side for information about mortgage counseling and assistance.

### Explanation of Amount Due

| | |
|---|---|
| Principal | $108.45 |
| Interest | $321.72 |
| Escrow | |
| Taxes | $181.83 |
| Insurance | $91.00 |
| Shortage | $2.58 |
| Regular Monthly Payment | $705.58 |
| Overdue Payment | $10,652.67 |
| **Total** | **$11,358.25** |

### Payment Breakdown

| | Last Payment | Paid year to date |
|---|---|---|
| Principal | $101.30 | $101.30 |
| Interest | $328.87 | $328.87 |
| Escrow | $355.12 | $355.12 |
| **Total** | **$785.29** | **$785.29** |
| Taxes | | $1,733.65 |
| **Total** | | **$1,733.65** |

Equal Housing Lender    Member FDIC

Page 1 of 2

(Detach and return the bottom portion with payment. Retain the top portion for your records.)

**Flagstar Bank**

JENNIFER L CRUMBLEY

Flagstar Bank
PO Box 660263
Dallas, TX 75266-0263

| Loan Number | Due Date | Total Amount Due |
|---|---|---|
| 504959113 | 11/01/21 | $11,358.25 |

| If Not Received By: | 11/16/21 | Amount Due |
|---|---|---|
| | | $11,379.76 |

| | |
|---|---|
| Additional Principal | $ |
| Additional Escrow (if applicable) | $ |
| Total Fees (includes late charges) | $ |
| Total Advances | $ |
| Additional Payment(s) | $ |
| **Total Amount Enclosed** | $ |

2745049591133000141116000070556 62

EXHIBIT FIVE B



**Flagstar Bank**

Pay by mail:
Flagstar Bank - PO Box 660263
Dallas, TX 75266-0263

» DELINQUENT MORTGAGE STATEMENT

STATEMENT CREATION DATE: 10/18/21

Loan Number: 504959113
**Payment Due Date: 11/01/21**
**Amount Due $11,358.25**
$21.51 late fee will be charged after 11/16/21

1-655-27717-0107080-022-1-000-010-000-000

JENNIFER L CRUMBLEY
112 EAST ST
OXFORD MI 48371-4943

Pay by website:
flagstar.com/MyLoans

Pay by phone:
(866) 837-4539

Customer service:
(800) 968-7700
Monday-Friday 7:30 a.m.-8 p.m. ET
Saturday 7:30 a.m.-4 p.m. ET

## Important Account Messages

At Flagstar, the health and well-being of our customers, employees, and communities is a top priority. To learn more about how we are here to help, as well as information on temporary mortgage relief visit flagstar.com/update.

Wondering the safest way to manage your mortgage, right now? MyLoans is a secure, fast and easy way for you to manage your loans online. Set up paperless statements and electronic payments when you sign up for MyLoans at flagstar.com/myloans.

You recently had an escrow analysis. This may or may not have affected your payment amount. If there was a change, the details can be found by visiting the website referenced above.

## Review Home Loan Activity

### Account Information

| | |
|---|---|
| Property Address | 112 EAST ST |
| Outstanding Principal² | $76,828.31 |
| Escrow Balance | ($2,890.82) |
| Interest Rate | 5.13000% |
| Prepayment Penalty | No |

²The outstanding principal above is not the total amount required to pay the loan in full. For a payoff quote, please visit flagstar.com/myloans

### Delinquency Notice

**The mortgage payments are late. The loan became delinquent on** 08/30/20. Failure to bring the loan current may result in fees and foreclosure - the loss of the home. As of 10/18/21 the mortgage loan is 443 days delinquent.

**Recent Account History**
• Payment due 01/01/21 — Unpaid balance of $691.40
• Payment due 06/01/21 — Unpaid balance of $691.40
• Payment due 07/01/21 — Unpaid balance of $691.40
• Payment due 08/01/21 — Unpaid balance of $691.40
• Payment due 09/01/21 — Unpaid balance of $691.40
• Payment due 10/01/21 — Unpaid balance of $691.40
Total Fees & Advances: $0.00

**Total Due - $11,358.25:** You must pay this amount to bring the loan current. This includes the next regularly scheduled payment.

**Loss Mitigation Program Status -** The mortgage is currently on an active Loss Mitigation option. If you have any questions about this option, please call the Loss Mitigation Department at (800) 393-4887, Monday-Friday, 8:30 a.m.-7 p.m. ET.

**If you are experiencing financial difficulty,** see the reverse side for information about mortgage counseling and assistance.

### Explanation of Amount Due

| | |
|---|---|
| Principal | $108.45 |
| Interest | $321.72 |
| Escrow | |
|   Taxes | $181.83 |
|   Insurance | $91.00 |
|   Shortage | $2.58 |
| Regular Monthly Payment | $705.58 |
| Overdue Payment | $10,652.67 |
| **Total** | **$11,358.25** |

### Payment Breakdown

| | Last Payment | Paid year to date |
|---|---|---|
| Principal | $101.30 | $101.30 |
| Interest | $328.87 | $328.87 |
| Escrow | $355.12 | $355.12 |
| **Total** | **$785.29** | **$785.29** |
| Taxes | | $1,733.65 |
| **Total** | | **$1,733.65** |

Equal Housing Lender    Member FDIC

Page 1 of 2

(Detach and return the bottom portion with payment. Retain the top portion for your records.)

**Flagstar Bank**

JENNIFER L CRUMBLEY

Flagstar Bank
PO Box 660263
Dallas, TX 75266-0263

| Loan Number | Due Date | Total Amount Due |
|---|---|---|
| 504959113 | 11/01/21 | $11,358.25 |

If Not Received By: 11/16/21    **Amount Due**
$11,379.76

| | |
|---|---|
| Additional Principal | $ |
| Additional Escrow (if applicable) | $ |
| Total Fees (includes late charges) | $ |
| Total Advances | $ |
| Additional Payment(s) | $ |
| **Total Amount Enclosed** | $ |

2745049591133000141116000070558 2

EXHIBIT SIX



SMITH LEHMAN, PC
1668 SOUTH TELEGRAPH ROAD
SUITE 200
BLOOMFIELD HILLS, MI 48302

SHANNON SMITH, ESQ.
MARIELL LEHMAN, ESQ.
PHONE: (248) 636-2595
www.smith-lehman.com

## SMITH LEHMAN

December 17, 2021

Karen McDonald
Oakland County Prosecutor's Office
1200 N. Telegraph Road
Pontiac, MI 48341

*Re: 112 East Street*
*Oxford, MI 48371*

Dear Ms. McDonald:

As you are aware, we represent James and Jennifer Crumbley in the matter that is currently pending in the 52-3 District Court. We have been notified by an individual associated with the family that the individual is working to list the above-listed residence for sale and will have a number of people in and out of the residence from December 18, 2021 through December 24, 2021 to prepare the residence for sale. The individual advised that access to the residence is limited to those with authority to be there.

We have been notified that the following people, who are employed by A&A Moving and a cleaning company, are authorized to be at the residence during the above-listed dates:
- Tina Moore
- Mary Stewart
- Mike McGregor
- Steve Culimore

If you have any questions or concerns, please feel free to contact my office or you can reach me on my cell phone (248) 563-3652.

Very truly yours,

Mariell Lehman
Smith Lehman, P.C.

cc: Detective Timothy Willis