UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RILEY FRANZ, and JEFFREY FRANZ
and BRANDI FRANZ, as NEXT FRIEND
for ISABELLA FRANZ, a Minor,

Plaintiffs,                                    Hon. Mark A. Goldsmith
                                               Magistrate Anthony P. Patti
v                                              No. 21-12871

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,            ┌─────────────────────────┐
NICHOLAS EJAK, SHAWN HOPKINS,           │   **OXFORD**             │
PAMELA FINE, JACQUELYN KUBINA,          │   **DEFENDANTS'**        │
ALLISON KARPINSKI and BECKY             │   **MOTION TO**          │
MORGAN,                                 │   **DISMISS**            │
                                        │   **PURSUANT TO**        │
Defendants.                             │   **FED. R. CIV. P. 12(c)** │
                                        └─────────────────────────┘
_____/

Geoffrey N. Fieger (P30441)                Timothy J. Mullins (P28021)
James J. Harrington (P65351)               Kenneth B. Chapie (P66148)
Robert G. Kamenec (P35283)                 John L. Miller (P71913)
Nora Y. Hanna (P80067)                     Annabel F. Shea (P83750)
Milica Filipovic (P80189)                  Giarmarco, Mullins & Horton, P.C.
Fieger, Fieger, Kenney & Harrington, P.C.  *Attorneys for Defendants*
*Attorneys for Plaintiffs*                 101 W. Big Beaver Road, 10th Floor
19390 West Ten Mile Road                   Troy, MI 48084-5280
Southfield, MI 48075                       (248) 457-7020
(248) 355-5555                             tmullins@gmhlaw.com
g.fieger@fiegerlaw.com                     kchapie@gmhlaw.com
j.harrington@fiegerlaw.com                 jmiller@gmhlaw.com
r.kamenec@fiegerlaw.com                    ashea@gmhlaw.com
n.hanna@fiegerlaw.com
m.filipovic@fiegerlaw.com

SANDRA A. CUNNINGHAM, Next Friend
of P.A., a minor,

        Plaintiff,                          Hon. Mark A. Goldsmith
                                                Magistrate Anthony P. Patti
v                                                No. 22-11398

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK and SHAWN HOPKINS,

        Defendants.

_____/

Wolfgang Mueller (P43728)             Timothy J. Mullins (P28021)
Mueller Law Firm                       Kenneth B. Chapie (P66148)
*Attorney for Plaintiff*                 John L. Miller (P71913)
41850 W. 11 Mile Road, Suite 101     Annabel F. Shea (P83750)
Novi, MI 48375                        Giarmarco, Mullins & Horton, P.C.
(248) 489-9653                       *Attorneys for Defendants*
wolf@wolfmuellerlaw.com          101 W. Big Beaver Road, 10th Floor
                                        Troy, MI 48084-5280
                                          (248) 457-7020
                                          tmullins@gmhlaw.com
                                          kchapie@gmhlaw.com
                                          jmiller@gmhlaw.com
                                          ashea@gmhlaw.com

ii

NICOLETTE ASCIUTTO, as Next
Friend of JOHN ASCIUTTO and
ANTHONY ASCIUTTO II, minors;
and JOHN VACKARO as Next Friend
of MARCO VACKARO, a Minor,

       Plaintiffs,                Judge Mark A. Goldsmith
                              Magistrate Anthony P. Patti

v                                 No. 22-10407

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK, PAM PARKER FINE,
SHAWN HOPKINS, JACQUELYN KUBINA,
ALLISON KARPINSKI and BECKY MORGAN,

       Defendants.
_____/

| | |
|---|---|
| ROBERT M. GIROUX (P47966) | TIMOTHY J. MULLINS (P28021) |
| ANDREW J. LAURILA (P78880) | KENNETH B. CHAPIE (P66148) |
| Giroux Trial Attorneys, P.C. | JOHN L. MILLER (P71913) |
| *Attorneys for Plaintiffs* | ANNABEL F. SHEA (P83750) |
| 28588 Northwestern Highway, Suite 100 | Giarmarco, Mullins & Horton, P.C. |
| Southfield, MI  48034 | *Attorneys for Defendants* |
| (248) 531-8665 | 101 W. Big Beaver Road, 10th Floor |
| rgiroux@greatMIattorneys.com | Troy, MI 48084-5280 |
| alaurila@greatmiattorneys.com | (248) 457-7020 |
| | tmullins@gmhlaw.com |
| | kchapie@gmhlaw.com |
| | jmiller@gmhlaw.com |
| | ashea@gmhlaw.com |

NICOLE BEAUSOLEIL, Personal
Representative of the Estate of Madisyn
Baldwin, Deceased,

   Plaintiff,       Hon. Mark A. Goldsmith
             Magistrate David R. Grand
v             No. 22-11250

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK and SHAWN HOPKINS,

   Defendants.

_____/

| | |
|---|---|
| Wolfgang Mueller (P43728) | Timothy J. Mullins (P28021) |
| Mueller Law Firm | Kenneth B. Chapie (P66148) |
| *Attorney for Plaintiff* | John L. Miller (P71913) |
| 41850 W. 11 Mile Road, Suite 101 | Annabel F. Shea (P83750) |
| Novi, MI 48375 | Giarmarco, Mullins & Horton, P.C. |
| (248) 489-9653 | *Attorneys for Defendants* |
| wolf@wolfmuellerlaw.com | 101 W. Big Beaver Road, 10th Floor |
| | Troy, MI 48084-5280 |
| | (248) 457-7020 |
| | tmullins@gmhlaw.com |
| | kchapie@gmhlaw.com |
| | jmiller@gmhlaw.com |
| | ashea@gmhlaw.com |

iv

G.J., a Minor, by his Next Friend,
Andrea Jones, et al,

           Plaintiffs,                   Judge Mark Goldsmith

v                                    No. 22-11360

OXFORD COMMUNITY SCHOOLS,
KENNETH WEAVER, STEVEN WOLF,
NICHOLAS EJAK and SHAWN HOPKINS,

           Defendants.

_____/

MANVIR S. GREWAL, SR. (P48082)
SCOTT WEIDENFELLER (P56001)
Grewal Law, PLLC
*Attorneys for Plaintiffs*
345 E. Cady St., 3rd Floor
Northville, MI  48167
(517)393-3000
sweidenfeller@4grewal.com

AMY L. MARINO (P76998)
Marino Law PLLC
*Attorneys for Plaintiffs*
18977 W. Ten Mile Road, Suite 100E
Southfield, MI  48075
(248)797-9944
amy@marinopllc.com

TIMOTHY J. MULLINS (P28021)
KENNETH B. CHAPIE (P66148)
JOHN L. MILLER (P71913)
ANNABEL F. SHEA (P83750)
Giarmarco, Mullins & Horton, P.C.
*Attorneys for Defendants*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
kchapie@gmhlaw.com
jmiller@gmhlaw.com
ashea@gmhlaw.com

v

MATTHEW MUELLER and MARY
MUELLER as Co-Next Friends for
E.M., a minor,                                             Hon. Mark Goldsmith
                                                          No. 22-11448

        Plaintiff,

v

OXFORD COMMUNITY SCHOOLS,
SHAWN HOPKINS, NICHOLAS EJAK,
TIMOTHY THRONE, STEVEN WOLF,
KENNETH WEAVER and ACME
SHOOTING GOODS, LLC,

        Defendants.
_____/

| | |
|---|---|
| Matthew L. Turner (P48706) | Timothy J. Mullins (P28021) |
| Lisa M. Esser (P70628) | Kenneth B. Chapie (P66148) |
| Sommers Schwartz, P.C. | John L. Miller (P71913) |
| *Attorneys for Plaintiff* | Annabel F. Shea (P83750) |
| One Towne Square, Suite 1700 | Giarmarco, Mullins & Horton, P.C. |
| Southfield, MI 48076 | *Attorneys for Defendants Oxford, Hopkins,* |
| (248) 355-0300 | *Ejak, Throne, Wolf and Weaver* |
| mturner@sommerspc.com | 101 W. Big Beaver Road, 10th Floor |
| lesser@sommerspc.com | Troy, MI 48084-5280 |
| | (248) 457-7020 |
| Jonathan E. Lowy | tmullins@gmhlaw.com |
| Erin C. Davis | kchapie@gmhlaw.com |
| Robert Cross | jmiller@gmhlaw.com |
| *Co-Counsel for Plaintiff* | ashea@gmhlaw.com |
| 840 Street NE, Suite 400 | |
| Washington DC 20002 | Thomas J. Rheaume (P74422) |
| (202) 370-8106 | Donovan S. Asmar (P77951) |
| jlowy@bradyunited.org | Fawzeih H. Daher (P82995) |
| edavis@bradyunited.org | Bodman PLC |
| rcross@bradyunited.org | *Attorney for Defendant Acme Shooting* |
| | *Goods, LLC* |
| | 201 W. Big Beaver Road, Suite 500 |
| | Troy, MI 48084 |
| | (248) 743-6000 |
| | trheaume@bodmanlaw.com |
| | dasmar@bodmanlaw.com |
| | fdaher@bodmanlaw.com |

vi

WILLIAM MYRE, and SHERI MYRE,
as co-personal representatives of the Estate
of T.M., Deceased; CRAIG SHILLING, and
JILL SOAVE, as co-personal representatives
of the Estate of J. S., Deceased; CHAD
GREGORY, as Next Friend for K. G., a minor;
LAUREN ALIANO, as Next Friend for S.K.,
a minor, and G.K., a minor; and LAURA LUCAS,
as Next Friend for A.S., a minor,

    Plaintiffs,         Judge Mark A. Goldsmith

v               No. 22-11113

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK, SHAWN HOPKINS,
KENNETH WEAVER, PAM PARKER
FINE, JACQUELINE KUBINA, BECKY
MORGAN and ALLISON KARPINSKI,

    Defendants.
_____/

| | |
|---|---|
| VEN JOHNSON (P39219) | TIMOTHY J. MULLINS (P28021) |
| JEFFREY T. STEWART (P24138) | KENNETH B. CHAPIE (P66148) |
| KANWARPREET S. KHAHRA (P80253) | JOHN L. MILLER (P71913) |
| CHRISTOPHER DESMOND (P71493) | ANNABEL F. SHEA (P83750) |
| Johnson Law, PLC | Giarmarco, Mullins & Horton, P.C. |
| *Attorneys for Plaintiffs* | *Attorneys for Defendants* |
| 535 Griswold St., Suite 2632 | 101 W. Big Beaver Road, 10th Floor |
| Detroit, MI 48226 | Troy, MI 48084-5280 |
| (313) 324-8300 | (248) 457-7020 |
| vjohnson@venjohnsonlaw.com | tmullins@gmhlaw.com |
| jstewart@venjohnsonlaw.com | kchapie@gmhlaw.com |
| kkhahra@venjohnsonlaw.com | jmiller@gmhlaw.com |
| cdesmond@venjohnsonlaw.com | ashea@gmhlaw.com |

KYLIE OSSEGE,

      Plaintiff,                          Hon. Mark A. Goldsmith
                                            Magistrate Judge Anthony P. Patti

v                                                No. 22-11251

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK and SHAWN HOPKINS,

      Defendants.

_____/

| | |
|---|---|
| Deborah L. Gordon (P27058) | Timothy J. Mullins (P28021) |
| Elizabeth Marzotto Taylor (P82061) | Kenneth B. Chapie (P66148) |
| Sarah Gordon Thomas (P83935) | John L. Miller (P71913) |
| Molly Savage (P84472) | Annabel F. Shea (P83750) |
| Deborah Gordon Law | Giarmarco, Mullins & Horton, P.C. |
| *Attorneys for Plaintiffs* | *Attorneys for Defendants* |
| 33 Bloomfield Hills Parkway, Suite 220 | 101 W. Big Beaver Road, 10th Floor |
| Bloomfield Hills, MI  48304 | Troy, MI 48084-5280 |
| (248) 258-2500 | (248) 457-7020 |
| dgordon@deborahgordonlaw.com | tmullins@gmhlaw.com |
| emarzottotaylor@deborahgordonlaw.com | kchapie@gmhlaw.com |
| sthomas@deborahgordonlaw.com | jmiller@gmhlaw.com |
| msavage@deborahgordonlaw.com | ashea@gmhlaw.com |

STEVE ST. JULIANA, Personal
Representative of the Estate of HANA
ST. JULIANA, deceased, and REINA
ST. JULIANA, a minor, by her NEXT
FRIEND, STEVE ST. JULIANA,

        Plaintiffs,             Judge Mark A. Goldsmith
                                  Magistrate Judge Anthony P. Patti

v                                  No. 22-10805

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, NICHOLAS EJAK,
SHAWN HOPKINS and KENNETH WEAVER,

        Defendants.
_____/

Michael L. Pitt (P24429)
Beth Rivers (P33614)
Megan Bonanni (P52079)
Kevin Carlson (P67704)
Danielle Canepa (P82237)
Pitt, McGehee, Palmer Bonanni & Rivers, PC
*Attorneys for Plaintiffs*
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

Timothy J. Mullins (P28021)
Kenneth B. Chapie (P66148)
John L. Miller (P71913)
Annabel F. Shea (P83750)
Giarmarco, Mullins & Horton, P.C.
*Attorneys for Defendants*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
kchapie@gmhlaw.com
jmiller@gmhlaw.com
ashea@gmhlaw.com

ix

JARROD WATSON, and LINDA WATSON,
as co-Next Friends for A.W., a minor; and
JARROD WATSON and LINDA WATSON,
Individually,

        Plaintiffs,                          Judge Mark A. Goldsmith

v                                       No. 22-11959

OXFORD COMMUNITY SCHOOLS,
TIMOTHY THRONE, STEVEN WOLF,
NICHOLAS EJAK, PAM PARKER FINE,
SHAWN HOPKINS, KIMBERLY POTTS
and KENNETH WEAVER

        Defendants.

