UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RILEY FRANZ and JEFFREY FRANZ
and BRANDI FRANZ, as Next Friend
for ISABELLA FRANZ, a Minor,

                Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.

                Defendants.

_____/

Case No. 21-12871
Hon. Mark A. Goldsmith
Mag. Judge Anthony P. Patti

Consolidated With Case Nos.
22-11398; 22-10407; 22-11250;
22-11360; 22-11448; 22-11113;
22-11251; 22-10805; 22-11959

SANDRA A. CUNNINGHAM, Next Friend
of P.A., a minor,

                Plaintiff,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

                Defendants.

_____/

**PLAINTIFFS' RESPONSE
IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS [ECF NO. 107]**

NICOLETTE ASCIUTTO, as Next Friend
Of JOHN ASCIUTTO and ANTHONY
ASCIUTTO II, minors; and JOHN
VACKARO as Next Friend of MARCO
VACKARO, a minor,

                Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

                Defendants

_____/

**\*\*Oral Argument Requested\*\***

i

NICOLE BEAUSOLEIL, Personal
Representative of the Estate of MADISON
BALDWIN, Deceased,

     Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants

_____/

G.J., a minor, by his Next Friend, ANDREA
JONES, et al.,

     Plaintiff,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants.

_____/

MATTHEW MUELLER and MARY
MUELLER as co-Next Friends for
E.M., a minor,

     Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants.

_____/

WILLIAM MYRE and SHERI MYRE, as
Co-Personal Representatives of the Estate of
T.M., deceased; CRAIG SHILLING and JILL
SOAVE as Co-Personal Representatives of
the Estate of J.S., deceased; CHAD GREGORY
as Next Friend for K.G., a minor; LAUREN
ALIANO, as Next Friend for S.K,, a minor,
and G.K., a minor; and LAURA LUCAS,
as Next Friend for A.S., a minor,

     Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants.

_____/

KYLIE OSSEGE,

     Plaintiff

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants.

_____/

STEVE ST. JULIANA, Personal Representative
of the Estate of HANA ST. JULIANA, deceased;
and REINA ST. JULIANA, a minor, by her
Next Friend, STEVE ST. JULIANA,

     Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

     Defendants.

_____/

JARROD WATSON and LINDA WATSON,
as co-Next Friends for A.W., a minor; and
JARROD WATSON and LINDA WATSON,
individually,

                Plaintiffs,

vs.

OXFORD COMMUNITY SCHOOLS, et al.,

                Defendants.

_____/

## **<u>TABLE OF CONTENTS</u>**

INDEX OF AUTHORITIES……………………………………………………..vii

STATEMENT OF ISSUES PRESENTED…………………………………………...x

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ......................................................................... 2

ARGUMENT ............................................................................................ 8

    I.     Standard of Review ................................................................ 8

    II.    Plaintiffs' right to be free from a state-created danger was clearly
         established at the time of Defendants' actions ....................... 9

    III.   Plaintiffs' allegations plead viable state-created danger claims
         Against the individual defendants ........................................ 11

        A. Defendants' affirmative acts created or increased the risk
           that Plaintiffs would be exposed to danger ..................... 12

           i.     Plaintiffs Allege Affirmative Acts ......................... 12
           ii.    Defendants' Case Law is Not Applicable Here .................... 25

        B. Defendants' actions especially endangered Plaintiffs ..................... 36

        C. Defendants had the requisite degree of culpability ......................... 37

    IV.   Plaintiffs have properly alleged supervisory liability claims against
         Defendants Wolfe and Throne............................................... 44

    V.    Plaintiffs have properly alleged individual Section 1983 claims against
         Teacher #1, Teacher #2, Teacher #3 and Pamela Parker Fine ............. 49

    VI.   Plaintiffs have properly alleged *Monell* liability claims against Oxford
         Community Schools ................................................................ 54

VII.   Injunctive Relief Claims..........................................................................58

CONCLUSION ......................................................................................................60

## INDEX OF AUTHORITIES

Cases

*A.L. v. Ann Arbor Pub. Sch.*, No. 10-10354, 2011 WL 87262
at *9-10 (E.D. Mich Jan. 11, 2011, J. Goldsmith)..........................................23, 43

*Babb v. Marysville Anesthesiologists, P.C.*,
942 F.3d 308, 323 (6th Cir. 2019) .......................................................................38

*Bartynksi v. City of Highland Park, Michigan*, No. 21-10049,
2022 WL 390892 at *4 (E.D. Mich. Feb. 8, 2022)..................................37, 44, 54

*Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007)....................................28-29

*Buddenberg v. Weisdack*, 939 F.3d 732, 738-39 (6th Cir. 2019) .......................... 8

*Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003)........................ 18, 26, 32

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) ........................................55

*Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)...................................28

*Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) ...............................45

*Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*,
954 F.3d 925, 928 (6th Cir. 2020) ..................................................................41, 52

*Drinkard v. Michigan Dep't of Corr.*, No. CIV. 12-14598,
2013 WL 3353935 at *4 (E.D. Mich. July 3, 2013, J. Goldsmith)......................42

*Everson v. Bd. Of Educ.*, 123 Fed. Appx. 221, 228 (6th Cir 2005)....................... 8

*Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002).............27-28, 42

*Goss v. Lopez*, 419 U.S. 565, 574 (1975) ...........................................................59

*Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019)....................................9-10, 37

*Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)................................................31

*Jones v. Union County*, 296 F.3d 417i, 428 (6th Cir. 2022)................................34

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ................. 9, 36, 58

*K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990) ...............21

*Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007)...........................................35-36

*Lansing Schools Educ. Ass'n v. Lansing Bd. Of Educ.*,
487 Mich 349, 374-75 (2010) ................................................................ 58

*League of Women Voters of Ohio v. Brunner*,
548 F.3d 463, 473 (6 th Cir. 2008) ...................................................... 60

*Lipman v. Budish*, 974 F.3d 726, 746 (6th Cir. 2020) ................................. *passim*

*L.R. v. Sch. Dist. Of Philadelphia*, 836 F.3d 235, 250 (3d Cir. 2016)....... 10, 24-25

*May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th Cir. 2006) ..........29-30

*M.J. v. Akron City School District Bd. Of Ed.*,
1 F.4th 439, 449 (6th Cir. 2021) .................................................... 23, 43

*McKinney v. Lexington-Fayette Urb. Gov't*,
651 Fed. Appx. 449, 466-67 (6th Cir. 2016) ......................................... 9

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 465 (6th Cir. 2006) .......12, 38-40

*M.S. by Covington v. Hamilton County Dep't of Educ.*,
756 Fed. Appx. 510, 516 (6th Cir. 2018)........................................*passim*

*Patrick v. Success Charter Schools, Inc.*,
354 F.Supp.3d 185, 216 (E.D.N.Y. 2018) ............................................ 59

*Peach v. Smith County*, 93 Fed. Appx. 688, 691 (6th Cir. 2004) ...................30-31

*Peatross v. City of Memphis*, 818 F.3d 233, 241-42 (6th Cir. 2016)................... 44

*Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) ............................ 8

*Reilly v. Ottawa Cnty., Michigan*, No. 20-2220,
2021 WL 3929324 at *4 (6th Cir. Sept. 2, 2021) ..............................26-27

*Ryan v. City of Detroit*, 2015 WL 1345303 (E.D. Mich, J. Goldsmith),
affirmed at 698 Fed. Appx. 272 (6th Cir. 2017).............................25-26

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) .............. 11

*Sciotto v. Marple Newton Sch. Dist.*, 81 F.Supp.2d 559, 570 (E.D. Pa. 1999) .... 10

*Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016) .................... 35

*United States v. Lanier*, 520 U.S. 259, 271 (1997).............................................. 11

*Walker v. Detroit Public Schools*,
535 fed. Appx. 461, 465 (6th Cir. 2013).........................................33-34

*Wesley v. Campbell*, 7798 F.3d 421, 433 (6th Cir. 2015)......................................... 8

*Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021)..................................................... 32


Court Rules

Fed. R. Civ. P. 12(b)(6)..................................................................................... 8, 11

Statutes

MCL § 722.623(a)................................................................................................ 55

## STATEMENT OF ISSUES PRESENTED

1. Plaintiffs allege that Defendants committed several affirmative acts that created or increased the danger of a deadly school shooting, including: confronting the shooter, EC, in front of his parents, threatening EC with involuntary mental health treatment, releasing EC from the safe confines of the office to the school instead of keeping him in the office under adult supervision, providing EC with the backpack containing his gun and bullets, and concealing from teachers and staff, including the school's liaison police officer, that  they were returning EC to class despite knowing that he was suicidal and had engaged in disturbing behavior demonstrating a risk of violence. Are these allegations sufficient to state a claim for relief under the state-created danger doctrine?

   Plaintiffs answer:          Yes.
   Defendants answer:          No.

2. When Defendants committed those affirmative acts, they knew that EC: (1) was suicidal; (2) had demonstrated a pattern of concerning behavior indicating psychiatric distress, suicidality, and the possibility of child abuse or neglect; (3) had been using his phone during class on November 29, 2021 to look up bullets; (4) had just gone to a gun range and had access to guns; (5) had been watching during class on November 30, 2021 a video depicting a shooting on his phone; (6) had drawn and written on his math assignment the morning of November 30, 2021: a picture of his handgun; "The thoughts won't stop. Help me;" a person with two gunshot wounds, one in the chest and one in the abdomen with blood coming from the mouth; "blood everywhere;" a shell casing or bullet; a laughing/crying emoji; "My life is useless" and "The world is dead." Are these allegations sufficient to plead that Defendants the state knew or should have known that its actions specifically endangered the plaintiffs?

   Plaintiffs answer:          Yes.
   Defendants answer:          No

3. Plaintiffs allege that the "supervisory" defendants, Wolf and Throne, engaged in affirmative acts that created or increased the danger to Plaintiffs, including

concealing facts from students and parents of ongoing violence at the school, falsely assuring them that there were no threats to school safety that they should be concerned with, discouraging students from taking seriously the threats they had perceived to their safety, and instructing them to stop talking about or sharing the threatening information they find on social media. Are these allegations sufficient plead claims for state-created danger against Wolfe and Throne?

Plaintiffs answer:          Yes.
Defendants answer:          No.

4.  As far back as 1998, in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), the Sixth Circuit recognized a right against government acts that threaten an individual's security and bodily integrity and held that state actors can be held liable under § 1983 for increasing the likelihood that a private actor would deprive the plaintiffs of their liberty interest in personal security. Was Plaintiffs right to be free from affirmative actions by school officials which rendered them more vulnerable to a shooting clearly established at the time of the shooting on November 30, 2021?

Plaintiffs answer:          Yes.
Defendants answer:          No.

5.  Plaintiffs allege several official policies, practices, and customs which directly caused Defendants to return EC to class where he killed and injured multiple members of the OHS community, including Plaintiffs. These policies include an official policy, practice, or custom of returning suicidal students to class, even if they have just demonstrated suicidality and threatening behavior, and where they have access to guns, as long as they do not present a "disciplinary issue" to justify keeping them in the safety of the office. Are Plaintiffs allegations sufficient to plead a claim against Oxford Community Schools under *Monell*?

Plaintiffs answer:          Yes.

Defendants answer:          No

6. The Michigan Revised School Code requires school districts and officials to create and maintain a safe educational environment. This mandate is part of Plaintiffs' due process property interest in their public education. Defendants' actions deprived and continue to deprive the injunctive relief Plaintiffs of a safe educational environment and have rendered their educational environment materially inferior to a safe educational environment. Defendants have not redressed these deprivations by implementing proper training, corrective actions, or threat assessment practices. Under the facts as pleaded, are Defendants entitled to dismissal of Plaintiffs' claims for injunctive relief?