_____/

| | |
|---|---|
| TODD F. FLOOD (P58555) | TIMOTHY J. MULLINS (P28021) |
| VINCENT J. HAISHA (P76506) | KENNETH B. CHAPIE (P66148) |
| FLOOD LAW, PLLC | JOHN L. MILLER (P71913) |
| *Attorneys for Plaintiffs* | ANNABEL F. SHEA (P83750) |
| 155 W. Congress St., Ste. 603 | Giarmarco, Mullins & Horton, P.C. |
| Detroit, MI 48226 | *Attorneys for Defendants* |
| (248) 547-1032 | 101 W. Big Beaver Road, 10th Floor |
| tflood@floodlaw.com | Troy, MI 48084-5280 |
| vhaisha@floodlaw.com | (248) 457-7020 |
| | tmullins@gmhlaw.com |
| | kchapie@gmhlaw.com |
| | jmiller@gmhlaw.com |
| | ashea@gmhlaw.com |

x

# **TABLE OF CONTENTS**

Statement Regarding Concurrence Pursuant to LR 7.1(a)................................. xi

STATEMENT OF ISSUES PRESENTED AND MOST
APPROPRIATE AUTHORITY ........................................................................ xiv

INTRODUCTION ...............................................................................................1

PLAINTIFFS' ALLEGATIONS ..........................................................................4

1.      Procedural History ........................................................................4

2       Plaintiffs Argue that EC was a Preexisting Danger before
        Defendants' Involvement ..............................................................5

3.      EC's Alleged Conduct that Defendants did NOT Know of ........................6

4.      What Plaintiffs Claim the District Knew about EC Before the
        Shooting .........................................................................................7

STANDARD OF REVIEW ................................................................................12

LAW AND ARGUMENT ..................................................................................13

I.      The Individual Oxford Defendants are Entitled to Qualified
        Immunity.........................................................................................13

        1.      The Individual Oxford Defendants did not Violate a
                Constitutional Right ........................................................14

                A.      No Substantive Due Process Violation Occurred.................14

                        i.      No Constitutional Duty for School District
                                Employees to Protect Plaintiffs from Harm
                                Caused by Other Students...........................................15

ii.    No State-Created Danger ...........................................16

1.    No "Affirmative Act" ......................................16

2.    No "Conscience-Shocking" Behavior ..............29

i.    No Knowledge of Risk of *Specific* Harm that Occurred .................................29

ii.    No Conscience Shocking Response to Known Risk of *Specific* Outcome ..........34

B.    No Supervisor Liability ........................................................42

2.    Defendants did not Violate "Clearly Established" Constitutional Rights ..........................................................44

II.    Plaintiffs' *Monell* Claim Against the School District Should be Dismissed ............................................................................49

1.    If no Underlying Constitutional Violation, then no *Monell* Liability .......................................................49

2.    No Clearly Established Right Ends *Monell* Claim ...............49

III.    Plaintiffs' Request for Prospective Injunctive Relief Should be Denied .........................................................................................50

1.    Plaintiffs' Procedural Due Process Claim Fails ...............50

IV.    Plaintiffs' Gross Negligence Claims are Barred by Immunity ................54

1.    The District is Immune from Tort Liability .....................54

2.    The Individual Defendants are Immune from Plaintiffs' Gross Negligence Claims ..........................................................55

a.    The Oxford Defendants Cannot be "the" Proximate

Cause .....................................................................................56

     b.    The Oxford Defendants were not Grossly Negligent ...........57

  3.    Plaintiffs' Claims under the Child Protection Act are
Barred by Immunity .........................................................59

     a.    The CPL was not Violated .....................................................59

     b.    The Individual Defendants are Immune from this Claim .....59

     c.    The District is Immune from this Claim ..............................60

V.    No Michigan Constitution Violation .........................................................61

CONCLUSION ....................................................................................................62

**Statement Regarding Concurrence Pursuant to LR 7.1(a):** The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel have not concurred.

## STATEMENT OF ISSUES PRESENTED AND MOST APPROPRIATE AUTHORITY

State Created Danger—"Affirmative Act"

Issue 1:      Plaintiffs must prove that Defendants individually committed an "affirmative act" that directly created or increased the risk of harm to Plaintiffs. Can Plaintiffs prove such an affirmative act when they admit that the type of harm that ultimately occurred existed well before any of the individual Defendants were involved? **NO.**

Issue 2:      Failures to act are not affirmative acts as a matter of law. Are Plaintiffs' allegations relating to an alleged failure to act, such as alleged failure to search, remove the student from school, or contact police an actionable affirmative act? **NO.**

Issue 3:      Returning a person to a situation of a pre-existing danger is not an affirmative act as a matter of law. Is Hopkins and Ejak's alleged act of returning EC to class an actionable affirmative act? **NO.**

Most Appropriate Authority:

- *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)(holding that the affirmative act requirement of a state created danger claim, it is not just a matter of whether the official committed an act but whether those acts "directly" created or increased the risk of danger); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002)(same); *Walker v. Detroit Public Schools*, 535 Fed. Appx. 461, 465 (6th Cir. 2013)( "[w]hen an official intervenes to protect a person, then later returns the person to 'a situation with a preexisting danger,' the intervention does not satisfy the affirmative act requirement for state-created danger.").

- *Jones v. Union County*, 296 F.3d 417, 428 (6th Cir. 2002)(holding that "a 'failure to act is not an affirmative act under the state-created danger theory.'"); *Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016)(holding that "[f]ailing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [police] are plainly omissions rather than affirmative acts.").

- *Koulta v. Merciez*, 477 F.3d 442, 446-47 (6th Cir. 2007)(holding that an action that did not create or increase the risk of danger but resulted in merely returning someone to a pre-existing danger is not an affirmative act); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir. 2006)(holding that even though the teacher took some action by leaving the class unsupervised with a student with known violent behavior, this did not constitute an affirmative act because the student already possessed the gun and already posed a pre-existing danger not created or increased by the teacher) *See Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)(holding that the police's act of encouraging a drag race to occur that resulted in bystander death was not an affirmative act because racers planned to drag race before police intervention); *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)(police act of taking custody of mentally disabled woman from suspect who had been abusing her, then returning her to suspect, who then raped her, not an affirmative act because the danger existed before police intervened).

- *Wilson v. Gregory*, 3 F.4th 844, 858 (6th Cir. 2021)( holding that "[t]he key question, then, is 'not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it.'")

State Created Danger—Knowledge Of "Specific Harm"

Issue 4:      Plaintiffs must also establish that Defendants knew of the "specific harm" that ultimately happened *before* it occurred. The Sixth Circuit has previously held that knowledge of a student's violent propensities, which included stabbing another student, did not sufficiently inform school employees of the risk that the same student would shoot another student. Does a limited knowledge of an interest in target shooting, violent video games or troubled drawings or phrases sufficiently inform a school counselor that EC would pose the specific risk of being a mass murderer? **NO.**

<u>Most Appropriate Authority</u>

- *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020)(holding that to meet the culpability requirement for purposes of a state created danger claim the school employee must know of more than the general risk of harm but must know the specific risk that later develops); *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 451 (6th Cir. 2021)(same); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir. 2006)(holding that the plaintiff failed to plead that the defendant acted with the requisite degree of culpability because the teachers knowledge of the students violent behavior was not enough to show that she knew of the specific risk he posed of gun violence)).

<u>State Created Danger—"Conscience Shocking Response"</u>

Issue 5:      Plaintiffs must also prove that Defendants responded to a known specific risk in a "conscience shocking" manner. Each individual's actions must be analyzed separately based on their own individual knowledge.

Issue 5(a):    Is it conscience shocking for a teacher to report a student to the office when he inappropriately used his cell phone during class?  **NO.**

xvi

Issue 5(b):   Is it conscience shocking for a school employee receiving a report of inappropriate cell phone use to immediately contact the student's counselor, pull the student from class, meet with the student about his behavior, then contact the student's mother? **NO.**

Issue 5(c):   Is it conscience shocking for a teacher to immediately report to the office a student who writes statements that may indicate depression or depiction of violence on his school assignment? **NO.**

Issue 5(d):   Is it conscience shocking for a counselor, who does not suspect a student is a school mass murderer, to address a report that the student wrote statements that may indicate depression by: 1.) immediately pulling the student from class, 2.) extensively questioning the student about the statements on his work and assess him, 3.) immediately calling the student's parents, 4.) meeting with the student's parents about the concerns, 5.) insist that the parents refer the student to professional outside counseling services, and 6.) planning to follow up with Child Protective Services if the parents did not obtain  outside counseling services for the student within 48 hours? **NO.**

<u>Most Appropriate Authority</u>

- *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)(finding that the "official must 'be aware of facts from which the inference could be drawn that" a specific risk of harm exists, "and he must also draw the inference.")

<u>"Supervisor Liability"</u>

Issue 6:      Supervisor liability claims require proof that the supervisor actively encouraged an unconstitutional act to occur. Claims of a failure to supervise are not actionable. Have Plaintiffs proven a supervisor liability claim based only on an alleged failure to supervise? **NO.**

<u>Most Appropriate Authority</u>

- *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470(6th Cir. 2006)( holding that "a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."); *Hays v. Jefferson Cty.*, 668 F.2d 869, 873–74 (6th Cir. 1982)(holding that a "mere failure to act (even) in the face of a statistical pattern of incidents of misconduct" will not suffice to establish supervisory liability.); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)(holding that supervisory liability requires some "active unconstitutional behavior" on the part of the supervisor.); *Shehee, v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)( holding that "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it.").

<u>Qualified Immunity—"Clearly Established"</u>

Issue 7:      An individual defendant is entitled to qualified immunity from constitutional claims if it is not "clearly established" "beyond debate" based on the "particularized facts" confronting the defendant that his/her actions would violate the Constitution. Neither the Supreme Court nor Sixth Circuit have found a constitutional violation under the facts presented here. To the contrary, in *Walker, Riley, McQueen, Brooks*, and *Jackson*, the Sixth Circuit found that similar allegations did not violate constitutional rights. Is the claimed unconstitutionality of each Defendant's actions

clearly established beyond debate in the particularized circumstances each individual

faced? **NO.**

    <u>Most Appropriate Authority</u>

- *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2011)( holding that a "clearly established" right is one that is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right."); *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021)(clearly established law cannot be defied with a high level of generality); *Kollaritsch v. Michigan State Univ.*, 944 F.3d 613, 626 (6th Cir. 2019) (holding that for the law to be clearly established the legal principal must clearly prohibit the official's conduct in the particular circumstances before him; requires a high degree of specificity so that it is clear to a reasonable official that his conduct was unlawful in the situation he confronted).

<u>Monell</u>

Issue 8:    A *Monell* claim against a school district fails as a matter of law when no

underlying Constitutional violation has occurred. Since Plaintiffs have failed to establish

a substantive due process claim, can their *Monell* claim survive?  **NO.**

    <u>Most Appropriate Authority</u>

- *City of Los Angeles v. Heller*, 475 U.S. 796, 799(1986)(A city "cannot be liable under § 1983 absent an underlying constitutional violation by its officers."); *Farinacci v. City of Garfield Hts.*, 2010 WL 1268068, at *5 (N.D. OH. 2010), aff'd, 461 Fed.Appx. 447 (6th Cir. 2012)("[When] no constitutional violation occurred, there can be no *Monell* claim against the [School District], regardless of its policies.")
- *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017)("The absence of a clearly established right spells the end of this *Monell* claim.").

*Prospective Injunctive Relief Procedural Due Process Claims*

Issue 9: Do Plaintiffs' procedural due process claims seeking prospective injunctive relief fail given that Plaintiffs fail to allege how they were deprived due process of law ? **YES.**

<u>Most Appropriate Authority</u>

- *Machisa v. Columbus City Bd. of Educ.*, 563 F. App'x 458, 562 (6th Cir. 2014)(holding that a procedural due process claim requires the plaintiff to allege that she possess a constitutionally protected interest, that she was deprived of that interest, and that the defendant did not afford her adequate procedural rights prior to depriving her of that interest); *See Hearns Concrete Const. Co. v. City of Ypsilanti*, 241 F. Supp. 2d 803, 811 (E.D. Mich 2003)(dismissing the plaintiff's procedural due process claim because the plaintiff failed to allege that there was an infirmity in the process itself).