Plaintiffs answer: No.

Defendants answer: Yes.

# INTRODUCTION

These cases arise out of the shooting inside Oxford High School on November 30, 2021. Plaintiffs allege that on the morning of the shooting, Defendants had the shooter, EC, safely in custody and confined securely in the counseling office. There, EC posed no risk of danger to anyone. Instead of keeping EC in the office under adult supervision, Defendants took the affirmative steps of writing him a pass, handing him the backpack containing his gun and bullets, and returning him to class. Less than two hours later, he opened fire, killing four students, and wounding six students and one teacher.

Defendants took these affirmative acts despite knowing that EC: (1) was suicidal; (2) had demonstrated a pattern of concerning behavior indicating psychiatric distress, suicidality, and the possibility of child abuse or neglect, including a depressed mood, disheveled appearance, minimal participation in class, and refusal to complete school assignments; (3) had been using his phone during class on November 29, 2021 to look up bullets; (4) had just gone to a gun range and had access to guns; (5) had been watching during class on November 30, 2021 a video depicting a shooting on his phone; (6) had drawn and written on his math assignment the morning of November 30, 2021: a picture of his handgun; "The thoughts won't stop. Help me;" a person with two gunshot wounds, one in the chest and one in the abdomen with blood coming from the mouth; "blood everywhere;" a

1

shell casing or bullet; a laughing/crying emoji; "My life is useless" and "The world is dead." At the time they acted to release EC from the safe confines of the office and return him to class, Defendants also knew that EC's counselor, Defendant Hopkins, had threatened EC and his parents that he wanted EC seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Services. Defendants also knew that their meeting with EC and his parents worsened EC's emotional and psychiatric condition.

These allegations easily satisfy the standards for pleading a substantive due process violation based on state-created danger. The Court should deny Defendants' motion to dismiss.[1]

### STATEMENT OF FACTS[2]

In the months leading up to the Oxford High School shooting, the shooter, "EC," was known to teachers, counselors, and administrators for his concerning

---

[1] Plaintiffs have not briefed arguments related to their state law claims for the reasons set forth in Plaintiffs' Joint Motion Dismiss Voluntarily and Without Prejudice Plaintiffs' State Law Claims. ECF No. 118.

[2] The citations in Plaintiffs' statement of facts are based on the Complaint filed in *St. Juliana, et al. v. Oxford Community School District, et al.*, Case No. 22-10805, ECF No. 1, PageID.1-52, except where cited otherwise. Plaintiffs adopt and incorporate by reference the factual allegations in the complaints filed in all the consolidated cases: *Franz, et al. v. Oxford Community Schools*, et al., No. 21-12871, *Cunningham v. Oxford Community Schools*, et al., No. 22-11398, *Asciutto v. Oxford Community Schools*, et al., No. 22-10407, *Beausoleil v. Oxford Community Schools*, et al., No. 22-11250, *G.J. by Jones, et al. v. Oxford Community Schools, et al.*, No.

behavior that indicated psychiatric distress, suicidality, and the possibility of child abuse or neglect, including a depressed mood, disheveled appearance, minimal participation in class, and refusal to complete school assignments. ECF No. 1, Page ID.11, Complaint ¶23.

On November 11, 2021, EC brought a severed bird's head to school and placed it in the boys' bathroom. This was reported to school administrators, who concealed the information from staff and parents. ECF No. 1, Page ID.12, Complaint ¶¶27-28.

Throughout November 2021, students and parents reported concerns about violent threats, but Defendants persisted in a campaign of concealing and minimizing threats to school safety. ECF No. 1, PageID.12-14, Complaint ¶¶ 31-37.

The morning of November 29, 2021, Nicholas Ejak, Dean of Students, and Pam Fine, the District's Restorative Practices Coordinator, received an email from EC's Spanish teacher stating that EC had been using his phone to look up information about bullets. ECF No. 1, PageID.15, Complaint ¶43. This email was also forwarded to EC's counselor, Shawn Hopkins. ECF No. 1, PageID.15, Complaint ¶44.

---

22-11360, *Mueller, et al. v. Oxford Community Schools, et al.*, Case No. 22-11448, *Myre, et al. v. Oxford Community Schools, et al.*, No. 22-11113, *Ossege v. Oxford Community Schools, et al.*, No. 22-11251, and *Watson, et al. v. Oxford Community Schools, et al.*, No. 22-11959.

EC met with Fine and Hopkins in Fine's office on November 29. ECF No. 1, PageID. 15, Complaint ¶¶45-47. EC told Fine and Hopkins that he had gone to a gun range with his mother the previous weekend to shoot guns, that shooting guns was a family hobby, and that he was researching information about his shooting hobby. ECF No. 1, PageID. 15, Complaint ¶48.

Later that day, EC posted to his public Twitter account: "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford." ECF No. 1, PageID.16, Complaint ¶53.

The morning of November 30, 2021, at approximately 8:30 am, Hopkins received an email from an English teacher stating that EC was watching during class a video depicting a shooting on his phone. ECF No. 1, PageID.15, Complaint ¶54.

Less than a half hour later, at 8:59 am, EC's math class participated in a test review. On his worksheet, EC drew a picture of his Sig Sauer 9 mm handgun. Under the gun, he wrote: "The thoughts won't stop. Help me." To the right, he drew a person with two gunshot wounds: one in the chest and one in the abdomen with blood coming from the mouth. Beside this, he wrote "blood everywhere" and drew a shell casing or bullet. Below, EC drew a laughing/crying emoji. Finally, he wrote: "My life is useless" and "The world is dead." EC's teacher saw the drawing and immediately reported it to Hopkins and Ejak. ECF No. 1, PageID.16, Complaint ¶55.

Defendant Ejak, the dean of students, came to Hopkins' office around 9:00 am to tell Hopkins that he had seen a picture of the writings and drawings on EC's math assignment. ECF No. 1, PageID.17, Complaint ¶57.

Ejak and Hopkins thus had actual knowledge of a safety threat and a concern for EC's safety and well-being, given the events in the preceding months and specifically on November 29 and 30, 2021. ECF No. 1, PageID.18, Complaint ¶65.

EC's only explanation was that the drawings were part of a video game he wanted to design, but Hopkins knew that EC was lying, telling him, "This does not sound like a video game." ECF No. 1, PageID.18-19, Complaint ¶66-68.

EC's demeanor demonstrably changed in the presence of Hopkins and Ejak, and as EC described upsetting things that had happened recently in his life, Hopkins determined that EC was suicidal. ECF No. 1, PageID.19, Complaint ¶¶69-70. Hopkins determined that EC was suicidal despite EC's statements that he was not a threat to himself or others. ECF No. 1, PageID.19, Complaint ¶73.

Hopkins and Ejak knew of a specific threat posed by EC, as demonstrated by their conclusion that he was suicidal, and by their decision to call EC's parents to the school for an intervention. ECF No. 1, PageID.19-20, Complaint ¶¶74-82.

While they waited for EC's parents to arrive, Hopkins stayed with EC in the office because he knew that EC was suicidal and that it was not safe to leave him alone. ECF No. 1, PageID.20, Complaint ¶83.

Hopkins told EC's parents why he was concerned about EC, including his conclusion that EC was suicidal, and his concern for EC's well-being. ECF No. 1, PageID.21, Complaint ¶86.

Hopkins provided EC's family with a list of resources for mental health support and stated that EC needed to start counseling as soon as possible, "today, if possible," or take other steps to protect EC from self-inflicted harm. ECF No. 1, PageID.21, Complaint ¶87. EC's parents stated that they had to return to work and could not get EC treatment that day. ECF No. 1, PageID.21, Complaint ¶88.

Hopkins then threatened that he wanted EC seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Services. ECF No. 1, PageID.21, Complaint ¶89.

Hopkins and Ejak knew that their meeting with EC and his parents worsened EC's emotional and psychiatric condition. ECF No. 1, PageID.22, Complaint ¶96. The meeting itself worsened the situation and affirmatively increased and the danger of harm at Oxford High School because the meetings placed direct pressure on EC, who was obviously in state of suicidal and homicidal ideation and experiencing a mental health crisis. ECF No. 1, PageID.25, Complaint ¶¶111-112. The meetings directly subjected EC to the shame, fear, humiliation, and embarrassment of having his parents ignore, ridicule, and embarrass him, thus increasing the risk of violence

6

upon his release from the office to the school environment. ECF No. 1, PageID.25, Complaint ¶113.

Hopkins and Ejak's actions in threatening to call CPS and remove EC from his home exacerbated his distress and created and increased danger that he would act on his violent ideation after they released him from the office and returned him to school. ECF No. 1, PageID.25, Complaint ¶114.

Hopkins and Ejak had the official authority to act as "gatekeepers" in deciding whether to release EC from the office and return him to the classroom with his backpack or keep him in the counseling office where he was safe and secure. ECF No. 1, PageID.24, Complaint ¶108. Ejak and Hopkins used their authority to write a hall pass, give EC his backpack (without searching it), and return him to his third hour class, alone.

After returning EC to school in a suicidal state, Hopkins and Ejak took the additional affirmative actions of concealing information by not informing either EC's teachers or the school safety liaison officer of the situation, including the fact that EC was suicidal, thus creating and increasing the danger of a violent incident. ECF No. 1, PageID.26, Complaint ¶117.

Less than two hours after Hopkins and Ejak returned EC from the office to school, EC took his backpack into a bathroom and emerged with his loaded handgun.

7

He opened fire, killing four students, wounding six more students, and wounding one teacher.

## ARGUMENT

### I.    Standard of Review

The Sixth Circuit has "cautioned that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'" *Buddenberg v. Weisdack*, 939 F.3d 732, 738–39 (6th Cir. 2019) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). "Although [a defendant's] entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Id.*

"On a motion to dismiss, [the Court] must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts in their complaint demonstrate a state-created danger." *Lipman v. Budish*, 974 F.3d 726, 746 (6th Cir. 2020). An assertion of qualified immunity does not alter the standard of review. "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir.2000). See also *Everson v. Bd. Of Educ.*, 123 Fed. Appx. 221, 228 (6th Cir. 2005) ("When facts on which the question of immunity turns are in dispute…it is for the trier of fact to make the factual findings underlying resolution of the qualified immunity issue"); *McKinney v. Lexington-Fayette Urb.*

*Gov't*, 651 Fed. Appx. 449, 466-67 (6th Cir. 2016); and *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019) (holding that the extent of the defendants' subjective knowledge to determine culpability had to be "fleshed out during discovery and [is] not appropriate to resolve at the motion-to-dismiss posture.").

In this case, the qualified immunity inquiry is entirely fact bound, such that the resolution of the legal issues hinges on which version of the facts is believed by the tier of fact. The Court should deny Defendants' motion.

### II. Plaintiffs' right to be free from a state-created danger was clearly established at the time of Defendants' actions.

At a minimum, the right to be free from state-created danger was clearly established in 2017. *Lipman*, 974 F.3d at 749. And as far back as 1998, in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), "the Sixth Circuit recognized a right against government acts that threaten an individual's 'security and bodily integrity,' and held that state actors can be held liable under § 1983 for "increasing the likelihood that a private actor would deprive [the plaintiffs] of their liberty interest in personal security.'" *Lipman*, 974 F.3d at 749–50 (citations omitted). "Numerous other cases have reiterated this doctrine." *Id*. "And in *Nelson [v. City of Madison Heights]*, [the Sixth Circuit] directly addressed qualified immunity with respect to state-created danger, rejecting the officer's claim to qualified immunity because *Kallstrom* clearly established [in 1998] that the state may not affirmatively act in a way that creates or increases a risk of private violence, provided that the state

9

actor had the requisite mental culpability." *Id.* (citing *Nelson*, 845 F.3d 695, 700–03(6th Cir. 2017)).[3]

Defendants argue that they were not on notice that it would be a due process violation to take the actions they took under the "particularized" facts of this case. They claim there was no way for them to know that it might be unconstitutional to threaten a suicidal student with involuntary mental health treatment, and then return that suicidal student to class, even after learning that he had just been watching shooting videos in school and had just drawn a picture of a gun, a bloody shooting victim, and the words: "The thoughts won't stop. Help me;" "blood everywhere;" "My life is useless" and "The world is dead."