*State Law Claims*

Issue 10:   Are Plaintiffs' state law claims barred by governmental immunity when EC pled guilty to the shooting?  **YES.**

<u>Most Appropriate Authority</u>

- *Yoches v. City of Dearborn*, 904 NW2d 887, 895 (Mich. App. 2017)(holding that governmental entities cannot be vicariously liable for an employee's gross negligence).
- *Tarlea v. Crabtree*, 263 Mich App 80, 88; 687 NW2d 333 (2004)(holding that a school district employee is immune from tort liability for injuries to persons  under MCL 691.1407(2) if all of the following are met: (1) the employee is acting or reasonably believes he is acting within the scope of his authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) the employee's conduct does not amount to <u>gross negligence</u> that is <u>the proximate cause</u> of the injury or damage); *Robinson v. City of Detroit*, 462 Mich 439, 459;

613 NW2d 307 (2000)(holding that for purposes of MCL 691.1407(2), a government employee is immune unless he was "the" proximate cause, meaning "the <u>one</u> most immediate, efficient and direct cause preceding an injury."); *Miller ex rel Miller v. Lord*, 262 Mich App 640; 686 NW2d 800 (2004)(holding that school employees could not be "the" proximate cause of a third party's criminal assault).

- *Bitner v. Jones*, 300 Mich. App. 65, 75, 76-77 (2013)(holding that claims under the CPL are subject to governmental immunity, meaning that "in order for [a governmental] defendant to be liable under the mandatory reporting statute, her conduct must have been grossly negligent and *the* proximate cause.")

# INTRODUCTION

"Like other cases involving the 'state-created-danger' theory of substantive due process, this case comes to [the court] with tragic facts": The shooting at Oxford High School. *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020), cert. denied sub nom. *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 141 S. Ct. 895 (2020). On November 30, 3021, 10th grade student, EC, shot one teacher and 10 students, killing four students. EC pled guilty as an adult to multiple charges arising from his criminal acts. Plaintiffs' lawsuit asserts that EC was a pre-existing danger intending to shoot students at school well before any Oxford Defendants' involvement. None of the Oxford Defendants knew that EC had a gun in his possession or that he would shoot students.

The Supreme Court and Sixth Circuit have considered many tragic state-created-danger cases. *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 467 (6th Cir. 2006) and *Walker v. Detroit Public Schools*, 535 Fed. Appx. 461 (6th Cir. 2013)(involving fatal school shootings caused by known violent students); *see Brooks v. Knapp*, 221 Fed Appx. 402 (6th Cir. 2007); *see Riley v. Ottawa County*, 2021 WL 3929324 (6th Cir. 2021)(concerning the murder of a women by a known abusive ex partners after inadequate police interventions); *see Jackson*, 954 F.3d 925 (concerning the sexual assault of a kindergartener by a student known to endanger and bully other students); *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,

1

489 U.S. 189, 202 (1989)(relating to officers returning a young child to his known violent father, only to have the father severely beat the child, causing severe brain damage); see *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)( involving the rape of a mentally disabled woman after police returned her to her rapist); *see Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)( where multiple bystanders were killed after police encouraged a drag race).

The Supreme Court and Sixth Circuit dismissed each of the above cases. In doing so, the courts have emphasized that substantive due process claims are exceedingly rare. The Sixth Circuit recognized that such claims are a "rare species of one of the narrowest constitutional doctrines" reserved for only the most "egregious and outrageous" acts by government officials. *Jackson*, 954 F.3d at 937. State-created danger claims require proof that the official knew of the *specific* risk of harm facing the plaintiff, the official committed an "affirmative act" that directly creates or increases the risk of the specific danger that occurred, and the official's act was "conscience shocking." *Id.* at 933. As the Court found when dismissing the kindergartner's sexual assault claims, "the Constitution does not empower federal judges to remedy every situation we find 'heart-wrenching.'" *Id.* at 928.

As in the above cases, Plaintiffs' allegations against Defendants do not amount to wrongdoing, much less a violation of their substantive due process rights. Their constitutional claims should be dismissed for multiple reasons. First, Plaintiffs

2

have not established that any Defendant committed any "affirmative acts" to create or increase Plaintiffs' risk of danger. To the contrary, Plaintiffs admit that the danger EC posed existed long before any Defendants' involvement. Plaintiffs mostly argue, with the benefit of hindsight, that more should have been done. But alleged failures to do more are not actionable constitutional violations. It is also well established that Plaintiffs' other complaint relating to returning EC to class is not an "affirmative act."

Second, Plaintiffs have not shown that any Defendants' acts were "conscience shocking." Plaintiffs have not established that any Defendant knew of the *specific* risk of harm facing Plaintiffs – that EC had a gun and would shoot students in the school. Nor have Plaintiffs shown that Defendants responded to the limited information they had in a "conscience shocking" manner.

Plaintiffs' supervisory liability claims against Superintendent Throne and Principal Wolf fail because Plaintiffs have not established that either individual actively encouraged or participated in an unconstitutional act.

Even if it is questionable whether a substantive due process violation has occurred, the individual Defendants are all entitled to qualified immunity. Cases such as *McQueen, Walker, Brooks,* and *Jackson* – cases dismissed under similar circumstances presented here – confirm it is not "clearly established based on the

3

"particularized facts" alleged to have occurred here that any Defendants' actions violated the U.S. Constitution.

Plaintiffs' *Monell* claims against the District also fail because Plaintiffs have not established a constitutional violation.

## PLAINTIFFS' ALLEGATIONS

### 1.   Procedural History

As a result of the school shooting at Oxford High School on November 30, 2021, Plaintiffs have filed suit in 10 separate cases[1] variously naming as Defendants Oxford Community Schools, former Superintendent Timothy Throne, Oxford High School Principal Steven Wolf, Assistant Superintendent Kenneth Weaver, Counselor Shawn Hopkins, Dean of Students Nicholas Ejak, Restorative Practices Coordinator Pamela Fine, and teachers Jacquelyn Kubina, Allison Karpinski and Becky Morgan in their individual capacities. Plaintiffs' federal lawsuits allege the following federal claims: State-Created Danger under § 1983; Supervisory Liability

---

[1] The federal cases include: Case No. 21-12871, *Franz et al. v. Oxford Community School  District et al.* (E.D. Mich.); Case No. 22-10407, *Asciutto et al v. Oxford Community  School District et al.* (E.D. Mich.); Case No. 22-10805, *St. Juliana et al v. Oxford Community  School District et al.* (E.D. Mich.); Case No. 22-11113, *Myre et al. v. Oxford Community School  District et al.* (E.D. Mich.); Case No. 22-11250, *Beausoleil v. Oxford Community School  District, et al.* (E.D. Mich.); Case No. 22-11251, *Ossege v. Oxford Community School  District, et al.* (E.D. Mich.); Case No. 22-cv-11398, *Cunningham et al v. Oxford Community School District et al* (E.D. Mich); Case No. 22-11360, *GLJ, et al. v. Oxford Community School  District, et al.*; Case No. 22-cv-11959, *Watson et al v. Oxford Community School District et al* (E.D. Mich); and Case No. 22-cv-11448, *Mueller et al. v. Oxford Community  School District et al.*  (E.D. Mich).

4

as to Defendants Superintendent Tim Throne and Principal Steve Wolf; and *Monell* liability.

All of the Complaints except *Myre* (case no. 22-11113) and *G.J.* (22-11360) have also alleged state law claims that include gross negligence, violation of the Child Protection Law, and violation of the Michigan Constitution.

*St. Juliana* (case no. 22-10805), *G.J.* (22-11360), *Mueller* (22-11448) and *Watson* (22-11959), also seek prospective injunctive relief against Superintendent Kenneth Weaver in his Official Capacity for alleged violation of procedural due process.

Defendants now file their motion to dismiss all of the federal complaints pending before this Court under Fed. R. Civ. P. 12(c).

Plaintiffs' complaints[2] specifically allege the following:

## 2.    Plaintiffs Argue that EC Was a Preexisting Danger Before Defendants' Involvement.

Plaintiffs' complaints begin by alleging that EC was a preexisting danger to shoot students at school long before Defendants' involvement. This is based on EC's alleged actions at home, and not at school.

---

[2] The complaints largely track the same allegations set forth in the *Myre* Complaint filed in Case No. 22-cv-11113-MAG, ECF No. 6. Given that the *Myre* Complaint is one of the more detailed complaints, Defendants will rely on those allegations in this Motion for the sake of brevity.

The allegations include claims that EC kept a bird's head in his bedroom, researched Nazi propaganda on his home computer, had homicidal tendencies, and told his mother he had hallucinations. *See* ECF No. 6, PageID 79, ¶ 30-31,37. Plaintiffs also allege that as of August 2021, EC had privately announced to a friend he would shoot up the school and had access to his father's gun. *Id.* at PageID 80, ¶ 39. Plaintiffs further claim that, well before any Oxford Defendants' involvement, EC made videos and kept journals describing "his plan to shoot up the school." *Id.* at PageID 79, ¶ 33.

Plaintiffs, however, do **not** allege that Defendants had any knowledge of these alleged acts. Plaintiffs also do **not** allege that EC committed any of these acts while at school. The Oxford Defendants were **not** aware of any of these behaviors.

## 3.    EC's Alleged Conduct that Defendants Did **NOT** Know Of.

Plaintiffs claim that on November 11, 2021, a jar containing a severed bird's head was found in the boys' bathroom. *See* ECF No. 6, PageID 81, ¶ 47. The incident and jar were immediately turned over to the Oakland County Sheriff's Department. The Sheriff's deputy arrived at the school and confirmed in writing to the District that he investigated and "I still don't see an actual threat" at the high school. Plaintiffs claim that EC placed the bird's head in the bathroom. *Id.* But Plaintiffs do **not** contend that anyone at the District knew that EC committed this act.

Plaintiffs then claim on November 12, 2021, school administration—relying on the deputy's assurances—sent an email to parents of OHS students stating that "every concern shared" had been investigated. Based on their investigation, they could not determine that an actual threat existed at the high school. *Id.* at PageID 82, ¶ 49. Plaintiffs assert that Principal Wolf and Superintendent Throne reiterated that statement on November 16, 2021. *Id.* at ¶¶ 52-53.

Ten days after that statement, on November 26, 2021, Plaintiffs claim that James Crumbley purchased a handgun for EC, and that Jennifer Crumbley took EC to the shooting range. *Id.* at PageID 82-83, ¶¶ 54-56. Plaintiffs do not claim that any Defendants were aware that EC had access or that his parents trained him in the use of a gun.

### 4. What Plaintiffs Claim the District Knew About EC Before the Shooting.

EC attended Oxford High School since August 2020. Before November 30, 2021, Plaintiffs do not claim that EC had a history of behavioral problems, aggression, or violent behavior at school. Plaintiffs also do not allege that EC made any threats of violence at school.

Plaintiffs claim that in early November 2021, EC's Spanish teacher emailed Hopkins stating that EC "appeared sad", nothing more. ECF No. 6, PageID 81, ¶ 45. EC's dog died. Hopkins appropriately responded to the vague email by "check[ing] in with EC and told him that he was available if EC wanted to talk." *Id.* at ¶ 46.

7

On Monday, November 29, 2021 – at the beginning of hunting season in a hunting community – Plaintiffs claim that teacher Jackie Kubina on a single occasion saw EC looking at a picture of bullets on his cell phone. *Id.* at PageID 83, ¶ 59. This is the first time Plaintiffs claim EC did anything in Kubina's class to catch her attention through the entire school year. While students having an interest in guns and hunting is common in Oxford, Plaintiffs alleged that Kubina still responded to this single incident. Plaintiffs claim that Kubina brought EC to the counseling office to meet with Pam Fine. *Id.* at ¶ 60. Plaintiffs do not allege that Kubina had any further involvement.

Plaintiffs allege that on the morning of November 29, 2021, Fine met with EC regarding Kubina's report. Like Kubina, Plaintiffs do not allege that Fine had knowledge of any prior discipline or behavioral issues with EC. Plaintiffs claim that Fine called Mrs. Crumbley after the meeting to discuss EC's behavior. *Id.* at PageID 84, ¶ 62. Plaintiffs do not allege that Fine had any further involvement.

Plaintiffs then claim that, on a single occasion, teacher Allison Karpinski witnessed EC watch a video with violent depictions on his cell phone. The video was similar to Call of Duty or Fortnite video games that kids that age routinely play and watch on YouTube. This is the only incident of note all year that Karpinski was alleged to have witnessed involving EC. Nonetheless, Karpinski also did not ignore

this incident. Plaintiffs assert that Karpinski made a report to counselor Hopkins. *Id.* at PageID 86, ¶ 73.

Plaintiffs next claim that, on the morning of November 30, 2021, EC appeared in teacher Becky Morgan's class. *Id.* at PageID 85, ¶ 69. Again, Plaintiffs do not contend that Morgan had any prior behavioral problems with EC. Plaintiffs allege that Morgan witnessed EC on this one occasion write violent phrases and draw violent pictures on his math assignment. *Id.* at ¶ 70. EC's drawing did not contain a specific threat of violence towards any individual at the high school. *Id.* Plaintiffs do not claim Morgan ignored this drawing. In response to witnessing this single incident, Morgan sent a picture of the drawing to Counselor Hopkins. *Id.* at PageID 86, ¶ 72.