Defendants' argument is absurd. Even if there are no cases with the exact same particular facts as this case, this "does not grant defendants a qualified immunity shield." *Guertin v. State*, 912 F.3d 907, 933 (6th Cir. 2019). "Rather, it showcases the grievousness of their alleged conduct: 'The easiest cases don't even arise[.]'" *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Thus, "'there is no need

---

[3] See also *L.R. v. Sch. Dist. of Philadelphia,* 836 F.3d 235, 250 (3d Cir. 2016)(Holding that "the law in 2013 was sufficiently clear to put [school teacher] on notice that permitting a kindergarten student to leave his classroom with an unidentified adult could lead to a deprivation of that student's substantive due process rights."); and *Sciotto v. Marple Newton Sch. Dist.*, 81 F.Supp.2d 559, 570 (E.D. Pa. 1999) (holding "it was clearly established ... that a student enjoy[s] a constitutional right to be free from school officials' deliberate indifference to, or acts that increase the risk of serious injury from[,] unjustified invasions of bodily integrity perpetrated by third parties").

that the very action in question [have] previously been held unlawful[.]'" *Id.*

(quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009).

### III.    Plaintiffs' allegations plead viable state-created danger claims against the individual defendants.

Plaintiffs have sufficiently alleged that the individual defendants violated Plaintiffs' clearly established right. Defendants do not truly argue that the law was not clearly established. Nor do they argue that their actions were reasonable, in light of the clearly established law. They merely dispute some of the Plaintiffs' factual allegations (contrary to the 12(b)(6) standard), and argue they are entitled to qualified immunity because no substantive due process violation occurred. ECF No. 107, PageID.1792-1821.

"Under the state-created danger doctrine, a governmental actor can be held responsible for an injury committed by a private person if (1) an affirmative act by the governmental actor either created or increased the risk that the plaintiff would be exposed to the injurious conduct of the private person; (2) the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and (3) the governmental actor had the requisite degree of culpability." *M.S. by Covington v. Hamilton County Department of Education*, 756 Fed. Appx. 510, 516 (6th Cir. 2018(quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008) (citation and internal quotation marks omitted)).

11

### A. Defendants' affirmative acts created or increased the risk that Plaintiffs would be exposed to danger.

**i.** **Plaintiffs Allege Affirmative Acts.** The first element of the constitutional claim has two related sub-components – affirmative acts and increased risk. "Whether conduct amounts to an 'affirmative act' in this context is at times a difficult question." *Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020) (citation omitted). "At one end of this spectrum, a failure to act is not enough." *Id.* "Instead, to find a state-created danger, the plaintiff must have been safer before the state action than he was after it." *Id.* Thus, the Sixth Circuit "has often rejected a plaintiff's due process claim 'because the challenged conduct either was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff.'" *Id.* (quoting *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 465 (6th Cir. 2006) (collecting cases)).

Plaintiffs allege affirmative acts by Defendants that increased the chances that EC would cause Plaintiffs harm and rendered Plaintiffs less safe after the actions then they were before. The morning of the shooting, Defendants had the shooter, EC, safely in custody and confined securely in the counseling office. There, EC posed no risk of danger to anyone. Instead of keeping EC in the office under adult supervision, Defendants took the affirmative steps of threatening him with imminent mental health treatment, then writing him a pass, handing him the backpack containing his gun and bullets, and returning him to class. Hopkins and Ejak took

the additional affirmative actions of concealing information by not informing either EC's teachers or the school safety liaison officer of the situation, including the fact that EC was suicidal, thus creating and increasing the danger of a violent incident. Less than two hours later, he opened fire, killing four students, and wounding six students and one teacher.

The actions that Defendants took on November 29 and 30, 2021 were preceded by months of disturbing signals about EC's condition and behavior. Defendants took these affirmative acts despite knowing that EC: (1) was suicidal; (2) had demonstrated a pattern of concerning behavior indicating psychiatric distress, suicidality, and the possibility of child abuse or neglect, including a depressed mood, disheveled appearance, minimal participation in class, and refusal to complete school assignments; (3) had been using his phone during class on November 29, 2021 to look up information about bullets; (4) had just gone to a gun range and had access to guns; (5) had been watching during class on November 30, 2021 a video depicting a shooting on his phone; (6) had drawn on his math assignment the morning of November 30, 2021: a picture of his handgun; written "The thoughts won't stop. Help me;" drawn a person with two gunshot wounds, one in the chest and one in the abdomen with blood coming from the mouth; wrote "blood everywhere;" drew a shell casing or bullet; drew a laughing/crying emoji; and wrote: "My life is useless" and "The world is dead." At the time they acted to

13

release EC from the safe confines of the office and return him to the classroom, Defendants also knew that EC's counselor, Defendant Hopkins, had threatened EC and his parents that he wanted EC seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Services. Defendants also knew that their meeting with EC and his parents worsened EC's emotional and psychiatric condition.

A jury could find that the environment before Hopkins and Ejak acted to release EC to the classroom was a status quo of safety because EC was safely and securely restricted to the counseling office, under the direct supervision of school administrators, and he did not have access to weapons. ECF No. 1, PageID.24, Complaint ¶107.Ejak and Hopkins had just specifically learned that EC was suicidal, which they did not know prior to the meeting in their office on the morning of November 30, 2021.ECF No. 1, PageID.19, Complaint ¶70.The meeting itself worsened the situation and affirmatively increased and the danger of harm at Oxford High School because the meetings placed direct pressure on EC, who was obviously in state of suicidal and homicidal ideation and experiencing a mental health crisis. ECF No. 1, PageID.25, Complaint ¶¶111-112. The meetings directly subjected EC to the shame, fear, humiliation, and embarrassment of having his parents ignore, ridicule, and embarrass him, thus increasing the risk of violence upon his release

from the office to the school environment. ECF No. 1, PageID.25, Complaint ¶113.Hopkins and Ejak's actions in threatening to call CPS and remove EC from his home exacerbated his distress and created and increased danger that he would act on his violent ideation after they released him from the office and returned him to school. ECF No. 1, PageID.25, Complaint ¶114.

Finally, the act of returning the unsearched backpack containing EC's gun and bullets, and sending him back to school, placed the students and staff directly in harms' way and provided EC with the weapon and bullets he used to commit the shooting. ECF No. 1, PageID.25-6, Complaint ¶115.

In two recent cases, the Sixth Circuit held that the plaintiffs stated a substantive due process claim under the state-created danger doctrine. In *M.S. by Covington v. Hamilton County Department of Education*, 756 Fed. Appx. 510 (6th Cir. 2018), the defendant school district utilized the services of a private transportation company to provide bussing services. Defendants received complaints that one driver "drove his school bus in a dangerous fashion." *M.S. by Covington*, 756 Fed. Appx. at 511-12. The district and the company did nothing "to prevent [him] from continuing to drive dangerously or to prevent students from riding on his bus. In fact, [one of the district's elementary principals] instructed…students on a

daily basis to board [his] bus." *Id*. at 512.[4] "On November 21, [2016,] [he] crashed his bus, which resulted in six students' fatalities and injuries to Plaintiff M.S. and several other students[.]" *Id*.

Plaintiff M.S. filed a class action complaint against the school district in federal court, alleging in part a violation of 42 U.S.C. § 1983 "for failure to protect M.S. from a state-created danger[.]" *M.S. by Covington*, 756 Fed. Appx. at 512. The district court granted the defendants' motion to dismiss. *Id*. The Sixth Circuit reversed the district court's dismissal of the plaintiffs' state created danger claim against the defendant school district, holding that the principal's act of instructing students to board the bus was an affirmative act for which the district could be held liable under a state created danger theory. *M.S. by Covington*, 756 F. Appx. at 516

---

[4] Defendants argue that some specific actions, like Defendants' decision not to search EC's backpack, are not actionable because they are only "failures to act." This argument is misleading. In *MS by Covington*, the district's affirmative acts (including instructing children to board the bus of a dangerous driver) were also accompanied by the acts of "doing nothing" to prevent his dangerous driving, failing to warn students, and failing to prevent them from boarding the bus. The Sixth Circuit's holding in *MS by Covington* illustrates why certain decisions *not to act*, along with other affirmative acts, can be combined in total to support a claim for state-created danger. In fact, *MS by Covington* further demonstrates that a particular affirmative act can be rendered *more dangerous* in the context of the state's prior failure – in that case, the act of putting kids on a bus was preceded and made more dangerous by its prior failure to address the dangerous driving of the bus driver. Here, sending EC back to class was preceded by Defendants' decision (which Plaintiffs say was an affirmative act and Defendants say was just an omission) to not search his backpack. In any event, the facts, taken together, are sufficient to allege that the sum of Defendants' actions was the creation or exacerbation of a specific danger, and that is all that is required to plead a claim for relief.

(Holding Plaintiffs alleged "the principal was sufficiently culpable because she knew that [the bus driver's] driving was dangerous."). The Sixth Circuit also rejected the district's argument that the principal's act was merely an act of "omission," holding that "[t] his circuit has never held that an affirmative action is not affirmative because it was taken in conformance with a policy, and for good reason." *Id*. To so hold would vitiate one way of establishing *Monell* liability—by "show[ing] that the particular injury was incurred because of the execution of [a] policy." *Id.* (citations omitted). Thus, "[e]ven if the principal was following the District's policy, the principal was still allegedly assisting students onto a bus that she knew was dangerous." *Id.*

Here, Defendants argue that they adhered to school policies when they took the affirmative acts that preceded the shooting. For the reasons set forth in *M.S.*, this argument is unpersuasive. Defendants also argue that there no "affirmative acts" because E.C. posed a "pre-existing danger." The Sixth Circuit also rejected this exact same argument in *M.S. by Covington*, where the defendant district argued that "the principal's instructing the schoolchildren to board [the] bus at the end of the school day did not increase the risk to them, but instead merely returned the students to a risky status quo to which they had voluntarily subjected themselves when boarding [the] bus on the way to school." *M.S. by Covington*, 756 Fed. Appx. at 516. The Sixth Circuit rejected this argument because the "Plaintiffs have alleged that the

principal instructed her pupils to board [the] bus and that the principal was fully aware of the dangers they faced on the road ahead." *Id*. at 517. In reaching this conclusion, the Sixth Circuit rejected the defendant school district's reliance on *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003), holding that *Bukowski* was "inapposite" because "[i]n *Bukowski*, the "officials were accommodating [the victim's] own wishes" when they drove her to her abuser's home, and they "did not have any knowledge of the dangers facing her." In contrast, Plaintiffs have alleged that the principal instructed her pupils to board [the] bus and that the principal was fully aware of the dangers they faced on the road ahead. *M.S. by Covington*, 756 F. Appx. at 517 (quoting *Bukowski*, 326 F.3d at 709)).

In this case, as in *M.S. by Covington*, the knowledge that Defendants had accrued before sending EC back to the classroom was sufficient to make them fully aware of the danger they were creating. EC was suicidal, and Defendants knew it. He had access to guns, and Defendants knew it. He had just written, "my life is useless, help me" and Defendants knew it. He had drawn images of bloody gun violence on his schoolwork that morning, and Defendants knew it. He had just been researching bullets and watching videos of mass shootings, and Defendants knew it. Despite all this knowledge, and more, Defendants sent EC to class anyway, along with his backpack containing a gun and bullets.