After being informed of the drawing, Hopkins pulled EC from class to meet in Hopkins' office. *Id.* at ¶ 75. EC left his backpack in the class, leaving the impression that the backpack and its contents were unimportant to EC. *Id.* at PageID 87, ¶ 77. While Hopkins met with EC, Ejak later retrieved EC's backpack from the classroom but did not look inside the bag. *Id.* at ¶ 78.

During the meeting, Plaintiffs note that Hopkins questioned EC about the drawing. EC responded that "it was just a drawing for a video game." *Id.* at ¶ 80. Plaintiffs contend that Hopkins questioned EC in detail about "the specifics of the drawing." *Id.* at ¶ 81. Plaintiffs claim that Hopkins was able to get EC to open up

9

about his dog dying, the death of a grandparent, the pandemic, a close friend who left the school, and an argument EC had with his parents about grades the night before—typical student concerns counselors address on a regular basis. *Id.* at ¶ 82. Plaintiffs claim that Hopkins thought there may be evidence of "suicidal ideation", but not that he was actively suicidal. As a result, Hopkins did the reasonable thing and called Mrs. Crumbley to meet. *Id.* at ¶ 83. Plaintiffs do not allege that EC ever expressed any threats of harm to himself or others or indicate that he had a weapon.

At approximately 10:30 AM, EC's parents arrived for a meeting. Hopkins showed the parents EC's drawing and advised them that EC needed mental health support that day. *Id.* at PageID 88, ¶ 86. EC's parents would not take EC out of school. *Id.* at ¶ 87. So, Plaintiffs claim that Hopkins took the reasonable action of advising EC's parents that if "they did not take EC to counseling with 48 hours he would be following up." *Id.* at ¶ 88.

Following the meeting with the parents, Hopkins and Ejak determined there was no disciplinary reason to withhold EC from school. Consistent with EC's state and federally protected right to an education (FAPE), EC returned to class. *Id.* at ¶ 90. Thereafter, Plaintiffs allege that EC committed his criminal act. *Id.* at PageID 89, ¶ 96. EC was charged as an adult for his deliberate and premediated actions. *Id.* at PageID 90, ¶ 102. He has since plead guilty to all counts.

10

Plaintiffs claim that the District implemented a policy in March 2011 addressing suicide prevention that described the process of "assessing the risk of suicide, conversing with the student to determine if he or she has any dangerous instrumentality, such as a weapon, substance, or other material capable of inflicting mortal wound, on his or her person, and timely intervening and removing the student away from other students." *Id.* at PageID 91, ¶ 106.

The high school was closed from December 1, 2021 until January 23, 2022 following the shooting for a number of reasons. The high school was a crime scene that the police investigated following the shooting. In addition, the building remained closed so that the District could address the mental health of students and staff affected by the shooting (and to provide mental health services), to repair damage to the building, to assess the safety of reopening the building, and to install additional safety equipment. Students returned to in-person learning at the high school on January 24, 2022.

Notably, Plaintiffs do not allege that any of the individual Defendants knew that EC had a gun or that he intended to harm any students. Also absent is any suggestion that EC had previously engaged in violent behavior, been the victim of bullying or had any prior disciplinary history.

## STANDARD OF REVIEW

Defendants seek dismissal of these matters pursuant to Federal Rule of Civil Procedure 12(c). "A Rule 12(c) motion for judgment on the pleadings for failure to state a claim upon which relief can be granted is nearly identical to . . . a Rule 12(b)(6) motion to dismiss." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) (citations omitted). When reviewing a motion to dismiss under Rule 12(c), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012).

Conclusory allegations are not enough to survive a motion to dismiss. *Handy-Clay*, 695 F.3d at 539. Additionally, "pleading on information and belief is not an appropriate form of pleading if the matter is within the personal knowledge of the pleader." *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447-48 (6th Cir. 2014). A plaintiff must also provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556, (2007). "To survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016).

12

When deciding a motion to dismiss, it is also appropriate to consider certain documents in addition to just the complaint. In ruling on a motion to dismiss, the court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("take[] liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6).").

## LAW AND ARGUMENT

### I. THE INDIVIDUAL OXFORD DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is an absolute defense to § 1983 claims. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). The doctrine is designed to protect "all but the plainly incompetent who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). These questions can be answered by the court as a matter of law. *See Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996). Once a qualified immunity defense is raised, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). To overcome a qualified-immunity defense, plaintiffs

must show two things: 1.) that government officials violated a constitutional right and 2.) that the unconstitutionality of their conduct was clearly established when they acted. *District of Columbia v. Wesby*, ––– U.S. ––––, 138 S. Ct. 577, 589(2018).

## 1. The Individual Oxford Defendants Did Not Violate a Constitutional Right.

### A. No Substantive Due Process Violation Occurred.

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). The substantive component of the Due Process Clause is "quite different" than a mere tort claim, such as negligence or assault and battery under state law. *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996); *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989); *Jackson*, 954 F.3d at 933 (Supreme Court "has long resisted turning due process into a 'font of tort law.'")

Substantive due process instead relates to the "rights to personal security and freedom from abuse at the hands of state officials." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). Such claims are reserved for "only the most egregious official conduct" that is arbitrarily and "oppressively" exercised. *Lewis*, 523 U.S. at 846; *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Thus, substantive due process claims focus on truly extreme abuses of a government officials' power

14

that are "so brutal, demeaning, and harmful as literally to **shock the conscience**." *Webb v. McCullugh*, 828 F.2d 1151, 1158 (6th Cir. 1987)(emphasis added); *Lewis,* 523 U.S. at 846-7. "The conscience-shocking limit on substantive due process claims serves to keep the doctrine from expanding to cover administrative incompetence or irresponsibility." *Brown v. Detroit Pub. Sch. Cmty. Dist.*, 763 F. App'x 497, 504 (6th Cir. 2019). Such claims are narrowly interpreted, as the Supreme Court has cautioned against "expand[ing] the concept of substantive due process." *Collins*, 503 U.S. at 125.

As a general rule, no substantive due process violation occurs when the injury is caused "by private actors," such as a student. *DeShaney*, 489 U.S. at 197. There are two narrow exceptions to this rule: (1) when the state has a special relationship to the victim, and (2) when the state creates the danger that led to the victim's harm. *Jones v. Union County*, 296 F.3d 417, 428 (6th Cir. 2002).

### i.      No Constitutional Duty For School District Employees To Protect Plaintiffs From Harm Caused by Other Students.

It is well established that—in the constitutional sense—there is no "special relationship" between school employees and students. *Doe v. Claiborne Co. Bd. of Ed.*, 103 F.3d 495, 510 (6th Cir. 1996); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 910–11 (6th Cir.1995). So, school districts and their employees do not have an affirmative *constitutional* duty to protect students from harm caused by private

actors, such as other students. *Id.*; *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999). This is true even if the school employee has knowledge of the risk of harm to the student, *Soper*, 195 F.3d at 853, or "knowledge of a student's vulnerability." *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 854 (6th Cir. 2016).

### ii. No State-Created Danger.

State-created danger claims require: 1.) A government official's "affirmative act" which increased or created the risk of private acts of violence. 2.) The plaintiff also must establish that the defendants acted with the "requisite degree of state culpability"—conscience shocking behavior. *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995). Here, Plaintiffs have not established these elements.

### 1. No "Affirmative Act".

Plaintiffs allege three categories of "affirmative" acts: 1.) Returning EC to class. 2.) The failure to act to stop EC from carrying out his criminal plan. 3.) Accelerating EC's pre-existing plan to commit criminal acts. Plaintiff's allegations are not actionable "affirmative acts" as a matter of law.

"Whether or not the defendants 'acted' may be a difficult question in the abstract." *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003). For there to be liability, it is not just a matter of whether the official committed an act, but whether those acts "directly" created or increased the risk of danger. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998); *Ewolski v. City of*

*Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002). This is determined by comparing the plaintiff's risk of harm *before* and *after* state action, not *during* the state's intervention. *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003).

Based on the above, "[w]hen an official intervenes to protect a person, then later returns the person to 'a situation with a preexisting danger,' the intervention does not satisfy the affirmative act requirement for state-created danger." *Walker*, 535 F. App'x at 465 (6th Cir. 2013), *citing Bukowski*, 326 F.3d at 709 ("returning a person to a situation with a preexisting danger' cannot serve as an affirmative act for a state-created danger claim."). <u>This includes the common scenario of intervening in a dangerous situation, detaining a known violent suspect with access to weapons, then releasing the suspect to a preexisting dangerous situation.</u> *Reilly v. Ottawa County, Michigan*, No.-2220, 2021 WL 3929324 (6th Cir. Sept. 2, 2021). The acts of intervening and returning a known violent suspect to a preexisting dangerous situation are not affirmative acts. *Id.*

Additionally, "a 'failure to act is not an affirmative act under the state-created danger theory.'" *Jones*, 438 F.3d at 691. This is so "even where officers can be seen not only to have ignored or disregarded the risk of injury, but to have condoned it.' And no 'affirmative duty to protect arises ... from the State's ... expressions of intent to help' an individual at risk." *Reilly*, No. 20-2220, 2021 WL 3929324, at *5, (*citing Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017)). Therefore, an "alleged failure

17

by Defendants to take [a suspect] into custody, take away his firearm or otherwise fail to 'follow up' is not actionable under § 1983." *Id.* And "[f]ailing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [police] are plainly omissions rather than affirmative acts." *Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016).

*Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007), establishes that even when the state takes some action, there is no affirmative act when the risk of harm existed before state intervention. In *Koulta*, a speeding drunk driver ran a red light and killed the driver of another vehicle. Minutes before the accident, police interviewed the drunk driver, who admitted to consuming alcohol. *Id.* at 444. Police did not cite the driver for having an expired license plate, did not conduct any investigation into the driver's driving record, and did not administer a sobriety test. Instead, police encouraged the inebriated driver to leave, and thereby permitted her to drive away. Minutes later, the crash occurred. In finding no affirmative act, the Sixth Circuit concluded there was no evidence that the police officers created or increased the risk of danger, which was that the drunk driver's "drinking and driving would injure someone." *Id.* at 446. The court reasoned that, while "the officers were in a position to head off the tragedy that materialized minutes later," their conduct did not affirmatively create a risk. *Id.* at 446–447. Therefore, the officer's conduct did not

increase the danger of the driver drinking and driving—a danger that had pre-dated their arrival on the scene. *Id.*

This principle is further illustrated in two cases involving fatal school shootings. First, in *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir.2006), a student named Smith was well known to the school to have violent tendencies. These included "several incidents where he attacked other students, sometimes beating them up, another time stabbing them with a pencil." *Id.* at 462. Despite these prior violent acts, **Smith was allowed to remain in school**. On the morning of the shooting, the teacher left the classroom unsupervised, leaving Smith and other students behind. While the teacher was away, Smith fatally shot a classmate. Although the teacher took some action, leaving the class unsupervised despite Smith's known history of violent behavior, that 'act' did not satisfy the affirmative act element. *Id.* at 466-467. The court reasoned that the student already possessed a gun and already posed a pre-existing danger, so the teacher did not create or increase the risk. *Id.* at 466.

Next, in *Walker v. Detroit Pub. Sch.*, 535 Fed. Appx. 461 (6th Cir. 2013), the school district combined two high schools, knowing that the schools had competing gangs. *Id.* at 462-463. Somewhat predictably, multiple fights erupted at school between the rival gangs, on an average of twice a week. *Id.* at 462. It was common for guns and other weapons to be found at school following the fights. *Id.*

Subsequently, another fight broke out. *Id.* at 463. **School district employees intervened and sent the fighting students back to class, rather than removing them from school**. *Id.* Later that day, one of the students involved in the fight opened fire on a crowd of students exiting the school. This resulted in multiple students being shot, one fatally. The Sixth Circuit found that the act of merging the high schools that placed rival gangs in one building was not an affirmative act, reasoning that the potential for danger between the two rival gangs already existed before the school's action. *Id.* at 466. The Sixth Circuit also found that the school's ineffective intervention in the fight did not constitute an affirmative act. *Id.* The court found that, "[w]ith the benefit of hindsight the school officials may wish they had handled the fight differently," but that is not the standard by which their actions were judged. *Id.* "Where state actors have intervened and subsequently returned the victim to a pre-existing danger such intervention was held not to be an 'affirmative act' for state created danger purposes." *Id.*

In *Cartwright,* the police picked up the plaintiff while he was walking at night on the side of the highway and dropped him off at a convenience store parking lot. 336 F.3d at 489. The plaintiff was hit by a truck two miles away. The Sixth Circuit rejected the argument that the police committed an affirmative act because the police transported the plaintiff from a more dangerous place to a less dangerous one. *Id.* at 492. *See also Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)(holding that the police

officer's act of encouraging a drag race to occur that resulted in bystander death was not an affirmative act because racers planned to drag race before police intervention); *see Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)(police act of taking custody of mentally disabled woman from suspect who had been abusing her, then returning her to suspect, who then raped her, not an affirmative act because the danger existed before police intervened).