18

In *Lipman v. Budish*, 974 F.3d 726 (6th Cir. 2020), the defendant social workers and other county employees received reports that a five-year-old child, Ta'Naejah McCloud, was suffering "a pattern of severe abuse by [Tequila] Crump [her biological mother] and [Ursula] Owens [her mother's girlfriend], a pattern that ultimately resulted in her death." *Lipman*, 974 F.3d at 731. The state actor defendants initially "did not report this abuse as required by law, and even when it was made aware, [the defendant agency] failed to adequately investigate or refused to investigate at all." *Id*. at 732. In October 2016, Ta'Naejah was admitted to the hospital with third-degree burns that social workers and a surgeon reported to the defendant agency as having been caused by abuse. *Id*. This information was provided to one of the defendant social workers, Kristina Quint. *Id*. Quint interviewed Ta'Naejah about her injuries in the presence of the abusers. *Id*. When asked about her injuries, Ta'Naejah implicated her mother and contradicted some of her mother's statements. *Id*. Quint later "directed the hospital to discharge Ta'Naejah to Crump and Owens" despite a policy that it could not discharge a suspected abuse victim until directed to do so by the agency. *Id*. "After Ta'Naejah was discharged from the hospital, DCFS received multiple other reports of abuse[,]" but according to the plaintiffs' complaint, none were investigated. *Id*. Several months later, another social worker reported that Ta'Naejah was being abused, and another case was opened. *Id*. Over the course of several medical appointments, the defendants learned that

Ta'Naejah was malnourished. *Id*. at 733. And "[o]n five different occasions, [defendant] social workers went to Ta'Naejah's home and interviewed her in front of [her abusers], which Plaintiffs [alleged] violated Ohio regulations and [agency] policy and placed Ta'Naejah at a heightened risk of harm." *Id*. Ta'Naejah continued to suffer serious abuse, which was reported to the defendant agency. *Id*. Ultimately, in March 2017, Ta'Naejah died as a result of a severe beating. Crump and Owens were convicted of "reckless homicide and child endangerment and murder, along with other charges[.]" *Id*. Plaintiff – the administrator of Ta'Naejah's estate – filed a federal lawsuit alleging that the defendants took affirmative acts that increased Ta'Naejah's risk of harm at the hands of private citizens. *Id*. at 733-34. The district court granted the defendants' motion to dismiss, finding that the claim failed because the alleged affirmative acts – interviewing Ta'Naejah in front of Crump and Owens – could not amount to a constitutional violation. *Id*. at 735.

In *Lipman*, as in this case, the defendants attempted to hide behind the sad sense of inevitability surrounding Ta'Naejah's death. Like Defendants here, the *Lipman* defendants claimed that Ta'Naejah was going to die in a pattern of abuse both before the state intervened and after it intervened, or that she was going to die with or without the effects of any state action. Similarly, in *M.S. by Covnington*, the defendants deflected responsibility for their own actions by claiming that the bus driver was a dangerous driver in the morning when the students' parents helped him

20

board his bus, just as he was in the afternoon, after the principal helped them to board his bus. But those cases also instruct that this sad and cynical logic is not the end of the analysis. This is because *even if* there was a risk to the plaintiffs before the state action in each case, the allegation that the state contributed to the creation or creased the risk of harm was sufficient to allege a viable state created danger claim. Thus, under the Sixth Circuit's reasoning in *Lipman* and *M.S.*, this Court must reject Defendants' argument. As the Seventh Circuit held in *K.H. Through Murphy v. Morgan*, "[i]f the fire department rescues you from a fire that would have killed you, this does not give the department a constitutional license to kill you, on the ground that you will be no worse off than if there were no fire department. The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved." *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990).

In *Lipman*, the Sixth Circuit rejected the same reasoning that Defendants offer here, holding that the defendants may ultimately succeed in showing, either at summary judgment or at trial, that "[Ta'Naejah's] risk was not increased when compared to not interviewing [her] at all." *Lipman*, 974 F.3d at 747. But the plaintiffs in *Lipman* alleged that "the state took some action that increased the chances that a private actor would cause the plaintiff harm" and "[t]his is enough to show an affirmative act under the doctrine." *Id.* Thus, "taking the allegations in the complaint

21

as true, and drawing all reasonable inferences in Plaintiffs' favor, compels the conclusion that Plaintiffs have adequately alleged a claim based on state-created danger, and the district court erred in finding otherwise." *Id*.

Here, there are unresolved issues regarding the extent of the pre-existing danger. For example, if Hopkins and Ejak had not threatened EC with mental health treatment, or demanded that his parents obtain treatment, then EC may not have felt the same sense of urgency to commit the shooting. If Ejak and Hopkins had kept EC in the office, where he was separated from his backpack, gun, and bullets, then he could not have shot anyone. The decisions in *Lipman* and *M.S. by Covington* establish that this Court cannot resolve this disputed issue at the 12(b)(6) stage. Plaintiffs' have alleged that Defendants took specific affirmative acts that created or increased the chances that EC would cause harm, and "this is enough to show an affirmative act under the doctrine." *Lipman*, 974 F.3d at 747.

Furthermore, as a matter of law, under *M.S. by Covington* and *Lipman*, the fact that EC presented a risk of danger to the students and staff of Oxford High School before his teachers reported him to Ejak and Hopkins is not dispositive. In this case, Defendants Hopkins and Ejak instructed EC to leave the safe confines of the counseling office and return to the classroom environment, despite being fully aware that EC: (1) was suicidal; (2) had demonstrated a pattern of concerning behavior that indicated psychiatric distress, suicidality, and the possibility of child

abuse or neglect, including a depressed mood, disheveled appearance, minimal participation in class, and refusal to complete school assignments; (3) had been using his phone during class on November 29, 2021, to access the internet and to look up information about bullets; (4) had just gone to a gun range and had access to guns; (5) had been watching during class on November 30, 2021, a video depicting a shooting on his phone; (6) had drawn on his math assignment the morning of November 30, 2021: a picture of his handgun, written "The thoughts won't stop. Help me," drawn a person with two gunshot wounds, one in the chest and one in the abdomen with blood coming from the mouth, wrote "blood everywhere," drew a shell casing or bullet, drew a laughing/crying emoji, and wrote: "My life is useless" and "The world is dead."

A jury could reasonably infer that Plaintiffs were safer before Ejak and Hopkins gave EC his backpack and directed him to return to class because when EC was inside the counseling office he was separated from his backpack and did not present a threat to the students and staff inside of Oxford High School. See *M.J. v. Akron City School District Bd. Of Ed*., 1 F.4th 439, 449 (6th Cir. 2021)("We can reasonably infer…that WH was safer before Morrison handed Hendon the phone because Hendon may have used the opportunity to convince MH that he was a police officer with authority to handcuff her son."); see also *A.L. v. Ann Arbor Pub. Sch*., No. 10-CV-10354, 2011 WL 87262, at *9 (E.D. Mich. Jan. 11, 2011)("Although the

affirmative act requirement is difficult to meet, this Court cannot definitively conclude at this stage in the proceedings that it cannot be met…At this point, discovery has not been completed. Certain evidence, if it exists, could potentially establish an affirmative act.")

At the time they acted to release EC from the safe confines of the office and return him to the classroom, Defendants Hopkins and Ejak also knew that Hopkins had threatened EC and his parents that he wanted EC seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Services. Hopkins and Ejak also knew that their meeting with EC and his parents worsened EC's emotional and psychiatric condition. These allegations easily satisfy the standards for pleading a state-created danger claim, as clarified by the Sixth Circuit in *Lipman* and *M.S. by Covington*. The Court should deny Defendants' motion to dismiss.

Furthermore, it is clearly established that the act of releasing a child from a place of safety and care, and into a position of danger, is affirmative conduct that creates a state danger in violation of a victim's due process rights. *LR v. School District of Philadelphia*, 836 F.3d 235 (3d Cir. 2016). In *LR*, an adult entered a kindergarten classroom and claimed to have the authority to leave with the plaintiff, a kindergarten student. After the defendant teacher allowed the student to leave, the

adult sexually assaulted the plaintiff. The Court held that "[u]nder the facts as pled, [the teacher] had the authority to release Jane from his classroom and used it. By allowing Jane to leave his classroom with an unidentified adult, [the teacher] 'created or increased the risk [of harm] itself.'" *LR*, 836 F.3d at 244.

Here, Defendants Ejak and Hopkins had EC safely secured in the counselor's office on the morning of November 30, 2021, where he was cared for and subject to close adult supervision. Hopkins and Ejak knew that it was not safe to leave EC alone, as demonstrated by the fact that they stayed with him while waiting for his parents to arrive. In the counseling office, EC posed no threat to the Plaintiffs. By releasing EC back to his class with his backpack containing a handgun and ammunition, after humiliating him in front of his parents, and with knowledge that he was suicidal and may be forced into involuntary mental health treatment within 48 hours, Defendants created or increased the risk of harm.

**ii. Defendants' Case Law Is Not Applicable Here.** Defendant cites several cases that are inapplicable here. For example, in *Ryan v. City of Detroit*, 2015 WL 1345303 (E.D. MI., J. Goldsmith), affirmed at 698 Fed. Appx. 272 (6th Cir. 2017), the police released a violent husband and allowed him to return home, where he shot his wife. The Court ruled that the husband's assaultive propensity existed before the officers took any action. The Sixth Circuit affirmed, holding that these "actions at most returned the wife to the same level of danger she faced before the state action."

25

*Id*. Like the facts of *Bukowski*, which the Sixth Circuit distinguished in *M.S. by Covington*, the plaintiff in *Ryan* rejected the assistance offered by the police, telling officers that she did not want them intervening. She also "refused to provide her name or [her husband's name]" to police and told the defendants "that she and her husband were both Detroit police officers and that she did not want [her husband] to lose his job." *Ryan*, 977 F.Supp.2d at 741. And like the victim in *Bukowksi*, the *Ryan* plaintiff was asked if she wanted an officer to come over to her house to ensure her safety and she responded "No." *Id*. She then reported another altercation with her husband, which the defendants addressed by issuing a LEIN notice regarding the husband, notifying the Detroit Police Department (the couple's employer), and sharing their concerns that it could spill over to the workplace. *Id*. After inquiring with the husband, officers from DPD called the defendant officers and told them, "all is well" with the husband. *Id*. at 793.The next day, the husband killed his wife and then himself. *Id*. In this case, unlike *Ryan*, Defendants knew that "all was not well" with EC, yet they gave him his backpack and returned him to school anyway. This case is clearly distinguishable from *Ryan.*

Another case cited by Defendants, *Reilly v. Ottawa Cnty., Michigan*, No. 20-2220, 2021 WL 3929324, at *4 (6th Cir. Sept. 2, 2021), was a pure failure-to-act case and is therefore not applicable. *Reilly only* "involve[d] inaction of the part of defendants, not actions that put Rosemarie at increased risk. In fact, the actions

taken—advising Rosemarie to obtain a PPO, accompanying her to retrieve her belongings, advising Jeremy to stop contacting Rosemarie, and obtaining arrest warrants—were all appropriate." *Id*. In this case, unlike *Reilly*, Defendants took affirmative steps that rendered Plaintiffs less safe *after* EC was released from the office than they were *before* he was released from the office. *Reilly* does not apply.