*Reilly v. Ottawa Cnty.*, illustrates **that returning violent suspects, known to have access to weapons, to a preexisting dangerous situation is <u>NOT</u> an affirmative act.** No. 20-2220, 2021 WL 3929324, at *3 (6th Cir. Sept. 2, 2021), cert. denied sub nom. *Reilly v. Ottawa Cnty.*, 142 S. Ct. 900, (2022). In *Reilly* police were aware of the boyfriend's long history of stalking, violent threats to kill the woman, violations of a PPO, and the boyfriend's possession of a gun, which made the potential harm specific and foreseeable. After police spoke with the boyfriend about his threats, he was not arrested, but sent an arrest warrant. The boyfriend then murdered the woman. The Sixth Circuit found that the failure to arrest the boyfriend or remove his weapons were not affirmative acts because the suspect posed a danger of violence *before* police intervened. *Id.* at *5. The plaintiff's further claimed that the police's act of notifying the boyfriend that he *would be* arrested without actually arresting him, and thus inflaming and emboldening the boyfriend to act immediately, was also not an affirmative act. *Id.*

21

*Ryan v. City of Detroit*, 2015 WL 1345303 (E.D. MI., J. Goldsmith), affirmed at 698 Fed. Appx. 272 (6th Cir. 2017), also involved a violent suspect, with access to weapons, who was allowed to return to a dangerous situation. In *Ryan,* decedent– wife called police after her husband physically abused her. During the altercation, the husband was intoxicated, holding a handgun and had left a suicide note. Police issued a notice through LEIN, which would have led to the husband being taken into custody and transported to a psychiatric unit. Later that day, police located the husband and questioned him. After the interview, police let the husband leave and removed the LEIN notice. About an hour later, the husband shot and killed his wife. The wife's mother sued, arguing that the officers' act of releasing the husband following the interview, then removing the LEIN notice were affirmative acts. This Court disagreed, finding that these acts merely returned the wife to the same level of danger that existed before the officers took any action. This Court reasoned that the husband's assaultive propensity towards his wife existed before the officers intervened. *Id.* at *8. The Sixth Circuit agreed with this Court, finding that the officer's "actions at most returned the wife to the same level of danger she faced before the state action." 698 Fed. Appx. at 283.

Similarly, in *Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007), a woman repeatedly called police due to her estranged husband threatening physical violence, violating a PPO, and becoming physically abusive while intoxicated. After months

22

of receiving these reports, police responded to another call and detained the suspect. When releasing the husband, police assured the wife that they would provide her with extra protection. Based on that assurance, the wife stayed at the residence. A few hours later, the husband broke into the home and killed his wife. The Sixth Circuit found that "officers who merely depart from the scene of a domestic violence call without having taken steps to reduce the risk of harm cannot be held liable under the 'state-created danger'…instead they must have done something affirmative to increase the harm". *Id.* at 407. The court continued that this is so, "even where officers can be seen not only to have ignored or disregarded the risk of injury, but to have condoned it." *Id.* at 407. The Court also found that the police officer's assurances of extra protection, upon which the wife relied, were not affirmative acts. *Id.*; *see also May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th Cir. 2006)(officers who merely depart from the scene of a domestic violence call without having taken steps to reduce the risk of harm cannot be held liable under the "state-created danger" exception to *DeShaney*)*; see also Peach v. Smith County*, 93 Fed.Appx. 688, 691 (6th Cir. 2004)(holding that "no evidence exists that the Smith County defendants' actions created the danger at issue" when they failed to seize all weapons during an arrest and the arrestee later shot and killed his girlfriend).

In all of the above cases, the state officials took some action. But those "acts" were not actionable because they did not "directly" create or increase the risk of a

danger. As these cases illustrate, "**[t]he key question, then, is 'not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it**.'" *Wilson v. Gregory*, 3 F.4th 844, 858 (6th Cir. 2021)(italics in original).

On their face, Plaintiffs' allegations here do not establish that Defendants created or increased the danger complained of. Rather, it is evident from Plaintiffs' pleadings, as in *McQueen*, *Walker*, *Jones*, *Ryan* and *Koultra*, that Oxford students were already exposed to the same threat of danger from EC as had existed before Defendants had any interaction with the deranged individual who had already formulated his intent and acquired the means to carry out his crime. *See e.g.*, *McQueen*, 433 F.3d at 466. Plaintiffs allege that before the Oxford Defendants were made aware of any issues with EC, he had psychiatric distress, homicidal thoughts (which played out in mutilating animals) and had already privately threatened to shoot up the school. Plaintiffs also claim that, well before any Oxford Defendants' involvement, EC made videos and kept journals describing "his plan to shoot up the school." Case No. 22-cv-11113, ECF No. 6, PageID 79, ¶ 33. Plaintiffs further assert that EC already brought a gun to school with him on November 30, 2021, before anyone spoke with him that day.

Based on these allegations, EC already posed a danger well before Defendants were involved. It cannot be reasonably argued that Defendants created or increased

the danger to Plaintiffs. As with the violent student in *McQueen* who already had a propensity for violent acts and already had a gun before the teacher left the room, or the drunk driver in *Koulta* who had created the risk of a fatal accident by driving while intoxicated before interacting with police, EC had created the risk of harm prior to any action by Defendants.

The cases cited above, such as *Reilly*, *Ryan, Brooks*, and *May*, establish that merely allowing EC to return to class is not an affirmative act. In each of those cases, the Sixth Circuit found no affirmative act in the common situation where police responded to a dangerous situation, detained a violent suspect, then returned a known violent suspect with access to weapons to a pre-existing dangerous situation. In contrast to this case, the teachers and counselors were not aware of any violent propensities or access to weapons before allowing the student to return to class. If the Sixth Circuit found no affirmative act in cases where the state was aware of a suspect's violent propensities and access to firearms before returning the suspect to a pre-existing dangerous situation, then no affirmative act can be found here. The staff's "actions at most returned the [students] to the same level of danger [they] faced before the state action." *Ryan*, 698 Fed. Appx. at 283. So, their alleged acts are not actionable.

Plaintiffs' conclusory argument that Hopkins' intervention somehow "accelerated" or emboldened the attack fails to establish an affirmative act.

25

"Plaintiff's theory fails to account for the principal factor leading to [Plaintiffs']
tragic demise—" Plaintiffs admit that the danger already existed before any state
intervention. *Ryan*, 2015 WL 1345280 at * 7. Plaintiffs allege that EC had long
planned to commit his criminal act. He brought a gun to school before Hopkins'
intervention on November 30, 2021. The Sixth Circuit has held that a plaintiff cannot
establish the affirmative act element when the risk of danger already existed. *See
Bukowski*, 326 F.3d at 709. Because the allegations are clear that EC already planned
to shoot students and had already brought a gun to school with him, "it cannot be
reasonably argued that [Hopkins] *increased* the danger to [any Plaintiffs]." *Ryan*,
2015 WL 1345280 at * 7

Further, Plaintiffs have not alleged any specific fact establishing that Hopkins'
alleged statement to the parents actually caused an acceleration; Plaintiffs just draw
that conclusion. That is insufficient. *See Walker,* 535 F. App'x at 466 (rejecting the
plaintiff's similar conclusory statement that combining two high schools with rival
gangs escalated the chance of violence, that led to a school shooting and finding that
even if "commonsensical," such a conclusion must be supported by facts; *see Reilly*,
2021 WL 3929324, at *5 (rejecting the plaintiff's similar argument, that police
intervention in a violent situation, without arresting the suspect only emboldened
him to act, amounted to an affirmative act because "[t]hese assertions fall far short

26

of alleging that the officers actually encouraged Jeremy to harm her by implying that he would be immune from prosecution should he do so.")

The Sixth Circuit has also repeatedly found that such an argument would lead to bad policy, as it would dissuade officials from intervening at all, which is "neither reasonable nor desirable." *Cutlip*, 488 F. App'x at 118; *see Jackson*, 954 F.3d at 937 ("'imposing liability ... for acting in this manner would dissuade [school employees] from responding expeditiously' to future risks."); *see Tanner v. Co. of Lenawee*, 452 F.3d 472, 479 (6th Cir. 2006) (same); *see May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 585–86 (6th Cir. 2006)(same, and finding "we decline to interpret the Due Process Clause in such a manner as to discourage law enforcement officers from responding to requests for assistance."); *see Brooks*, 221 F. App'x at 406 (same).

Finally, Plaintiffs' claims related to "failure to act [are] not affirmative act[s]." *Jones*, 438 F.3d at 691. In *Langdon v. Skelding*, 524 Fed.Appx. 172, 176 (6th Cir. 2013), the Sixth Circuit dismissed a state created danger claim where a state official failed to investigate or report allegations of child abuse, which tragically lead to the child's death. The court held that "failing to remove a child from a foster home is not an affirmative act under the state-created danger exception" even where the officials' investigation revealed "obvious dangers" to the child's safety. *Id.* at 176. Similarly, in *Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017), the Sixth Circuit also dismissed a mother's state created danger claim brought on behalf of a child

27

tragically murdered as a result of abuse. In that case, it was alleged that a social services employee failed to properly investigate allegations of child abuse, resulting in the child's substantial physical and psychological suffering and eventual death. In affirming the dismissal of the claim, the court held, "[a]n assertion of a failure to act does not support a state-created-danger theory". *Id.* at 576.

As the above cases confirm, Plaintiffs' allegations premised on a "failure to act" are not "affirmative acts" as a matter of law. *See Brooks*, 221 F. App'x at 407(holding "a 'failure to act is not an affirmative act under the state-created danger theory… even where officers can be seen not only to have ignored or disregarded the risk of injury, but to have condoned it.")( citing *Jones*, 438 F.3d at 691); *see Stiles*, 819 F.3d at 855. (holding that"[f]ailing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [police] are plainly omissions rather than affirmative acts."); *see Reilly*, 2021 WL 3929324, at *5 (6th Cir. 2021)("failure by defendants to take [a suspect] into custody, take away his firearm or otherwise fail to 'follow up' is not actionable"). Thus, Defendants' alleged actions of deciding against involving or informing law enforcement, failing to inspect or search EC's backpack, not reporting EC to CPS, or failing to insist upon an immediate mental health intervention, are claims of omissions and not affirmative acts. *See* ECF No. 6, PageID 93-94 ¶ 114 c., d., e., f., h..

28

### 2.    No "Conscience-Shocking" Behavior.

Plaintiffs' claims should also be dismissed because Plaintiffs cannot establish that Defendants acted with the "requisite degree of state culpability." *McQueen*, 433 F.3d at 464. The government's conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense'", such that it "shocks the conscience." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). "[O]nly extreme misconduct will violate the clause." *Lewis*, 523 U.S. at 847.

"The [conscience shocking] standard has two parts. [1.] An official must 'be aware of facts from which the inference 'could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' [2.] 'Having drawn the inference,' the official next must act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights. Given the call for caution in this area, our cases set demanding rules for both parts of this standard." *Jackson*, 954 F.3d at 935. When analyzing this test, each individual's knowledge of facts and response to those facts must be analyzed separately. *Id.* at 934-935. This is to prevent vicarious liability. *Id.*

### i.    No knowledge of risk of *specific* harm that occurred.

"Start with the first part: To 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' [the school employee] must know of more than a *general* risk of harm. The [school employee] must know of the

29

*specific* risk that later develops." *Jackson*, 954 F.3d at 933-934 (citation omitted) (emphasis in original). Stated differently, the school employee must know of a "risk of harm *of the type that actually happened*." *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 451 (6th Cir. 2021)(emphasis in original).

But mere knowledge of facts from which an inference can be drawn is still not enough. The school employee actually "must also draw the inference" that the specific type of harm will actually occur from the facts known. *Jackson*, 954 F.3d at 933, (quoting *Ewolski*, 287 F.3d at 513). This is "a demanding standard." *Id.*

Illustrating this demanding standard, the Sixth Circuit found that actual knowledge of a student's violent propensities, which included stabbing another student, is insufficient to put the school employees on notice of a *specific* risk that the student would shoot other students.

Consider again *McQueen*. Before the school shooting in *McQueen*, the assailant-student ("Smith") had been "involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil." 433 F.3d at 462. There, the court found that the teacher's knowledge of Smith's "sometimes violent behavior" was not enough to prove that she knew that Smith posed a specific risk of gun violence. *Id.* at 469. (citation omitted). Based on just these facts, the teacher had no notice that Smith "would escalate from hitting with fists, feet, and pencils" to shooting with guns. *Id.* at 470; see also *Jackson*, 954

F.3d at 934 (relying on this analysis of *McQueen*). Contrast *McQueen* with the present case. Here, there are no allegations suggesting that EC had previously engaged in any physical violence of any kind at school. Similarly, there are no allegations that the school employees had any knowledge that EC previously harmed or attempted to harm any student either in or out of school.