In *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002), the plaintiffs sued the defendant officers after "a two-day armed standoff with Mr. Lekan, which tragically ended with Mr. Lekan's decision to kill his son and himself." *Ewolski*, 287 F.3d at 496.[5] *Ewolski* was decided at summary judgment, where the evidence gathered through discovery, including an independent expert report, established that the standoff could not have "been resolved through the traditional form of hostage negotiations" and where "Lekan set out on a path of self destruction when he shot [a police officer] on that Friday afternoon." *Id.* Thus, the Sixth Circuit

---

[5] In *Ewolski*, the police went to the Lekans' house to check on the family's welfare. Mr. Lekan shot one of the officers when he attempted enter the house. The police set up a perimeter around the house and evacuated the neighborhood. The police decided to order an armed entry. "Mr. Lekan exchanged gunfire with the police, and two more officers were injured. The police ultimately retreated and the standoff continued." *Ewolski*, 287 F.3d at 499. After further negotiations, Lakin asked to speak with a priest, which the police interpreted as a precursor to a "murder-suicide ritual." For an extended time after, the police tried but failed to communicate with Mr. Lekan. The police used an armored vehicle to ram the home and inject tear gas inside "in the hopes of eliciting a response from Mr. Lekan." Later, the police heard gunshots inside the house, and entered to find that Lekan had "shot his son and then killed himself." *Id*.

found that under the unique and exigent circumstances of that case, the police actions could not be found "conscience shocking." In so holding, the Court emphasized that "[w]hether conduct…reaches the level of conscience shocking depends upon the facts and circumstances of the individual case…'and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of the circumstances before any abuse of power is condemned as conscience shocking.'" *Id*. at 510 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). In this case, unlike *Ewolski*, Defendants had the benefit of time and patience to simply wait in the office, where EC was safely secured, to decide whether and how to act. The situation was materially different from *Ewolski*, where the police knew that "further delay and inaction also posed substantial risks[.]" *Ewolski*, 287 F.3d at 513. Here, despite knowing EC was suicidal and posed a threat to others, Defendants took the affirmative act of removing him from a place of safety and returning him to school. Further discovery is necessary to complete "an exact analysis of the circumstances" before deciding the issue of deliberate indifference, and Defendants' motion on the pleadings should be denied.

In *Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007), after several incidents involving domestic violence and threatening behavior, the police released an abusive husband from their custody. After being released, the husband killed his wife and himself. The Sixth Circuit found there were no affirmative acts for purposes

28

of a state created danger where the parties agreed that "the plaintiffs base[d] their claims on the officers' failure to take more effective steps to incapacitate Mr. Hernandez, thereby creating a danger of death or serious injury that otherwise would not have existed. Plaintiffs' "state-created danger" claim allege[d] that the failure of the officers to arrest Mr. Hernandez 'emboldened' Mr. Hernandez to return to the house and kill Mrs. Hernandez, which also increased Mrs. Hernandez's vulnerability to harm." *Brooks*, 221 F. App'x at 406. *Brooks* is in line with other case law providing that a mere "[f]ailure to act, as opposed to affirmative conduct, does not cause a 'state-created danger to arise." *Brooks*, 221 F.App'x at 407 (citations omitted). Here, unlike *Brooks*, Plaintiffs allege the opposite of a mere "failure to act." In this case, Defendants had secured EC in the office, where no further affirmative acts were required to preserve a status quo of safety. Defendants then affirmatively returned EC to school with the backpack containing his gun and bullets. The affirmative acts alleged by Plaintiffs distinguish this case from the "failure to act" allegations in *Brooks*.

Similarly, in *May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th Cir. 2006), another "failure to act" case, the Sixth Circuit held that officers who merely depart from the scene of a domestic violence call without having taken steps to reduce the risk of harm cannot be held liable for a state created danger. *May* was decided through summary judgment following discovery. The plaintiffs' own expert

"agreed that even before the 911 call, [the victim] was at a 'high risk of being killed by [her abuser.]" *May*, 437 F.3d at 584. Thus, the Sixth Circuit held that the mere act of dispatching a police officer to the scene, where the couple was engaged in a physical confrontation, did not create or increase the risk of harm to the plaintiff. *Id*. Unlike *May*, Plaintiffs allege (and should have the chance to establish through discovery), that Defendants took affirmative acts which changed the status quo from one of safety to one of danger by releasing EC from the office and sending him to school with his backpack.

In another "failure to act" case, *Peach v. Smith County*, 93 Fed.Appx. 688, 691 (6th Cir. 2004), the plaintiff obtained a PPO against her abusive boyfriend, and he was briefly arrested the same day. Over the next seven weeks, the plaintiff periodically reunited with the boyfriend. After reuniting, the couple went shopping together. They were reported missing, and the police then found them dead, "victims of a murder-suicide[.]" *Peach*, 93 F. App'x at 690. The Sixth Circuit found "no evidence…that the… County defendants' actions created the danger at issue" when they failed to seize all weapons during the shooter's initial arrest, approximately seven weeks before the killing. *Id*. Specifically, the Court found that "plaintiff at most was challenging omissions by the…defendants–not affirmative acts…[and] even if the…defendants had seized all weapons that Carr possessed on June 7, 1999 (when McDonald arrested him), they could not have seized the murder weapon

30

because it was not purchased until two weeks later." *Id*. at 691 (6th Cir. 2004). In this case, Defendants were aware of EC's access to guns on the day of the shooting, yet they had him safely secured in the office, away from his gun. They acted affirmatively to depart from this status quo and set in to motion a new and increased danger to Plaintiffs that did not exist when EC was in the office. *Peach* is unpersuasive here.

In *Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006), the Court held that the officers' act of encouraging a drag race that resulted in bystander death was not an affirmative act because racers planned to drag race before police intervention. The Court held that the police had not increased the risk to spectators. In so holding, Judge Sutton wrote, "When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say the 'state' has 'created' the 'danger' to her by its affirmative acts." *Id*. at 694. In this case, unlike *Jones*, Plaintiffs played no role in creating the danger they incurred. Rather, unbeknownst to Plaintiffs, the Defendants learned that EC was suicidal and that he had access to guns and ammunition, and that he had written threatening words and images on his schoolwork, and then released him into the classroom setting. After creating that danger, Defendants concealed the information from the OHS staff and school safety officer, thus exacerbating the danger.

31

In *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003), the officer's act of taking custody of mentally disabled woman from a suspect who had been abusing her, then returning her to suspect, who then raped her, was not an affirmative act because the danger existed before police intervened. The Sixth Circuit expressly distinguished *Bukowski* in *M.S. by Covington*, *supra*, holding that the plaintiffs pleaded a state-created danger where a school principal instructed her students to board a school bus despite knowing that the bus driver was a dangerous driver. Here, as in *M.S. by Covington*, *Bukowski* is "inapposite" because in *Bukowski*, the "officials were accommodating [the victim's] own wishes" when they drove her to her abuser's home, and they "did not have any knowledge of the dangers facing her." *Id*. at 709. In contrast, in both *M.S. by Covington* and in this case, the plaintiffs alleged that the Defendants acted to put Plaintiffs in harm's way after learning of the dangers of the situation facing them.

In *Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021), there was literally no affirmative act alleged that could have created or increased the danger to the plaintiff-decedent. In *Wilson*, the decedent's daughter called 911 to report that her father, who suffered from paranoia and bipolar disorder, was suffering a mental health crisis. *Wilson*, 3 F.4th at 849. After responding to the home, the officers left the man "unattended, for about nine minutes[,]" in part so that the officer could go to his patrol car and request a response from the county's "mobile crisis unit." The

officer returned to the home to tell the husband that the unit was on its way, and then returned to his patrol car to take a call. During this brief period of about nine minutes, the husband killed himself. *Id*. After discovery, the district court granted the defendants' motion for summary judgment based on qualified immunity. The Sixth Circuit affirmed, holding only that in the specific context of "suicide by someone not in official custody," the right to be free from state created danger was not clearly established. *Id*. at 859. The Sixth Circuit did not "reach the issue of whether any conduct by the [defendant officers] violated [the suicide victim's] constitutional rights[,]" and it did not decide the scope of a state-created danger beyond the context of "suicide by someone not in official custody." This is not a suicide in custody case, and *Wilson* is therefore unpersuasive here.

The facts of *Walker v. Detroit Public Schools*, 535 Fed. Appx. 461, 465 (6th Cir. 2013), are materially different than this case. In *Walker*, the high school had "a long history of violence and gang activity" and routinely confiscated weapons from students. *Id*. at 462-63. During the school day, security officers broke up a fight between students Walker and Morton, who returned to class. After school, Morton returned to the area and fatally shot Walker. *Id*. at 463. The plaintiffs' allegation was that "if school officials had intervened more effectively, the shooting may have been averted." *Id*. at 466. The Court held that this allegation focused only on actions that the school could have taken but failed to take. The argument failed because there

was no evidence that the action that was taken—breaking up the fight—created or greatly increased the risk that Morton would unilaterally return after school and kill Walker. *Id*. Thus, in *Walker*, the plaintiff's argument amounted only to a failure to act - the defendant school officials failed to take actions which could have prevented the harm to the plaintiff. The plaintiff presented no evidence that the action that was taken created or increased the harm to the plaintiff. This case is different. Plaintiffs allege that the actions Defendants did take—i.e., returning EC to the classroom, interviewing EC about potential violence, threatening him with immediate mental health treatment, returning EC's backpack to him, and concealing all of it from teachers and the school security officer—created or increased the risk of harm to Plaintiffs.

Defendants say returning EC to class is not an affirmative act, and they base this argument on *Jones v. Union County*, 296 F.3d 417, 428 (6th Cir. 2002)*. In *Jones*, the defendant officers attempted but failed to serve an *ex parte* PPO obtained by the plaintiff against her ex-husband. Before the hearing on the PPO, the ex-husband shot the plaintiff and killed himself. *Jones*, 296 F.3d at 422. The Sixth Circuit affirmed the grant of summary judgment, following discovery, because the failure to timely serve the PPO was merely a failure to act, and therefore not a state created danger. *Id*. at 430-431. For the reasons set forth above, Plaintiffs allege affirmative acts which distinguish this case from *Jones*.

In *Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016), the Court held that "[f]ailing to punish students, failing to enforce the law, failing to enforce school policy, and failing to refer assaults to [police] are plainly omissions rather than affirmative acts." *Stiles* is a case where the state actors were alleged to have "done nothing," i.e., a pure failure-to-act case. It is not applicable here because Plaintiffs allege affirmative acts that created or increased danger.

In *Koulta v. Merciez*, 477 F.3d 442, (6th Cir. 2007), the police responded to a home where a woman was engaged in a confrontation with her mother. The woman told the police that she had drunk one 40-ounce bottle of malt liquor. To resolve the disturbance, the police ordered the woman to leave her mother's home. Unbeknownst to the officers, the woman had also consumed a second 40-ounce bottle of beer, and she had taken Paxil. After leaving her mother's home, the woman crashed her car and killed the driver of another vehicle. The Sixth Circuit held that the police did not create or increase the woman's propensity to drink and drive, which had "blossomed long before the officers arrived on the scene." *Koulta*, 477 F.3d at 446. Here, unlike *Koulta*, Defendants gained specific knowledge of the danger posed by releasing EC from the safety and security of the office and returning him to the classroom, and then took the affirmative action of threatening him with mental health intervention before returning him to the classroom with the backpack containing his gun and bullets. Unlike the officers in *Koulta*, Defendants here sent

35

to class a student whom they knew was suicidal and had just written ""The thoughts won't stop. Help me…blood everywhere…My life is useless…the world is dead." This case is materially different from *Koulta*, and Defendants' motion should be denied.[6]

## B. Defendants' actions especially endangered Plaintiffs.

Defendants do not dispute the second element of Plaintiffs' state created danger claim, which requires Plaintiffs to allege that the defendants' actions created "a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large." *Lipman*, 974 F.3d 726 (quoting *Cartwright*, 336 F.3d at 493(citing *Kallstrom*, 136 F.3d at 1066)). This element of the claim is satisfied by Plaintiffs' allegations that "[i]n comparison with the public-at-large, as students of Oxford High School, [Plaintiffs] were specifically at risk and exposed to the dangers presented by the act of releasing [EC] from the safety of the counseling office to the school environment, where he committed the shooting." ECF No. 1, PageID.36, Complaint ¶152. These allegations further distinguish this case from cases such as *Koulta*, *supra*.