*Doe v. Jackson Local School District*, the case involving the sexual assault of kindergartner by an older student, provides another example that knowledge of a student's propensity to endanger other students is not enough to satisfy the culpability standard; instead, there must be knowledge of the end result. *See* 954 F.3d at 935. Before the assault in *Doe*, the school district knew that the assailant, C.T., had a significant history of behavioral problems, including lighting matches on the school bus, bullying students, and preventing students from reporting his conduct. He had also been dishonest when confronted by school officials. While the school official "knew that C.T.'s poor judgment, bullying tendencies, and dishonesty had the potential to endanger students", the court found that "nothing about the 'kind and degree of risk' … suggested that C.T. also posed a risk of intentional sexual assault." *Id.* at 935. The court reasoned, "our cases focus on the kind of *risk* known to the state actors because that will inform the kind of *response* the Constitution requires." *Id.* at 937. The court then found, "[t]his is not a negligence claim, but one sounding in a rare species of one of the narrowest doctrines of constitutional law."

31

*Id.* Again, the facts in *Doe* provided significantly more notice to school employees of the potential for harm, which is in stark contrast to the present situation. Here, EC had no disciplinary history or history of violent behavior that would suggest he posed a potential danger to other students. *See also M.J. v. Akron City School District Bod. Of Ed.*, 1 F.4th 439, 451 (6th Cir. 2021) (school officials' knowledge that security guard had been improperly handcuffing students did not inform them of the *specific* risk the guard would "violently throw[] students around a room.").

Here, nothing about what the individual Defendants knew could have put them on notice that EC posed the specific risk of shooting multiple students. Unlike *McQueen*, there is no suggestion that EC had a *known* longstanding history of disciplinary issues, issues with other students, threatening behavior, or violence towards others. He did not. EC had never been disciplined for or claimed to have possessed a weapon of any kind. There is also no allegation that any Defendants knew EC had a weapon in his possession that day.

What was known, in fact, was very limited. Teacher Kubina and Fine are only alleged to have seen EC *once* looking at ammunition on his cell phone during hunting season. Teacher Karpinski is only alleged to have seen EC watching a violent video game on his phone on one occasion. Such conduct is no different than an average 15-year-old watching Fortnite or Call of Duty videos. Teacher Morgan is alleged to have witnessed EC draw odd depictions and statements of depression

32

on one assignment one day. The drawings and statements do not make a direct threat against another student, group of students, or anyone else. Counselor Hopkins and Dean of Students Ejak are non-specifically alleged to have known of "all relevant facts." All told, these Defendants are alleged to have had very limited individual knowledge of an interest in violent depictions, similar to any student with an interest in horror and action movies, or video games. Yet nothing about the kind and degree of risk from a limited interest in violent depictions suggested that EC also posed the *specific* risk of shooting his classmates.

Certainly, Plaintiffs do not contend that any of the Defendants "actually drew the inference" from these limited facts that EC posed a risk of shooting students. *Jackson*, 954 F.3d at 934 (finding that the "official must 'be aware of facts from which the inference could be drawn that" a specific risk of harm exists, "**and he must also draw the inference.**"). That fact alone should lead to the dismissal of Plaintiffs' lawsuit. *See Drinkard v. Michigan Dep't of Corr.*, No. CIV. 12-14598, 2013 WL 3353935, at *4 (E.D. Mich. July 3, 2013, J. Goldsmith) (where this Court granted Rule 12(b)(6) motion on state created danger claim because plaintiff did not establish knowledge of risk element); *A.L. v. Ann Arbor Pub. Sch.*, No. 10-CV-10354, 2011 WL 87262, at *10 (E.D. Mich. Jan. 11, 2011, J. Goldsmith) (same).

Here, it cannot be claimed otherwise that the staff were concerned for the well-being of the student and sought the assistance of his parents. This is indicative of

teachers and counselors acting in furtherance of their most essential role in responding to a common scenario, an apparently depressed teenager in the age of Covid.

"[T]his case is easier than *McQueen," Jackson*, 954 F.3d at 935, another fatal school shooting case that was dismissed. "There, the school official actually knew of the shooter's history of intentional violence against other students. As noted, 'in the months leading up to the shooting, [he had been] involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil.' [*McQueen*,] 433 F.3d at 462. Yet these prior assaults did not put his teacher on notice that he would bring a gun to school and shoot a classmate. *Id.* at 469–70." Id. Conversely, here, EC had no history of violence towards others. His interest in action videos is beyond commonplace. If the school district employees in *McQueen* did not draw the inference that the assailants in those cases would shoot their classmates based on a known history of violence towards students, then certainly the comparatively limited knowledge that the Defendants possessed in this matter would not lead them to any inference of impending violence.

## ii.     No conscience shocking response to known risk of *specific* outcome.

Only if Plaintiffs can prove that Defendants were aware of the *specific* risk of harm, then courts "[t]urn to the second part: To act with "reckless or callous

indifference," *Ewolski*, 287 F.3d at 513 (citation omitted). The official's response to that known specific risk of harm must also be "conscience shocking." *Schroder*, 412 F.3d at 731. Conscience-shocking conduct is defined as conduct: "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Lillard v. Shelby Cnty. Bd. of Educ.,* 76 F.3d 716, 725 (6th Cir. 1996)(case involving teacher's direct physical assault of a student); *see Jackson Loc. Sch. Dist.*, 954 F.3d at 932 ("the culpability standard that applies to state actors who indirectly allow a private party to inflict harm should not be lower than the culpability standard that applies to state actors who directly inflict that harm themselves."); *see also Bukowski*, 326 F.3d at 710.

Further limiting the circumstances is where the official chooses a response motivated by a "legitimate governmental purpose," then the challenged conduct will generally not be found conscience shocking. *Jackson*, 954 F.3d at 933–34. For example, the Sixth Circuit has repeatedly found that even in the extreme cases such as a case involving a school teacher's direct physical abuse of a student, which included strapping a disabled student to a gurney and gagging the student with a bandana, did not shock the conscience, because the abuse was committed for a legitimate reason, namely student discipline. *Domingo v. Kowalski*, 810 F.3d 403

35

(6th Cir. 2016); *see also Gohl v. Livonia Public Schools*, 836 F.3d 672 (6th Cir. 2016) (same).

*Jackson*, 954 F.3d 925, the case involving the sexual assault of the kindergarten student, also illustrates this principle. In that case, the court found that relocating an older student next to a much younger student in response to behavioral issues, which allowed the sexual assault to occur, was not conscience shocking. *Id.* at 935. The court reasoned that the bus driver "did not make this seating change for some 'arbitrary reason' designed to increase the risks of harm to Minor Doe." *Id.* "[The bus driver] was instead 'motivated by a countervailing, legitimate governmental purpose,'" which was to keep a closer eye on the assailant. *Id.* The bus driver chose a course of action based on the known risk before her (match lighting), not based on an unknown risk that had yet to come to pass (sexual assault). *Id.* The court recognized that as will often be the case in retrospect, more could have been done when implementing this discipline. But at most, the failure to take additional precautions suggests negligence, which falls well short of establishing the required callous disregard for the safety of the victim. *Id.*

If faced with "tradeoffs" when choosing an appropriate response to a situation, school employees' actions generally also "do not establish conscience-shocking behavior." *Jackson*, 954 F.3d at 936. In *Jackson*, the Sixth Circuit found that a principal's prior decisions to discipline C.T. more severely for his earlier

36

transgressions was not conscience shocking because "tougher sanctions faced countervailing concerns." The Sixth Circuit recognized that "[s]ure, Waltman could have sought to expel C.T. or barred him from the bus. But these harsher sanctions likely would have risked an administrative or judicial retort that the punishment did not fit the crime." *Id.*

*McQueen*, the case involving a school shooting, provides a clear example why Defendants response as alleged in these lawsuits is not conscience shocking. 433 F.3d 460. In *McQueen,* the court found that it was not conscience shocking to leave a student with known violent tendencies unsupervised in a class with other students, which allowed the shooting to occur. The Sixth Circuit concluded that teacher's decision to leave the student unsupervised in light of the student's known history of violence was not enough to satisfy the high standard of a state created danger. *Id.* at 469-470.

*Bukowski*, is particularly instructive here. In *Bukowski*, a mentally disabled 19-year-old woman was coaxed to travel out-of-state to visit a much older man she met online, who raped her. When the woman's parents discovered she had left their home, they contacted police, who ultimately found the woman at the rapist's home. Police took the woman into custody and promised to detain her until her parents arrived. While in custody, the woman falsely told police that the rapist was her boyfriend and that her parents abused her. During the interview, police noted that

37

the woman was obviously mentally disabled. Despite that obvious disability, police accepted the woman's false story. So, police returned the woman to the man who lured her from home and ultimately raped her again. The woman's parents sued over the officers' decision to return her to the rapist. The Sixth Circuit dismissed plaintiff's state created danger claim. The court noted that even if there were sufficient state action here, which there was not, the officers' actions were not conscience shocking. *Id*. at 710. The court acknowledged that police knew they were questioning a mentally disabled young woman under suspicious circumstances. But the court was satisfied that the mentally disabled woman provided an explanation to police that left them ignorant of many facts that were only apparent in hindsight. Based on what the mentally disabled young woman shared, police "would not have been aware of facts from which it could be deduced that a substantial risk of harm existed." *Id*. at 711.

In this case, weighing each Defendants' responses against what *was* known. Unlike the students in *McQueen* and *Jackson*, who were known to have violent or troubled histories, EC did not have a history of violence toward others, or behavioral issues in general. The only issue Kubina had with EC for the entire school year occurred when she saw him *once* looking at an image of bullets on his cell phone during hunting season, nothing more. In response to that single incident, with a

student with no discipline or violent history, Kubina immediately reported it to the counseling department.

Pam Fine had not received any complaints regarding EC during the 1.5 years EC had been at the high school. Upon receiving the first report that EC had been looking at bullets on his cell phone, Fine immediately called EC to her office, spoke with EC, and called EC's mother.

Karpinski is alleged to have only seen EC watching a violent video game on his cell phone *one time* throughout the entire school year. In response to the single act, Karpinski immediately reported the conduct to EC's counselor.

Like Kubina and Karpinski, Morgan had EC as a student all school year. Morgan only knew of the single drawing on ECs one geometry assignment. Nothing similar is alleged to have ever occurred in the three months prior. Plaintiffs allege that in response, Morgan took EC to the counselor's office, and gave the counselor a picture of the geometry assignment.

Counselor Hopkins and Ejak knew less than what was known in *McQueen*, where the student-perpetrator had a known history of violence (including stabbing) against his classmate. Hopkins' response to these reports was also appropriate. According to Plaintiffs, upon receiving these reports, "Hopkins spoke extensively with EC, **who denied that there were any problems**." Although EC confirmed he did not have any issues, still "Hopkins [ ] called EC's parents and asked them to

come to school for a meeting." During the meeting, Plaintiffs claim that Hopkins informed the parents he would call CPS if they did not obtain professional counseling for EC within the next 48 hours. This is a far greater response than the police officers in *Bukowski*, when the mentally disabled woman falsely informed police she was safe. Rather than simply let EC return to class based alone on his assurance, as the officers in *Bukowski* did when they returned the mentally disabled woman to her rapist based on her statements, Hopkins still followed up with EC's parents so he could get professional counseling.

Far from conscience-shocking, the responses here are appropriate under the circumstances, even hypervigilant. The type and nature of the complaints are not uncommon in a high school setting. There were also no threats made to harm anyone, and no one was aware that EC had a gun. At the first indication of any issue, teachers immediately reported their observations. Immediately upon receiving these reports, Hopkins, Fine, and Ejak met with EC, called his parents, and strongly urged mental health support. And similar to *Jackson*, these Defendants had a legitimate governmental purpose behind their actions, namely trying to appropriately counsel a student. See *Hunt,* 542 F.3d at 542 (finding that officials' actions when acting with a legitimate governmental purpose is not conscience shocking). That is not conscience shocking conduct. *See Jackson*, 954 F.3d at 937.

As will often be the case with the benefit of hindsight, arguments will unfairly be made that district employees "could have done more when" responding to the facts they knew.  Knowing now the end result, and not based on the limited information these Defendants knew at the time, Plaintiffs argue that police should have been called, ECs backpack—which was not with him—should have been searched, and EC should have been removed from school.

But like *Jackson* and *Bukowski*, there are significant countervailing interests present here impacting Defendants' decisions under the circumstances. It is questionable whether any employee, with the facts they knew, had a right to search EC under the circumstances. *See Beard v. Whitmore Lake*; 402 F.3d 598  (6th Cir. 2005)(finding that the Fourth Amendment applies to student searches conducted by school employees in the schools); *see also E.T., a minor, by his parents v. Bureau of Special Education Appeals of the Division of Administrative Law Appeals*, 169 F. Supp. 3d 221, 245 (D. Mass. 2016)(discussing that a violent drawing may not support a search to E.T.'s locker or personal belongings).

Additionally, arguments that EC should have been summarily removed from school following his meeting with Hopkins would infringe on EC's his right to a public education. *See Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Removing him from school under those circumstances would also violate the state law and policy for Restorative Justice Practices that the Michigan

41

Attorney General reminded school districts of weeks before the incident. Michigan law on restorative practices "requires" school districts to consider alternatives before suspending students from school. MCL 380.1310c.