---

[6] *Koulta* was also decided after summary judgment, and not on the pleadings, and is therefore unpersuasive here.

### C. Defendants had the requisite degree of culpability.

The third element of the state created danger claim requires Plaintiffs to allege that "the state knew or should have known that its actions specifically endangered the plaintiff." *Lipman*, 974 F.3d 726 (citations omitted). "This knowledge prong is synonymous with the requirement that the state official's conduct must fairly be said to shock the contemporary conscience. [C]onduct typically meets this conscience-shocking standard when the executive actor is deliberately indifferent to the risk of a private party's harm. *Lipman*, 974 F.3d at 744 n. 7 (citations and quotation marks omitted). The extent of the defendants' subjective knowledge to determine culpability ha[s] to be "fleshed out during discovery and [is] not appropriate to resolve at the motion-to-dismiss posture." *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019). Thus, in *Bartynski v. City of Highland Park, Michigan*, No. 21-10049, 2022 WL 390892, at *4 (E.D. Mich. Feb. 8, 2022)(Goldsmith, J.), this Court summarized Sixth Circuit case law in holding that "[t]he question of whether conduct is conscience-shocking is fact specific" and "depends on the facts and circumstances of the individual case. *Bartynski*, 2022 WL 390892 at *4 (citations omitted). The determination demands an "exact analysis." *Id*.

Here, Defendants argue that Plaintiffs have not alleged the requisite culpability because they do not allege that Defendants were aware of facts from which the inference could be drawn that a substantial risk of harm exists, or that

Defendants knew of the specific risk that later developed. See ECF No. 107, Page ID.1807-08. Defendants' claim is categorically false, as Plaintiffs allege extensive facts giving rise to Defendants' knowledge that it was dangerous for them to return EC to school on the morning of the shooting. To the extent that Defendants disagree with those allegations, or they ask for the Court to see the facts differently, such issues cannot be resolved at the 12(b)(6) stage.

Defendants rely upon the Sixth Circuit's decision in *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir. 2006) to argue that Defendants cannot be liable for sending EC to class on the morning of the shooting. ECF No. 107, PageID.1809. These assertions are clearly intended to warp the factual allegations to fit the Defendants' self-serving narrative of the case.[7] Defendants deliberately ignore the specific facts that caused Defendants to *know* that EC was suicidal and dangerous on the morning of November 30, 2021, and that they were creating a serious danger when they released him from the office and returned him to school. Specifically, a reasonable jury could find it shocking to the conscience that Hopkins and Ejak released EC from the security of the office and returned him to the classroom, because they specifically knew that EC was suicidal, that EC had an obsession with

---

[7] In deciding the motion, the Court must be mindful not to accept Defendants' "narrative" of the case at face value, because doing so is to view the facts in the light most favorable to the defendant rather than the plaintiff. *Babb v. Marysville Anesthesiologists P.C.*, 942 F.3d 308, 323 (6th Cir. 2019)(addressing Rule 56 standard).

guns and gun violence, that EC had been researching bullets and school and had told Hopkins that he enjoyed shooting guns, that EC had been watching a video of a shooting during his first hour class, that in his second hour class EC had drawn disturbing and violent words and images onto a paper assignment, including: "The thoughts won't stop. Help me…blood everywhere…My life is useless…the world is dead;" that EC's parents were informed of his suicidal ideation and abandoned him at school, that EC was a to himself and others, and lied about it. Under these circumstances, Defendants had a constitutional obligation to keep EC away from the classroom environment given their specific knowledge. Their refusal to honor that duty, and to return EC to the classroom given what they knew, is shocking to the conscience. See ECF No. 1, PageID.36, Complaint ¶151.

The facts of *McQueen* are also materially different. In *McQueen*, a student brought a gun to school and fatally shot a classmate while their teacher was outside the classroom. *McQueen*, 433 F.3d at462-63. The Court found that the teacher leaving the classroom unsupervised did not satisfy the affirmative act requirement because the teacher's location inside or outside the classroom had no impact on the danger that existed irrespective of the teacher's presence. *Id*. at 466.

In this case, the information known to Defendants was much more specific to acts of fatal gun violence and mass shooting than the information known to the teacher in *McQueen*. Defendants knew EC was suicidal, a factor that was not present

in *McQueen*. They knew he lied about being a threat to himself and others, another factor not present in *McQueen*. Unlike the teacher in *McQueen*, Defendants knew they had threatened to force EC into mental health treatment. They knew he used guns and had access to guns. They knew what he had written on his schoolwork that morning, including suicidal and homicidal words and images. None of those factors were present in *McQueen*. Furthermore, here, it is the shooter's location—which Defendants affirmatively acted to alter—that is relevant, not the state actor's location. Defendants acted affirmatively when they returned EC to the classroom with his weapon, despite knowing that he was suicidal ("My life is useless") and fixated on drawing and acting out fantasies of fatal shootings ("Blood everywhere" and "The world is dead.")

Defendants also argue that Plaintiffs have not alleged that their response to the known risk of harm was "conscience shocking" or undertaken with "reckless or callous indifference." ECF No. 107, PageID. 1812-1813. First, this determination requires "exacting analysis," and it is for a jury to decide whether Defendants' actions, in light of all the evidence, was conscience shocking, reckless, or callous. Furthermore, simply as a matter of fact, Defendants are wrong. Plaintiffs allege that Defendants returned a suicidal child to school with deliberate disregard for whether he would harm himself or others, thus placing Plaintiffs in greater danger than they were before the state action. A reasonable juror could conclude that these actions

were taken with "reckless or callous indifference," and that they were "conscience shocking."

Having failed to defeat Plaintiffs' claims on the pleadings alone, Defendants resort to arguments beyond the pleadings, making speculative assertions about what the Defendants knew, when they knew it, and by speculating about the "reasonableness" of their actions, or what considerations they had to "weigh" in forming their "responses against what was known." See, e.g., ECF No. 107, PageID.1816-1820 (arguing at length about facts and evidence that have not been established or tested through discovery and engaging in extensive arguments about the weight of the evidence and Defendants' states of mind.) Defendants also argue about whether EC should have summarily been removed from school, or sent home, which is neither relevant nor pertinent to the 12(b)(6) analysis of Plaintiffs' allegations. ECF No. 107, PageID. 1819-1820. These arguments are nothing more than an effort by Defendants to construct a fallacy rather than address the merits of the Plaintiffs' actual allegations. The Court should not go down such rabbit holes.

Defendants cite *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020), which held that to meet the culpability requirement for purposes of a state created danger claim the school employee must know of more than the general risk of harm but must know the specific risk that later develops. *Doe* is unpersuasive here for at least two reasons. First, *Doe* was decided after summary

judgment, which demonstrates that the parties should have the opportunity to complete discovery on the issue of culpability before a decision on the merits of the case. See *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (explaining that the analysis "depends upon the facts and circumstances of the individual case"); *M.S. by Covington*, 756 F. App'x at 517 (explaining that the "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before making that determination"). Second, in this case, Plaintiffs allege that Defendants had very specific knowledge of the risk that EC, whom they determined was suicidal, posed to himself and others at the high school. Defendants knew EC had just drawn violent images depicting shooting people. They knew he had access to guns. They knew that on the morning of the shooting, EC had declared that his life was useless, written "the thoughts won't stop," and that he was literally crying out for help. Plaintiffs' pleadings allege sufficient facts to conclude that Defendants knew the specific risks of returning EC to school under those circumstances, and that they disregarded those risks by returning him to school anyway.

Defendants also cite *Drinkard v. Michigan Dep't of Corr.*, No. CIV. 12-14598,2013 WL 3353935, at *4 (E.D. Mich. July 3, 2013, J. Goldsmith), where the Court found that MDOC did not have knowledge of the risk that a parolee would harm the Plaintiff after being released from prison. This case is materially different,

however, because Plaintiffs allege that Defendants had specific knowledge of the fact that EC was suicidal and was likely to cause harm to students inside Oxford High School.

Defendants also cite *A.L. v. Ann Arbor Pub. Sch.*, No. 10-CV10354, 2011 WL 87262, at *10 (E.D. Mich. Jan. 11, 2011, J. Goldsmith), where the complaint merely alleged that "Defendants 'knew or should have known, based on the prior mediation and IEP process, that its actions specifically endangered the plaintiff.'" *A.L.*, 2011 WL 87262, at *10. In this case, unlike *A.L.*, Defendants specifically knew that EC was suicidal, that he had access to guns, that he had just drawn violent and disturbing images depicting shooting deaths and violence, and that he had just written "the thoughts won't stop. Help me" on his classwork, among other specific facts establishing specific knowledge that it was dangerous to return EC to the classroom.

Defendants cite *M.J. v. Akron City School District Bd. Of Ed.*, 1 F.4th 439, 451 (6th Cir. 2021), where a teacher literally "stood by and did nothing" when a man disguised as a police officer came to classroom and removed a student in handcuffs before violently battering and verbally assaulting the children. *M.J.* was a pure failure to act case and is not applicable in this case involving the affirmative acts of threatening EC with mental health treatment, giving him the backpack containing his gun and bullets, and returning him to the classroom after learning specifically that he was suicidal and engaging in threatening behaviors.

43

In this case, "because the parties have not engaged in discovery, the Court cannot at this stage conduct the necessary fact-specific determination of whether the alleged conduct shocks the conscience. Therefore, dismissal of [Plaintiffs'] substantive due process claim would be premature." *Bartynski¸ supra* at \*4.

## IV. Plaintiffs have properly alleged supervisory liability claims against Defendants Wolfe and Throne.

Plaintiffs have sufficiently alleged supervisory liability claims against Defendants Wolf and Throne that involve affirmative acts, and not merely a failure to act. First, accepting Plaintiffs' allegations as true, Defendants Wolf and Throne are properly sued for their own affirmative acts that created and increased the danger to Plaintiffs, and not merely for vicarious liability. For this reason alone, Defendants' motion to dismiss should be denied because it mischaracterizes the nature of Plaintiffs' claims against these Defendants. Furthermore, even if this were purely a "supervisory liability" case, Plaintiffs allegations are sufficient to state claims against Defendants Wolf and Throne. Supervisory liability merely "requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241-42 (6th Cir. 2016)(citations omitted)(affirming denial of supervisory officer's motion to dismiss on qualified immunity grounds). "However, 'active' behavior does not mean 'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Id.* at 242. Thus, acts of

"encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability." *Id.* (citing *Doe v. City of Roseville*, 296 F.3d 431, 440(6th Cir. 2002)). In this case, Plaintiffs sufficiently allege that Wolf and Throne violated Plaintiffs' constitutional rights.