Finally, sending an apparently depressed student home to an empty house without supervision or companionship may not be in a student's best interest. ECF No. 6 PageID.88, ¶ 83,87. *See Jahn v. Farnsworth*, 617 F. App'x 453 (6th Cir. 2015)(plaintiff claimed school sent suicidal student home alone causing suicide; plaintiff argued student should have remained in school given suicidal state). Isolating students at home for a prolonged period and denying them an environment in which they learn and socialize in a normal fashion cannot be said to have had a positive effect on our children and is and was an understandable occurrence on the part of the school staff in this case.

Thus, Defendants could have faced a lawsuit no matter how they acted. *Bukowski*, 326 F.3d at 712. The Sixth Circuit has made clear it "will not place governmental actors in a Catch 22 situation by imposing … liability for failure to do an act that might itself have exposed the actor to liability on another theory." *Hunt v. Sycamore Cmty. Sch. Dist.*, 542 F.3d 529, 542 (6th Cir. 2008); *see also Jackson*, 954 F.3d at 936. "Many, if not most, governmental policy choices come with risks attached ... and yet 'it is not a tort for government to govern' by picking one option over another.'" *Walker*, 535 F. App'x at 465–66. Hopkins made a judgement call

42

based on the limited information presented. What he learned during his meeting with EC and in the context of the above considerations was understandably an attempt to assist a troubled student. That is not conscience shocking.

### B.   No Supervisor Liability.

"[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *McQueen*, 433 F.3d at 470. Because Plaintiffs have not pointed to unconstitutional conduct by Throne's and Wolf's subordinate employees, it follows that the supervisory liability claim against them fails.

Assuming Plaintiffs can establish a substantive due process claim, the supervisory liability claim still fails. It is well-settled that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of respondeat superior." *Iqbal*, 556 U.S. at 676; *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir.2006). **Consequently, a "mere failure to act (even) in the face of a statistical pattern of incidents of misconduct" will not suffice to establish supervisory liability**. *Hays v. Jefferson Cty*., 668 F.2d 869, 873–74 (6th Cir. 1982)(emphasis added). "And supervisory liability requires more than negligence or recklessness." *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021). The Sixth Circuit has long held that supervisory liability requires some "active unconstitutional behavior" on the part of the supervisor. *Bass v. Robinson*,

43

167 F.3d 1041, 1048 (6th Cir. 1999). "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, *v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Here, Plaintiffs do not allege that Wolf or Throne directly participated in or encouraged the specific act of unconstitutional conduct. They had no knowledge of or report concerning EC. Instead, Plaintiffs' supervisory liability claim against Throne and Wolf is tied to the allegation that they did not expel, discipline, properly supervise EC, or notify police. ECF No. 6, PageID 97-98, ¶¶ 119, 123. But those allegations are claims of a failure to act. Such allegations are not substantive due process violations, or supervisory liability claims. *Crawford*, 15 F.4th at 761 ("supervisory liability … not attach for "a mere failure to act."); *Hays*, 668 F.2d at 873–74 (same). Therefore, the supervisory liability claims against Throne and Wolf should be dismissed.

### 2.    Defendants Did Not Violate "Clearly Established" Constitutional Rights.

Even if a question could be raised as to whether the individual Defendants' actions violated Plaintiffs' constitutional rights, that is not enough to impose liability. The District employees are entitled to qualified immunity if their conduct does not violate a "clearly established" constitutional right. *Pearson v. Callahan*,

555 U.S. 223, 231 (2009). The Sixth Circuit recently found that the clearly established test is "a tough standard [to meet]" *Ashford v. Raby*, 951 F.3d 798 (6th Cir. 2020). A "clearly established" right is one that is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2011).

The "clearly established" analysis starts with examining United States Supreme Court and Sixth Circuit case law for similar cases. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 675 (6th Cir. 2020). The facts of the prior cases must be sufficiently similar to clearly establish the law. Recently, the Supreme Court once again reminded us "not to define clearly established law at a high level of generality." *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021). For example, merely recognizing that the Fourth Amendment bars the police from using excessive force is too general and will "not clearly establish that force was excessive on a particular occasion." *Beck v. Hamblen Cty. Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020)

Rather, "the legal principal must clearly prohibit the official's conduct in the **particular circumstances** before him. The rule's contours must be so well defined that it is clear to a reasonable official that his conduct was unlawful **in the situation he confronted. This requires a high degree of specificity**." *Kollaritsch v. Michigan State Univ.*, 944 F.3d 613, 626 (6th Cir. 2019)(emphasis added)(citing

*Tahlequah,* 142 S. Ct. at 11). The Sixth Circuit also elaborated that "the fact pattern of the prior case must be 'similar enough to have given "fair and clear warning to officers" about what the law requires.'" *Beck*, 969 F.3d at 599; *see also Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 570 (6th Cir. 2013)("qualified immunity must be assessed in the context of each individual's *specific* conduct.").

The high degree of similarity in fact patterns required is illustrated in *Tahlequah*, a case involving the shooting death of a suspect. 142 S. Ct. 9. In *Tahlequah*, the Court drew a distinction between the details of two arrests, calling them "dramatically different" for purposes of the qualified immunity analysis:

> The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was unlawful.

*Tahleuah*, 142 S.Ct. at *12 (citing Allen *v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997). The above illustrates the high degree of specificity that is required to define clearly established law—i.e. the then-existing precedent must be so well defined that it is clear to any reasonable school district's employee that Defendants' conduct was unlawful in the situation they confronted.

Here, there are no Supreme Court or Sixth Circuit Opinions finding that a school district's employees' actions in attempting to look to the well-being of a student under these circumstances amounted to this high threshold of conduct. The only two cases decided by the Supreme Court and Sixth Circuit related to school shootings are *Walker* and *McQueen*, repeatedly referenced above. Both found that the school district employees' conduct ***did not violate substantive due process rights*** by returning known violent students to class, and in one case, leaving the student unsupervised.

Additionally, the Sixth Circuit's holdings in similar cases established there is no constitutional violation here. It is not clearly established that detaining a violent suspect known to have access to firearms, then returning that suspect to a known violent situation, violates the Constitution. *See Brooks*, 221 F. App'x 402, 407 (6th Cir. 2007)(briefly detaining a known violent suspect, failing to take away his firearms or search him, then releasing the suspect back to a known volatile situation, and the suspect then murderers the victim, does not violate the Constitution.); *see Reilly*, No. 20-2220, 2021 WL 3929324, at *5 ("alleged failure by Defendants to take [a suspect] into custody, take away his firearm or otherwise fail to 'follow up' is not actionable under § 1983."); *see Ryan*, 698 Fed. Appx. at 283 (same).

It is also not clearly established that an alleged failure to intervene to prevent a student from carrying out a criminal act against other students violates the

47

Constitution. The opposite is true, as the Sixth Circuit has found that such does not lead to constitutional liability. *See Soper*, 195 F.3d at 853. This is true even if the school employee has knowledge of the risk of harm to the student, or "knowledge of a student's vulnerability." *See Stiles*, 819 F.3d at 854. It is also not clearly established that failing to search a student for a gun, calling police, disciplining him, or removing him from school violates the Constitution. The Sixth Circuit has repeatedly held that such actions do not amount to constitutional violations. *See Stiles*, 819 F.3d at 855 (6th Cir. 2016)("Failing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [police] are plainly claims of omissions rather than affirmative acts" and not substantive due process violations.).

Based on these cases, it is not clearly established that the teachers' alleged acts of reporting limited observations regarding student behavior to a counselor violates the Constitution. It is not clearly established that the principal's and superintendent's alleged act of informing students they believed the school was safe violated the constitution. It is also not clearly established that Fine's, Ejak's and Hopkins' response in discussing these concerns with the student, meeting with the parents regarding these concerns, and strongly encouraging counseling to the student and his parents violates any constitutional rights. As a result, Defendants are entitled to immunity and the claims against them should be dismissed.

48

**II.   PLAINTIFFS' *MONELL* CLAIM AGAINST THE SCHOOL DISTRICT SHOULD BE DISMISSED.**

**1.   If No Underlying Constitutional Violation, Then No *Monell* Liability.**

"[When] no constitutional violation occurred, there can be no *Monell* claim against the [School District], regardless of its policies." *Farinacci v. City of Garfield Hts.*, 2010 WL 1268068, at *5 (N.D. OH. 2010), aff'd, 461 Fed.Appx. 447 (6th Cir. 2012); *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (A city "cannot be liable under § 1983 absent an underlying constitutional violation by its officers."). Since there is no substantive due process violation in this case, there is no *Monell* liability. That should end the inquiry into *Monell* liability.

**2.   No Clearly Established Right Ends *Monell* Claim.**

Failure to train and supervise *Monell* claims also fail as a matter of law when the right at issue is not clearly established. *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017)("The absence of a clearly established right spells the end of this *Monell* claim."). The Sixth Circuit found that "[a] municipality cannot be deliberately indifferent to the violation of a constitutional right—and thus liable under § 1983—if that right is not clearly established." *Brennan v. Dawson*, 752 F. App'x 276, 287 (6th Cir. 2018)(citing *Hagans v. Franklin Co. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012)("[A] municipal policymaker cannot exhibit fault

49

rising to the level of deliberate indifference to a constitutional right when that right has not yet been clearly established."")); *J.H. v. Williamson Cty., Tennessee*, 951 F.3d 709, 721 (6th Cir. 2020)("The absence of a clearly established right spells the end of [a plaintiff's] *Monell* claim.").

Just as in *Arrington-Bey*, Plaintiffs' claim of any failure to train/supervise and inadequate/absence of policy claims should be dismissed because the right at issue was not clearly established. As argued above, neither the Supreme Court nor Sixth Circuit have found a constitutional violation under these circumstances. In light of *McQueen* and *Walker,* where the Sixth Circuit dismissed substantive due process claims arising out of school shootings, it cannot be seriously argued that the individuals alleged conduct violated clearly established constitutional rights under the particular circumstances in this case. Therefore, Plaintiffs' *Monell* claim should be dismissed.

### III.   PLAINTIFFS' REQUEST FOR PROSPECTIVE INJUNCTIVE RELIEF SHOULD BE DENIED.[3]

### 1.   Plaintiffs' Procedural Due Process Claim Fails.

Plaintiffs' request for prospective injunctive and equitable relief is premised on alleged violations of procedural due process. More specifically, they claim that

---

[3] This claim is brought against former Superintendent Ken Weaver in his official capacity only. A Section 1983 claim brought against a school district employee in his official capacity is actually a claim against the school district. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985)

50

the District's policies deprived them of their property right to education without due process of law. "To prevail on a procedural due process claim, [the plaintiff] must establish that [she] possessed a constitutionally protected interest, that [she] was deprived of that interest, and that the state did not afford [her] adequate procedural rights prior to depriving [her] of that interest." *Machisa v. Columbus City Bd. of Educ.*, 563 F. App'x 458, 562 (6th Cir. 2014). Here Plaintiffs failed to plead a procedural due process claim for several reasons.

First, Plaintiffs cannot establish that the District's policies deprived them of a constitutionally protected right. Plaintiffs' complaints admit that school reopened nearly a year ago, therefore, students returned. While students do not have a fundamental right to a public education, *see Steward as next friend of M.S. v. Manchester Community Schools*, No. 21-12392, 2022 WL 4385346, at *7 (E.D. Mich Sept. 21, 2022), any alleged property interest in their education has been restored.[4] Injunctive relief claims fail when the relief sought is moot. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (denying claim for injunctive relief because the claim was now moot).

Second, Plaintiffs failed to allege how they were deprived of due process of law. This is fatal to Plaintiffs' procedural due process claim. *See Hearns Concrete*

---

[4] Plaintiffs lament that the property interest was restored to the extent that the District maintained its same polices upon reopening.

51

*Const. Co. v. City of Ypsilanti*, 241 F. Supp. 2d 803, 811 (E.D. Mich 2003)(dismissing the plaintiff's procedural due process claim because the plaintiff failed to allege that there was an infirmity in the process itself); *see E.M.J. by and through M.J. v. Garrard County Board of Educ.*, 413 F. Supp. 3d 598, 617 (E.D. Ky. 2019)(dismissing the plaintiff's procedural due process claim because the plaintiff failed to allege that the defendant denied her of the fundamental requirements of due process); *see also Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992).

Third, Plaintiffs cannot show that they were deprived of adequate process. Normally, due process requires a party whose rights will be affected be provided with notice and an opportunity to be heard. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). However, the Supreme Court has recognized an exception and that due process requirements may be suspended in emergency situations. *See Hodel v. Virginia Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-300 (1981).

Here, to the extent Plaintiffs' procedural due process claim is premised the temporary suspension of in-person learning following the school shooting, their claim fails given that this amounts to permissible summary action. *see e.g., Libertas Classical Ass'n v. Whitmer*, 498 F. Supp. 3d 961, 976 (W.D. Mich. 2020)(recognizing summary administrative action as an exception to due process requirements in response to COVID-19 public health crisis); *see Michigan*

52

*Restaurant & Lodging Association v. Gordon*, 501 F. Supp. 3d 460, 464-65 (W.D. Mich. 2020)(same).