Defendant Throne was the Superintendent of Oxford Community School District and therefore responsible for supervising and overseeing the actions of Defendants Wolf, Ejak, and Hopkins, and other staff and administrators. *See Ossege*, Case No. 2:22-cv-11251-MAG-APP, ECF No. 1, PageID.21, Complaint ¶136; *Asciutto*, Case No. 2:22-cv-10407-SFC-CI ECF No. 1, PageID.27, Complaint ¶119. Throne discouraged students, parents, and staff from reporting suspected threats to the safety and security of students and staff. *See Ossege*, Case No. 2:22-cv-11251-MAG-APP, ECF No. 1, PageID.21, Complaint ¶137; *Asciutto*, Case No. 2:22-cv-10407-SFC-CI ECF No. 1, PageID.27, Complaint ¶120; *G.J.*, Case No. 2:22-cv-11360-MAG-APP ECF No. 3, PageID.200, Complaint, ¶66.

Defendant Wolf was the Principal of Oxford High School and therefore responsible for supervising and overseeing the actions of Defendants Ejak and Hopkins. *See Ossege*, Case No. 2:22-cv-11251-MAG-APP, ECF No. 1, PageID.21, Complaint ¶138; *Asciutto*, Case No. 2:22-cv-10407-SFC-CI ECF No. 1, PageID.28, Complaint ¶121. Wolf had the authority and obligation to maintain school safety and to investigate fully and completely all threats of violence. *G.J.*, Case No. 2:22-cv-

11360-MAG-APP ECF No. 3, PageID.257, Complaint, ¶269. Wolf directed the teachers and counselors to tell students to stop reporting, sharing or otherwise discussing the threatening social media posts and other known threats at Oxford High School. *Mueller*, Case No. 2:22-cv-11448-TGB-APP ECF No. 1, PageID.13, Complaint, ¶54; *G.J.*, Case No. 2:22-cv-11360-MAG-APP ECF No. 3, PageID.200, Complaint, ¶65.

Throne and Wolf knew that there were active threats of violence that compromised student safety at the Oxford High School in the weeks and months leading up to the shooting, and that those threats had not been formally or fully investigated. *Mueller*, Case 2:22-cv-11448-TGB-APP ECF No. 1, PageID.46, Complaint ¶249; *G.J.*, Case No. 2:22-cv-11360-MAG-APP ECF No. 3, PageID.257, Complaint, ¶268. Yet Throne and Wolf told students that there was no credible threat, demonstrating conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted. *Mueller*, Case 2:22-cv-11448-TGB-APP ECF No. 1, PageID.12, Complaint ¶55. For example, on November 16, 2021, Principal Wolf emailed parents, stating: "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors." *Mueller*, Case 2:22-cv-11448-TGB-APP ECF No. 1, PageID.12, Complaint ¶47.

46

That same day, Throne made an announcement on the school-wide loudspeaker at Oxford High School, instructing students to stop spreading rumors and to stop relying on information on social media, while also reassuring students that there were no threats that posed any danger to them at Oxford High School. *Asciutto*, Case No. 2:22-cv-10407-SFC-CI ECF No. 1, PageID.9, Complaint ¶37; *G.J.*, Case No. 2:22-cv-11360-MAG-APP ECF No. 3, PageID.200, Complaint, ¶63.

The affirmative actions of Throne and Wolf in the weeks leading up to the November 30, 2021 shooting include: (1) Deliberately and intentionally concealing facts from appropriate law enforcement as to the severed bird head EC placed in the boys' bathroom just weeks before the shooting; (2) Deliberately and intentionally concealing facts from the Oxford High School students and parents of ongoing violence at the school, and instead falsely assuring them that there were no threats to school safety that they should be concerned with in the days and weeks leading up to the November 30, 2021 shooting; (3) Deliberately discouraging Oxford High School students from taking seriously the threats they had perceived to their safety; and instructing them to stop talking about or sharing the threatening information they find on social media; (4) Promoting a policy, practice, or custom of misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school violence; and (5) Any and all additional breaches that created or increased the danger of violence at the school that may become known through

discovery. *Mueller*, Case 2:22-cv-11448-TGB-APP ECF No. 1, PageID.47, Complaint ¶252; *G.J.*, Case No. 2:22-cv-11360-MAG-APP ECF No 3, PageID.257, Complaint, ¶271 (as to Defendant Wolf only).

Wolf also encouraged the specific unconstitutional acts or directly participated in them by not expelling, disciplining, removing or providing proper supervision for EC; not calling Child Protective Services, Law Enforcement or school security, and by adopting a policy, practice, and/or custom of not informing local law enforcement of the risk of danger to Oxford High School students and staff, and by discouraging students, parents, and staff from reporting suspected threats to the safety and security of students and staff. *Ossege*, Case No. 2:22-cv-11251-MAG-APP, ECF No. 1, PageID.21, Complaint ¶139.

Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct by not expelling, disciplining, removing or providing proper supervision for EC. *See Ossege*, Case No. 2:22-cv-11251-MAG-APP, ECF No. 1, PageID.22, Complaint ¶139140; *Asciutto*, Case No. 2:22-cv-10407-SFC-CI ECF No. 1, PageID.27, Complaint ¶¶119, 121, 123.

Plaintiffs allege specific actions, including encouragement, authorization, approval, and knowing acquiescence, as to Defendants Wolf and Throne. These allegations are sufficient, if proven, to prevail on a claim against those Defendants, and the Court should therefore deny Defendants' motion to dismiss.

48

## V.    Plaintiffs have properly alleged individual Section 1983 claims against Teacher #1, Teacher #2, Teacher #3, and Pamela Parker Fine.[8]

Plaintiffs allege specific affirmative acts by Teacher #1, Teacher #2, and Teacher #3, and Pamela Parker Fine, including hiding information from law enforcement, choosing not to file mandatory reports of suspected child abuse, and deciding not to search EC's backpack, which increased the risk of danger to Oxford High School students and staff in the weeks leading up to November 30, 2021. These defendants did not just fail to act. They knew and concealed specific information about EC's threats to the school.

In their motion, Defendants' attempt to raise a factual dispute as to whether they were aware of facts from which the inference could be drawn that a substantial risk of harm exists. ECF No. 107, Page ID.1807-08. But Plaintiffs allege extensive facts establishing that Teacher #1, Teacher #2, Teacher #3, and Fine knew EC was a danger to himself and others, and that he was developing a plan for a school shooting. Teacher #1 had direct contact with EC on November 29, 2021, when EC violated multiple school policies, procedures, and rules by searching on the internet for information about ammunition for the Sig Sauer handgun that was used in the fatal shootings of November 30, 2021. *Asciutto*, No. 22-10407, ECF No. 1,

---

[8] Two cases in these consolidated actions include claims against teachers as individual defendants under Section 1983. See Asciutto, Case No. 2:22-cv-10407-SFC-CI, ECF No. 1 (Compl.); Franz, Case No.2:21-cv-12871-MAG-APP, ECF No. 55 (Am. Compl.).

PageID.5, Complaint ¶17, ¶21; PageID.11, ¶51; *Franz*, No.21-12871, ECF No. 55, PageID.1155, ¶67. Teacher #1 recognized this behavior as concerning and took a photo to document the incident. *Asciutto*, No. 22-10407, ECF No. 1, PageID.12, Complaint ¶¶53-54. Teacher #1 knowingly and deliberately decided to exclude the school safety liaison officer from notice of such dangers. *Franz*, No.21-12871, ECF No. 55, PageID.1155, ¶69, PageID.1161, ¶87. Teacher #1 and Fine made a knowing and deliberate decision not to report this information to CPS or to local law enforcement (including the OHS liaison officer), and both violated that law by such failure to report. *Asciutto*, No. 22-10407, ECF No. 1, PageID.12, Complaint ¶58. Teacher #1 and Defendant Fine then deliberately and knowingly sent EC home and permitted him to return to school the next day without any discipline or follow-up, which accelerated and provided clearance for EC's plans to engage in a mass school shooting. *See Asciutto*, No. 22 -10407, ECF No. 1, PageID.14, Complaint ¶66; *Franz*, No. 21-12871, ECF No. 55, PageID.1157, ¶¶76-78. The students and staff of OHS were safer before this acceleration and clearance. *Id.* Defendants released EC home from school without investigating his inappropriate internet search. *Franz*, No.21-12871, ECF No. 55, PageID.1159, ¶81. That night, EC posted, "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford." *Id.*

Teacher #2 had direct contact with EC on the morning of November 30, 2021, when he caught EC violating multiple school policies, procedures, and rules by

drawing pictures of his handgun, a bullet, and a person shot twice in the chest with blood and other violent images, demonstrating that EC was mentally disturbed and dangerous. *Asciutto*, No. 22-10407, ECF No. 1, PageID.5, Complaint ¶19; PageID.14, ¶68; *Franz*, No.21-12871, ECF No. 55, PageID.1162, ¶¶90-92. Teacher #2 saw that underneath the handgun, the drawing read: "The thoughts won't stop. Help me." *Asciutto*, PageID.14-15, ¶¶68-69. On the same page, Teacher #2 saw that EC wrote "blood everywhere" with another drawing of a bullet, a laughing face with tears, and the words "My life is useless" and "The world is dead." *Asciutto*, PageID.14-15, ¶¶68-69. These drawings and statements were plainly violent and disturbing, and openly expressed EC's thoughts of despair, violence, and homicidal ideation. *Asciutto*, No. 22-10407, ECF No. 1, PageID.15, ¶69. Teacher #2 knew this and took a photo of the drawing. *Asciutto*, 22-10407, ECF No. 1, PageID.15, ¶70. Teacher #2 also observed EC viewing violent videos of shootings. *Franz*, No.21-12871, ECF No. 55, PageID.1160, ¶85. Teacher #2 made a knowing and deliberate decision not to search EC's backpack. *Asciutto*, No. 22-10407, ECF No. 1, PageID.15, ¶71-72; *see also Franz*, No.21-12871, ECF No. 55, PageID.1175-1176, ¶156(g).

Teacher #3 had direct contact with EC on November 30, 2021, when they caught EC violating multiple school policies, procedures, and rules by looking up

violent videos that depicted a shooting on his phone. *Asciutto*, No. 22-10407, ECF No. 1, PageID.16, ¶75.

Unlike the teacher in *McQueen*, 433 F.3d at 466, Teacher #1, Teacher #2, and Teacher #3 knew that EC used guns and had access to guns. They knew what he had written on his schoolwork that morning, including suicidal and homicidal words and images. With this knowledge, the Defendant teachers "knew that EC was mentally unstable, distraught, and likely to attempt some sort of attack using a handgun and bullets. Indeed, he drew it for them to see." *Asciutto*, No. 22-10407, ECF No. 1, PageID.17, ¶82. This knowledge is far more specific than the "general risk of harm" in *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th Cir. 2020) (considered at summary judgment after discovery was properly allowed).

Despite this specific knowledge, Teacher #1, Teacher #2, and Teacher #3 knowingly and deliberately decided to exclude the school safety liaison officer from notice of such dangers. *Franz*, No.21-12871, ECF No. 55, PageID.1155, ¶69, PageID.1161, ¶87, PageID.1163, ¶95; PageID.1176, ¶156. The teachers deliberately and intentionally concealed facts from the appropriate law enforcement authority before returning EC to class. *Franz*, No.21-12871, ECF No. 55, PageID.1177, ¶156(l); *Asciutto*, No. 2:22- 10407, ECF No. 1, PageID.27, Complaint ¶119. Teacher #1, Teacher #2, and Teacher #3 chose not to discipline or provide proper supervision for EC. *Asciutto*, No. 22-10407, ECF No. 1, PageID.27-28, Complaint ¶119, 121.

52

Both Teacher #2 and Teacher #3 made a knowing and deliberate decision not to search EC's backpack. *Asciutto*, No. 22-10407, ECF No. 1, PageID.15, ¶71-72; *see also Franz*, No.21-12871, ECF No. 55, PageID.1162, ¶¶92-93, PageID.1175-1176, ¶156(g). Teacher #1, Teacher #2, and Teacher #3 actively participated in the District's policy or practice of dismissing the reporting, sharing, or mentioning of threats against OHS. *Asciutto*, No. 22-10407, ECF No. 1, PageID.27, Complaint ¶120.