Similarly, to the extent Plaintiffs' procedural due process claim is premised on the District's policies, these are legislative acts that are generally applicable and apply to the entire student body rather than one individual. Because of this, the due process clause does not require notice or a hearing before adoption of a policy. *See Smith v. Jefferson County Bd. of School Com'rs*, 641 F.3d 197, 216 (6th Cir. 2011)(holding that the school board's determination to eliminate the alternative school for budgetary reasons constituted a legislative activity; no notice or hearing was required before such legislative action so the school board did not violate the teachers' procedural due process rights). This is because "'the legislative process generally provides all the process that is constitutionally due' when a plaintiff's alleged injury results from a legislative act 'of generally applicability.'" *Id.* (citations omitted).

Finally, the District's policies could not have constructively denied due process—had Plaintiffs alleged they stopped attending school, which they have not—because the alleged policies Plaintiffs identify do not violate the constitution. Plaintiffs' allegation of an alleged policy that requires school officials to return a suicidal student to his class does not violate the constitution. *Walker*, 535 F. App'x at 465 (6th Cir. 2013)("[w]hen an official intervenes to protect a person, then later

returns the person to 'a situation with a preexisting danger,' the intervention does not satisfy the affirmative act requirement for state-created danger."). Policies that do not affirmatively require school officials to protect student safety do not violate the constitution.  School districts and their employees do not have an affirmative *constitutional* duty to protect students from harm caused by private actors, such as other students. *Soper*, 195 F.3d at 853. This is true even if the school employee has knowledge of the risk of harm to the student, or "knowledge of a student's vulnerability." *Stiles v. Grainger Cty., Tenn*., 819 F.3d at 854.

## IV.   PLAINTIFFS' GROSS NEGLIGENCE CLAIMS ARE BARRED BY IMMUNITY.

### 1.   The District is Immune from Tort Liability.

The District is entitled to immunity from Plaintiffs' gross negligence claim. School districts are absolutely immune from tort liability unless one of six narrowly statutory exceptions to governmental immunity apply. MCL 691.1407(1) provides that: "Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." There is no gross negligence statutory exception to immunity as it relates to governmental entities, and a governmental agency school district cannot be vicariously liable for an employee's gross negligence. *Yoches v City of Dearborn*, 904 NW2d 887, 895 (Mich. App. 2017); MCL § 691.1407(2). In *Yoches*, the Court stated as follows:

54

This statutory language is unambiguous. MCL 691.1407(1) provides immunity to a governmental agency without regard to an employee's gross negligence. MCL 691.1407(2) provides immunity for governmental employees, but MCL 691.1407(2)(c) provides an exception to that immunity when the employee's conduct constitutes gross negligence. **Although subsection (2)(c) establishes an exception to the grant of immunity to an officer or employee of a governmental agency, it does not provide that a governmental agency otherwise entitled to immunity can be vicariously liable for the officer's or employee's gross negligence.** Consequently, if an exception to governmental immunity does not apply 'as otherwise provided in this act,' e.g., pursuant to the motor vehicle exception, the [defendant] would not be vicariously liable for [the employee]'s negligence, regardless of whether it rises to the level of gross negligence.

*Id.* at 895-896 (citing *Hobrla v Glass*, 143 Mich App 616, 624; 372 NW2d 630 (1985)(providing that under MCL § 691.1407(1), "the department's immunity extends to allegations of vicarious liability, since the individual defendants, even if they acted negligently, were also engaged at the time the tort was committed [in] the exercise of a governmental function."))(emphasis added).

### 2. The Individual Defendants are Immune from Plaintiffs' Gross Negligence Claims.

Pursuant to MCL 691.1407(2), "each . . . employee of a governmental agency" is immune from tort liability for injuries to persons if all of the following are met: (1) the employee is acting or reasonably believes he is acting within the scope of his authority; (2) the governmental agency is engaged in the exercise or discharge of a governmental function; and (3) the employee's conduct does not amount to **gross negligence** that is **the proximate cause** of the injury or damage. *Tarlea v. Crabtree*,

55

263 Mich App 80, 88; 687 NW2d 333 (2004)(citations omitted). Therefore, a governmental employee's gross negligence must be "*the*" proximate cause of injury.

### a.   The Oxford Defendants Cannot be "the" Proximate Cause.

In *Robinson v City of Detroit*, 462 Mich 439, 459; 613 NW2d 307 (2000), the Michigan Supreme Court rejected liability if the governmental employee was only "a" proximate cause of the purported injury. Rather, the Court held that proximate cause means "**the <u>one</u> most immediate, efficient and direct cause preceding an injury.**" *Id.* at 462. *Robinson* held that the statutory language used in the governmental immunity statute is more restrictive than conventional proximate cause requirements. The Court came to this conclusion based on the statutory interpretation of MCL 691.1407(2)(c) and explained that the "use of the definite article 'the' clearly evinces an intent to focus on <u>**one**</u> cause. The phrase "the proximate cause" is best understood as meaning "the <u>**one**</u> most **immediate, efficient, and direct cause preceding an injury.**" *Smith v Jones*, 246 Mich App 270, 280 (2001) (citing *Robinson*, 462 Mich at 458-459)(emphasis added). A governmental employee cannot be "the proximate cause" of a third party's criminal act. *See Bitner v Jones*, 300 Mich. App. 65 (2013); *Miller ex rel Miller v Lord*, 262 Mich App 640; 686 NW2d 800 (2004)(holding that school employees could not be "the" proximate cause of a third party's criminal assault).

Here, EC plead guilty to shooting each of the students. EC repeatedly fired a gun supplied to him by his parents. This action of firing the gun was the proximate cause of the injuries inflicted. These acts, as a matter of law, were "the" proximate cause. There can only be <u>one</u> "the" proximate cause, and here that is without any doubt EC. All claims against the Oxford Defendants should be dismissed.

### b.      The Oxford Defendants Were Not Grossly Negligent.

The GTLA defines gross negligence as "[c]onduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(2)(C). As the Legislature intended, the statutory gross negligence standard is difficult to satisfy.  To find that a defendant acted in a grossly negligent manner is to conclude that the defendant simply did not care about the safety of the person under his supervision.

Under MCL 691.1407(2), the Michigan Supreme Court held that the gross negligence standard requires that a defendant act "substantially more than negligent."  Furthermore, gross negligence is said to suggest **"a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks," so much so that the defendant "simply [does] not care about the safety or welfare of those in his charge."** *Tarlea*, 263 Mich App 90. To prove this standard, "[i]t is as though, if an objective observer watched the actor, he could conclude, reasonably, that the actor simply did not care about the safety or welfare

57

of those in his charge." *Id.* Consistent with the Legislature's intent to create a high threshold, Michigan courts have drawn a clear distinction between gross negligence and mere ordinary negligence, and the Court of Appeals has held that "[e]vidence of ordinary negligence does not create a material question of fact concerning gross negligence." *Maiden v Rozwood*, 461 Mich 109, 122, 122; 597 NW2d 817 (1999).

For the same reasons that Defendants' responses were not conscience shocking, their conduct is not grossly negligent either. Here, even taking Plaintiffs' alleged facts as true, it is undisputed that Defendants responded to each incident immediately. When each of his teachers saw something, they immediately reported it. Immediately upon receiving these reports, EC was spoken to by his counselor twice, his parents were called, and outside therapy was recommended. No one can claim with a scintilla of support that the employees were not attempting to help this student with such troubles as were perceived. With the benefit of hindsight, it is easy to suggest that more could have been done. However, that is not the legal standard. Here, the Oxford Defendants responded in a reasonable way. If their response is to result in their careers ruined and their financial stability threatened, why would anyone want to serve in public education? Based on these facts, Plaintiffs have not pled facts sufficient to establish a claim of gross negligence.

**3.      Plaintiffs' Claims Under the Child Protection Act are Barred by Immunity.**

Plaintiffs alleges that the Oxford Defendants violated the Child Protection Law (CPL). The CPL imposes a duty on certain listed professionals to report reasonable suspicions of child abuse or neglect. *Marcelletti v. Bathani*, 198 Mich App 655, 659; 500 NW2d 124 (1993). MCL 722.623(1)(a).

**a.      The CPL was Not Violated.**

The term "child abuse" as used in MCL 722.623 is defined as "harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, sexual abuse, sexual exploitation, or maltreatment, by a parent, a legal guardian, or any other person responsible for the child's health or welfare or by a teacher, a teacher's aide, or a member of the clergy.*" Doe v. Doe*, 289 Mich. App. 211, 215, 809 N.W.2d 163, 165 (2010). Under the plain language of the CPL, school district employees are not required to report that they believe a student may harm another student. *People v. Beardsley*, 263 Mich. App. 408, 415 (2004). Therefore, abuse suspected to be caused by EC does not fall within the Act.

**b.      The Individual Defendants are Immune from this Claim.**

Governmental immunity, MCL 691.1407(2), also applies to individual governmental mandatory reporters. In the 2013 Michigan Court of Appeals opinion of *Bitner v Jones*, 300 Mich. App. 65, 67 (2013), found that claims under the Child

Protection law are barred by the Government Tort Liability Act. The Michigan Court of Appeals held that "in order for [a governmental] defendant to be liable under the mandatory reporting statute, her conduct must have been grossly negligent and *the* proximate cause." (emphasis in original). *Id.* at 75, 76-77. The *Bitner* Court then explained that, in cases where a child is abused by a third-party, the third party will be "the" proximate cause and the mandatory reporter cannot be liable. *See also Campbell v Dundee Cmty Sch*, No. 12-CV-12327, 2015 WL 4040743, at *12 (ED Mich July 1, 2015). As a result, these claims are barred by governmental immunity for the reasons stated above.

### c.    The District Is Immune from this Claim.

The District is also entitled to governmental immunity from Plaintiffs' Child Protection Law (CPL), MCL 722.621 *et seq.,* claim. As stated above, the District, as a governmental entity, is entitled to absolute immunity unless one of six "narrowly-construed" statutory exceptions to immunity apply. *Tarlea v Crabtree*, 263 Mich App 80, 87 88 (2004). *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 614; 664 NW2d 165 (2003). Plaintiffs did not plead any of the six statutory exceptions and Plaintiffs' claims do not fit within any of these exceptions. Instead, Plaintiffs assert that the District is liable for violating the CPL. However, the CPL does not expressly state an exception to governmental immunity.

Governmental entities (as opposed to individuals) cannot be denied immunity by implication. *Walters v Leech*, 279 Mich App 707, 710; 761 NW2d 143 (2008)(holding that well-established common-law principles cannot be abrogated by implication.). The Michigan Supreme Court has recently held that immunity will only be denied to a governmental entity when the Legislature enacts a statute that **expressly** states that governmental immunity does not apply. *Lash v. Traverse City*, 479 Mich 180, 194 (2007). Statutes in derogation of governmental immunity are to be narrowly construed in favor of immunity. *Maskery v U of M Bd of Regents*, 468 Mich 609, 614; 664 NW2d 165 (2003).  Here, the CPL does not expressly state governmental entities can be held liable or are denied governmental immunity. Accordingly, governmental immunity applies to bar Plaintiffs' CPL claim against the District.

## V.  NO MICHIGAN CONSTITUTION VIOLATION.

The Michigan Supreme Court has found that Plaintiffs cannot bring a claim for violation of the Michigan Constitution against a municipality or an individual government employee. *Jones v. Powell*, 462 Mich. 329, 335, 612 N.W.2d 423, 426 (2000). The Court reasoned that a cause of action does not exist under the state constitution when there are other remedies potentially available under section 1983 or state tort law:

> Unlike states and state officials sued in an official capacity, municipalities are not protected by the Eleventh Amendment. A plaintiff may sue a municipality in federal or state court under 42 U.S.C. § 1983 to redress a violation of a federal constitutional right. Further, a plaintiff may bring an action against an individual defendant under § 1983 and common-law tort theories.

*Jones v. Powell*, 462 Mich. 329, 337, 612 N.W.2d 423, 426 (2000)(citing *Lake Country Estates*, 440 U.S. 391, 400–401 (1979); *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690, n. 54 (1978))).

Here, since Plaintiffs have already brought a § 1983 claim for substantive due process violation, this claim should be dismissed.

## CONCLUSION

Based on the legal authority set forth above, Plaintiffs failed to state a claim upon which relief can be granted. Therefore, these matters should be dismissed in their entirety pursuant to Federal Rule of Civil Procedure 12(c).

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Oxford Defendants

DATED: December 22, 2022

LOCAL RULE CERTIFICATION: I, Timothy J. Mullins, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). Defendants are filing concurrent herewith an ex parte motion to exceed the page length.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Oxford Defendants

DATED: December 22, 2022

## CERTIFICATE OF ELECTRONIC SERVICE

TIMOTHY J. MULLINS states that on December 22, 2002, he did serve a copy of **OXFORD DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(c)** via the United States District Court electronic transmission.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorneys for Oxford Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
P28021