The students and staff at OHS were safer before Teacher #2 and Teacher #3 intentionally chose not to report the violent notes and drawing by EC to the school liaison officer or other law enforcement and chose not to search the backpack. *See Asciutto*, Case 22-10407, ECF No. 1, PageID.16, ¶74; *Franz*, No.21-12871, ECF No. 55, PageID.1163, ¶94.

A reasonable jury could find it shocking to the conscience that Teacher #1, Teacher #2, and Teacher #3 took these affirmative acts. The teachers' specific knowledge about EC's homicidal ideations, which specifically depicted guns and mass shootings, underscores why a reasonable juror could conclude that their actions were taken with "reckless or callous indifference," and that they were "conscience shocking." On this point, Defendants' attempt to speculate and offer merits arguments about what Defendants had to "weigh" in forming their "responses against what was known," *see, e.g.*, ECF No. 107, PageID.1816-1820, is completely

outside the scope of the Court's 12(b)(6) analysis. *See Bartynski,* Case No. No. 21-10049, 2022 WL 390892, at *4.

Plaintiffs have adequately alleged that Teacher #1, Teacher #2, and Teacher #3 undertook affirmative acts that increased the danger EC posed to students and staff at Oxford High School, each of the teachers knew or should have known that their actions specifically exposed OHS students and staff to the increased risk of a school shooting, and their conduct shocks the conscience. These allegations are sufficient, if proven, to prevail on a claim against those Defendants, and the Court should therefore deny Defendants' motion to dismiss on these claims.

## VI. Plaintiffs have properly alleged *Monell* liability claims against Oxford Community Schools.

In this case, Defendants' only argument for dismissal of Plaintiffs' *Monell* claims is that Plaintiffs have not alleged a constitutional violation. For the reasons argued above, there are genuine issues of material fact as to Plaintiffs' state-created danger claim, and the Court should therefore deny Defendants' motion. Even if the Court were to review the sufficiency of Plaintiffs' *Monell* allegations, Plaintiffs have stated a claim for municipal liability.

Under *Monell* and its progeny, there are four ways a plaintiff can demonstrate a policy or custom that could allow for municipal liability: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decisionmaking authority ratified illegal actions; (3) the existence of a policy of

inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Lipman*, 974 F.3d at 747(citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

Plaintiffs allege that the fatal affirmative act of returning EC to the classroom with his backpack happened because of the official policies, practices, and customs of Oxford Community School District. Defendants, including Superintendent Throne, Principal Wolf, and Dean of Students Ejak, adopted and maintained policies, procedures, customs that included: (1) preventing staff and administrators from maintaining administrative supervision over students in the counseling office, and of restricting students from returning to the classroom, unless there exists a "disciplinary issue"; (2) concealment, misrepresentation, minimization or avoidance, and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence; (3) failing or choosing not to train staff and administrators for how to respond where the student is suicidal or is displaying homicidal tendencies, where the student presents a threat of harm to himself/herself or others; (4) failing or choosing not to train staff and administrators in proper methods to conduct a student risk assessment; (5) permitting its staff and administrators to refrain from immediately reporting or filing mandatory reports of known or suspected acts of child abuse or neglect in contravention and violation of MCL § 722.623(a); (6) discouraging students, parents, and staff from reporting

suspected threats; and (7) obstructing and discouraging reports of threats local law enforcement. See *Ossege*, No. 22-11251, ECF No. 1, PageID.21-23, Complaint ¶¶137-151; *Asciutto*, No. 22-10407, ECF No. 1, PageID.27; *G.J.*, No. 22-11360, ECF No. 3, PageID.244, Complaint, ¶243; *St. Juliana*, ECF No.1, PageID.37

By adopting a policy, practice, and/or custom of not informing local law enforcement of the risk of danger to Oxford High School students and staff, Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct. See *Ossege*, No. 22-11251, ECF No. 1, PageID.22, Complaint ¶141; *Asciutto*, No. 22-10407, ECF No. 1, PageID.27, Complaint ¶120; *G.J.*, No. 2:22-11360, ECF No. 3, PageID.244, Complaint, ¶243.

By discouraging students, parents, and staff from reporting suspected threats to the safety and security of students and staff, Throne and Wolf authorized, approved, or knowingly acquiesced in Ejak and Hopkins' unconstitutional conduct. *Ossege*, No. 22-11251, ECF No. 1, PageID.22, Complaint ¶142.

By inadequately training and/or supervising their teachers, counselors, and dean of students, and having a custom or policy of indifference to the constitutional rights of their citizens, and/or by failing to adequately supervise school shooter, EC, Defendants Throne and Wolf encouraged and cultivated the conduct which then caused a violation of Plaintiffs' Minors' rights under the Fourteenth Amendments of

56

the United States Constitution. *Asciutto*, No. 22-10407, ECF No. 1, PageID.28, Complaint ¶122.

As discussed above, in *M.S. by Covington*, the Sixth Circuit found that the plaintiffs alleged a viable state created danger claim against the municipal defendant, a school district, where students were instructed to board a bus operated by a private third party. *M.S. by Covington*, 756 F. Appx. at 516. There, the principal who directed children onto the bus claimed to be following school policy. Similarly, Defendants Hopkins and Ejak profess to be following an official policy of the defendant district which prohibited them from keeping EC in the office, even though he was safe there, unless there was some "disciplinary issue." Based on this allegation alone, there is a sufficient basis to move forward with discovery to determine the extent to which the district's policies, practices, and customs contributed to the affirmative act of returning EC to school on the day of the shooting.

Finally, Defendants argue with respect to the *Monell* claims that the law was not "clearly established." This argument is misplaced, however, because unlike individual state actors, the municipal defendant – Oxford Community School District – cannot assert qualified immunity and the question of whether the law was "clearly established" is immaterial. Furthermore, even if the *Monell* claim did require clearly established law, as argued above, the right to be free from state-

created danger has been clearly established since at least 1998, when the Sixth Circuit decided *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998).

## VII.   Injunctive Relief Claims

Defendants misconstrue the nature of Plaintiffs' injunctive relief claims. The scope of a student's property interest in their educational status is determined with reference to state law, and here, the Michigan Revised School Code requires school districts and officials to create and maintain a safe educational environment. See *Lansing Schools Educ. Ass'n. v. Lansing Bd. of Educ.*, 487 Mich. 349, 374-75 (2010)(holding that teachers had standing to sue school district for failure to maintain safe educational environment and to request declaratory and injunctive relief to restore safe educational environment as required by the Code,).

Here, instead of protecting their students' interests in a safe educational environment, Defendants' policies, practices, and customs created and increased the risk of the shooting at Oxford High School. See, e.g., *St. Juliana* Complaint ¶162, Case No. 22-10805, ECF No. 1, PageID. 40. As a result, the school was closed, "and its surviving students…were completely deprived of their right to a public education, from November 30, 2021 until January 24, 2022." *Id*. at ¶163. Even after the school re-opened, Defendants continued to conceal and cover up the truth of what caused the shooting and failed to discontinue or otherwise remedy any of the unconstitutional practices that caused it to happen. *Id*. at ¶¶ 166-67.

Thus, the surviving students, including the injunctive relief Plaintiffs, are to this day subjected to inferior and unsafe educational resources, including being forced to attend online classes instead of returning to Oxford High School, and they are therefore deprived of the full and equal enjoyment of their property right to a public education. *Id*. at ¶164; See *Goss v. Lopez*, 419 U.S. 565, 574 (1975)("[T]he State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by the Clause."); see also *Patrick v. Success Charter Schools, Inc.* 354 F.Supp.3d 185, 216 (E.D.N.Y. 2018)(Student sufficiently alleged due process violation where he was placed in an alternative education program that was materially inferior.).

Defendants argue that the injunctive relief claims are moot, but to this day, Defendants have not implemented the injunctive relief requested by Plaintiffs, including cessation of the policies, practices, and customs that caused the shooting, provision of proper training in how to handle suicidal and dangerous student behavior, proper training on risk assessment, and proper training on searches. See *St. Juliana* Complaint ¶167, Case No. 22-1085, ECF No. 1, PageID. 42-43. Furthermore, the issue of mootness hinges on disputed issues of fact that cannot be resolved on the pleadings, and Defendants cannot sustain the "heavy burden of

persuading the court" that the challenged conduct has completely ceased or will not continue. See *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 473 (6th Cir. 2008)("A defendant's 'voluntary cessation of a challenged practice' does not moot a case.")

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss (ECF No. 107).

Respectfully submitted,

| | |
|---|---|
| PITT, McGEHEE, PALMER, BONANNI & RIVERS PC | FIEGER, FIEGER, KENNEY & HARRINGTON, P.C. |
| */s/ Kevin M. Carlson* | */s/ Milica Filipovic (w/p)* |
| Michael L. Pitt (P24429) | GEOFFREY N. FIEGER (P30441) |
| Megan A. Bonanni (P52079) | JAMES J. HARRINGTON (P65351) |
| Beth M. Rivers (P33614) | ROBERT G. KAMENEC (P35283) |
| Kevin M. Carlson (P66704) | MILICA FILIPOVIC (P80189) |
| Danielle Young Canepa (P82237) | Attorneys for Franz et. al. Plaintiffs |
| Counsel for St. Juliana Plaintiffs | 19390 West Ten Mile Road |
| 117 West Fourth Street, Suite 200 | Southfield, MI 48075 |
| Royal Oak, MI 48067 | P: (248) 355-5555 / F: (248) 355-5148 |
| (248) 398-9800 | m.filipovic@fiegerlaw.com |
| mpitt@pittlawpc.com | |
| mbonanni@pittlawpc.com | |
| kcarlson@pittlawpc.com | |
| dcanepa@pittlawpc.com | |

60

DEBORAH GORDON LAW

*/s/Deborah L. Gordon (P27058) w/p*
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
Molly Savage (P84472)
Attorneys for Ossege Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
msavage@deborahgordonlaw.com

MUELLER LAW FIRM

*/s/ Wolfgang Mueller (P43728) w/p*
WOLFGANG MUELLER (P43728)
Attorney for Beausoleil Plaintiff
Attorney for Arthur Plaintiff
41850 W. 11 Mile Rd. #101
Novi, MI 48375
P: (248) 489-9653
wolf@wolfmuellerlaw.com

GIROUX TRIAL ATTORNEYS,
P.C.

*/s/ Andrew J. Laurila (w/p)*
Andrew J. Laurila (P78880)
Robert M. Giroux (P47966)
Attorneys for Asciutto & Vackaro
Plaintiffs
28588 Northwestern Hwy., Suite 100
Southfield, MI 48034
(248) 531-8665
alaurila@greatMIattorneys.com

GREWAL LAW, PLLC

*/s/ Scott Weidenfeller (w/p)*
Scott Weidenfeller (P56001)
Attorney for GLJ, et. al. Plaintiffs
GREWAL LAW, PLLC
345 E. Cady St., 3rd Floor
Northville, MI 48167
(517)393-3000
sweidenfeller@4grewal.com

FLOOD LAW PLLC

*/s/ Todd Flood w/p*
Todd. F. Flood (P58555)
Counsel for *Watson* Plaintiffs
155 W Congress St Ste 603
Detroit, MI 48226-3267
P: 248-547-1032
tflood@floodlaw.com

Date: January 26, 2023

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 26th day of January, 2023, the foregoing document was filed using the Court's CM/ECF electronic filing system which will provide electronic notice of this filing to all counsel of record.

*/s/ Milica Filipovic*