UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY FRANZ, et al.,

Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT, et al.,

Defendants.

No. 21-cv-12871

HON. MARK A. GOLDSMITH

## OPINION & ORDER
## (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON PLEADINGS (Dkt. 107), (2) GRANTING DEFENDANTS' MOTIONS TO FILE EXCESS PAGES (Dkts. 108, 124), AND (3) DENYING DEFENDANTS' MOTION TO STAY (Dkt. 109)

This matter concerns the tragic school shooting executed by student E.C. at Oxford High

School (OHS) in Oxford, Michigan on November 30, 2021. Plaintiffs—OHS students, their Next

Friends, and certain students' estates—bring ten separate but related actions against school district

Oxford Community Schools and certain district employees.[1] Before the Court are Defendants'

motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) (Dkt. 107) and

---

[1] These related cases (Oxford Cases) are: <u>Franz et al. v. Oxford Community School District et al.</u>, No. 21-cv-12871 (E.D. Mich.); <u>Asciutto et al v. Oxford Community School District et al.</u>, No. 22-cv-10407 (E.D. Mich.); <u>Myre, et al. v. Oxford Community School District, et al.</u>, No. 22-cv-11113 (E.D. Mich.); <u>St. Juliana et al v. Oxford Community School District et al.</u>, No. 22-cv-10805 (E.D. Mich.); <u>Beausoleil v. Oxford Community School District et al.</u>, No. 22-cv-11250 (E.D. Mich.); <u>Ossege v. Oxford Community School District et al.</u>, No. 22-cv-11251 (E.D. Mich.); <u>G.J. et al. v. Oxford Community School District et al.</u>, No. 22-cv-11360, (E.D. Mich.); <u>Mueller et al. v. Oxford Community School District et al.</u>, No. 22-cv-11448 (E.D. Mich.); <u>Watson et al. v. Oxford Community School District, et al.</u>, 22-cv-11959 (E.D. Mich.); and <u>Cunningham et al. v. Oxford Community School District et al.</u>, No. 22-cv-11398 (E.D. Mich.). The <u>G.J.</u> Plaintiffs purport to bring their suit as a class action on behalf of all students enrolled in the Oxford Community Schools district. <u>See</u> <u>G.J.</u> Am. Compl. (No. 22-cv-11360, Dkt. 42).

related motions.[2]  For the reasons that follow, the Court grants Defendants' motion for judgment on the pleadings in part and denies it in part.[3]

## I.  BACKGROUND

The following statements are allegations taken collectively from the ten complaints in these related actions.  For purposes of resolving Defendants' motion for judgment on the pleadings, the Court accepts Plaintiffs' well-pleaded allegations as true.  See Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 480 (6th Cir. 2020).[4]

### A.  Safety Concerns at OHS in November 2021

A jar containing a severed bird's head was found in a boys' bathroom at OHS on November 11, 2021.  See Br. in Supp. Mot. at 6 (citing Myre Compl. ¶ 47 (No. 22-cv-11113, Dkt. 6)).  Plaintiffs allege that E.C.'s personal journal and cell phone data indicate that E.C. was responsible for the bird incident.  See, e.g., St. Juliana Compl. ¶ 30 (No. 22-cv-10805, Dkt. 1).

The next day, November 12, 2021, OHS administrators emailed parents: "Please know that we have reviewed every concern shared with us and investigated all information provided . . . .

---

[2] Per this Court's order (Dkt. 105), Defendants filed a single motion for judgment on the pleadings in this action, No. 21-cv-12871, which is to be applicable to all of the Oxford Cases.  A single joint response was filed in this action by all Plaintiffs (Dkt. 119); Defendants filed a reply (Dkt. 123).  The Court held a hearing on Defendants' motion for judgment on the pleadings on March 21, 2023.

[3] The Court also grants Defendants' motions for leave for the parties to file excess pages in support of their motion and response (Dkt. 108) and for Defendants to file excess pages in support of their reply (Dkt. 124).  Additionally, because the Court has now ruled on Defendants' motion for judgment on the pleadings, the Court denies Defendants' motion to stay discovery (Dkt. 109).

[4] Defendants title their Rule 12(c) motion as a motion to dismiss, see Mot. at PageID.1758, but they reference the standard for a motion for judgment on the pleadings, see, e.g., Br. in Supp. Mot. at 12.  A motion brought under Rule 12(c) is properly viewed as a motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(c).  Regardless, the Court applies the same standard whether Defendants move to dismiss or move for judgment on the pleadings; the Court assesses the sufficiency of the allegations in the complaint.  See Bates, 958 F.3d at 480.

We want our parents and students to know that there has been no threat to our building nor our students." Id. ¶ 31.

Within the next few days, "multiple parents directly informed" Defendant Steven Wolf, principal of OHS, of "concerns about threats to students made on social media" and "concerns about multiple severed animal heads at Oxford High School," indicating that their children did not "feel safe." Id. ¶¶ 32–33 (quoting example parent email). Wolf responded by emailing parents on November 16, 2021: "I know I'm being redundant here, but there is absolutely no threat at the HS [high school] . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors." Br. in Supp. Resp. at 46 (citing Mueller Am. Compl. ¶ 47 (No. 22-cv-11448, Dkt. 55)).

Also on November 16, 2021, Defendant Timothy Throne—then superintendent for school district Oxford Community Schools—made an announcement on the OHS loudspeaker "warn[ing]" students "to stop spreading information over social media and to stop relying on information on social media, reiterating that there were no threats that posed any danger to students at OHS." Asciutto Am. Compl. ¶ 37 (No. 22-cv-10407, Dkt. 21).

**B. E.C.'s Behavior in Advance of Shooting**

Multiple teachers allegedly noticed and reported troubling signs from E.C. in the approximately 24-hour period before the November 30, 2021 shooting.

One of E.C.'s teachers—Defendant Jackie Kubina—saw E.C. looking at a picture of bullets on his cell phone while in class on November 29, 2021. Br. in Supp. Mot. at 8 (citing Myre Compl. ¶ 59). Kubina emailed this information to Defendant Nicholas Ejak, the high school's dean of students, and Defendant Pam Fine, the school district's restorative practices coordinator. See Resp. to Mot. at 3 (citing St. Juliana Compl. ¶¶ 43–44). Kubina's email was also forwarded to Defendant Shawn Hopkins, an OHS counselor. Id. That same day, E.C. met with Fine and

Hopkins in Fine's office, and E.C. explained to Fine and Hopkins that shooting guns was a family hobby.  Id. at 4 (citing St. Juliana Compl. ¶ 48).

Later on November 29, 2021, E.C. posted to his public Twitter account: "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."  Id. at 4 (citing St. Juliana Compl. ¶ 53).

On the morning of November 30, 2021, another one of E.C.'s teachers—Defendant Allison Karpinski—witnessed EC watching a video depicting a shooting on his cell phone during class. Resp. to Mot. at 4 (citing St. Juliana Compl. ¶ 54); Br. in Supp. Mot. at 8–9 (citing Myre Compl. ¶ 73).  Karpinski reported the incident to Hopkins via email at approximately 8:30 a.m.  Resp. to Mot. at 4; see also St. Juliana Compl. ¶ 54.

About half an hour later, at approximately 8:59 a.m., E.C.'s math teacher—Defendant Becky Morgan—witnessed E.C. writing violent phrases and drawing violent pictures on his math assignment during class.  Br. in Supp. Mot. at 9 (citing Myre Compl. ¶ 72).  The drawing depicted a handgun, a person with two gunshot wounds bleeding from the mouth, a shell casing or bullet, and a laughing/crying emoji.  Br. in Supp. Resp. Mot. at 4.  The phrases included: "The thoughts won't stop.  Help me"; "blood everywhere"; "My life is useless"; and "The world is dead."  Id.

Morgan reported the drawing to Hopkins and Ejak.  Br. in Supp. Resp. at 4 (citing St. Juliana Compl. ¶ 55).  Shortly after 9:00 a.m., Hopkins pulled E.C. from class and brought him to the counselor's office.  Br. in Supp. Mot. at 9 (citing Myre Compl. ¶ 75); St. Juliana Compl. ¶¶ 57–58.  Hopkins and E.C. left E.C.'s backpack in the classroom, where Ejak picked it up before joining Hopkins and E.C. in the counselor's office.  St. Juliana Compl. ¶¶ 59–60, 63.

Hopkins questioned E.C. about the drawing, and when E.C. told Hopkins that it was a drawing for a video game, Hopkins responded: "This does not sound like a video game."  Br. in

4

Supp. Resp. at 5 (citing <u>St. Juliana</u> Compl. ¶¶ 66–68).  After further discussing personal issues in

EC's life, Hopkins determined that EC may be suicidal.  <u>Id.</u> (citing <u>St. Juliana</u> Compl. ¶¶ 69–70).

Hopkins called E.C.'s parents to attend a meeting at the school.  Br. in Supp. Mot. at 10;

Br. in Supp. Resp. at 5.  When EC's parents arrived later that same morning at approximately

10:30 a.m., Hopkins showed them the drawing and advised that E.C. needed to start counseling as

soon as possible, ideally that same day.  Br. in Supp. Mot. at 10 (citing <u>Myre</u> Compl. ¶ 86); <u>St.</u>

<u>Juliana</u> Compl. ¶¶ 82–87.  When E.C.'s parents declined to remove EC from school, Hopkins

advised that he would follow up if they did not take E.C. to counseling within 48 hours.  Br. in

Supp. Mot. at 10 (citing <u>Myre</u> Compl. ¶ 88).  Hopkins also told EC's parents that, if they did not

seek counseling, he would report them to Child Protective Services (CPS).  Br. in Supp. Resp. at

6 (citing <u>St. Juliana</u> Compl. ¶ 89).

Hopkins and Ejak returned E.C.'s backpack to him, and E.C. returned to class.  <u>Myre</u>

Compl. ¶¶ 92–94.

### C.  Shooting and Aftermath

At approximately 12:51 p.m., using a gun in his backpack, EC killed four students and

wounded six students and a teacher.  <u>See</u> Br. in Supp. Resp. at 1; <u>Myre</u> Compl. ¶ 96.

The high school was closed from December 1, 2021 until January 23, 2022 following the

shooting.  Br. in Supp. Mot. at 11.

## II.  ANALYSIS[5]

---

[5] To survive a motion for judgment on the pleadings, a plaintiff must allege "facts that state a claim
to relief that is plausible on its face and that, if accepted as true, are sufficient to raise a right to
relief above the speculative level."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007); <u>see</u>
<u>also</u> <u>Bates</u>, 958 F.3d at 480 (explaining that <u>Twombly</u> pleading standard applies to 12(c) motions).
"Courts must accept as true all well-pleaded factual allegations . . . ."  <u>Bates</u>, 958 F.3d at 480.  A
plaintiff plausibly pleads a claim for relief if his or her allegations "allow the court to draw the

Plaintiffs filed their several actions on behalf of various students. All actions bring substantive due process claims based in state-created danger under 42 U.S.C. § 1983 against Oxford Community Schools, Hopkins, Ejak, Fine, Kubina, Karpinski, Morgan, Wolf, and Throne. Four actions—St. Juliana, G.J., Myre, and Watson—also seek injunctive relief against Oxford Community Schools and the district's current superintendent, Kenneth Weaver, based on alleged procedural due process violations.

Defendants argue that (i) they are entitled to immunity on Plaintiffs' state-created danger claims, and (ii) Plaintiffs have failed to state a procedural due process claim. The Court addresses each argument in turn.

## A. Immunity Defense to State-Created Danger Claim

Defendants are entitled to immunity under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." D.C. v. Wesby, 138 S. Ct. 577, 589 (2018) (punctuation modified).

Defendants argue that Plaintiffs have failed to adequately plead that Defendants violated their substantive due process rights under a state-created danger theory. A plaintiff must plead three elements to assert a state-created danger claim:

> 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) [that] the state knew or should have known that its actions specifically endangered the plaintiff.

Lipman v. Budish, 974 F.3d 726, 744 (6th Cir. 2020) (punctuation modified).

---

reasonable inference that the defendant is liable for the misconduct alleged." Id. (punctuation modified).

This Court proceeds by considering whether Plaintiffs have plausibly pleaded that Defendants violated their substantive due process rights, beginning with Plaintiffs' allegations as to affirmative acts.

### 1. Affirmative Acts: More Than Failure to Act

To plead a state-created danger, a plaintiff must establish that a defendant took some kind of action; "a failure to act is not enough." Lipman, 974 F.3d at 744. For example, state officials do not commit affirmative acts simply by failing to report or investigate suspected child abuse.[6]

Plaintiffs assert several supposed affirmative acts based on Defendants' failure to do something:

- Defendants "decid[ed] not to search E.C.'s backpack," Br. in Supp. Resp. at 49; see also id. at 51;

- Defendants failed to discipline E.C., see id. at 50;

- Defendants "cho[se] not to file" child abuse reports, id. at 49; and

- Defendants "hid[]" or "conceal[ed]" information from law enforcement, the school liaison officer, Child Protective Services (CPS), and other OHS staff members, id. at 13, 44–48, 49–50.

None of these alleged decisions is an affirmative act. Plaintiffs cite no case law supporting their novel position that the failure to investigate suspicious behavior, the failure to discipline a student, or the failure to submit reports to authorities constitutes anything more than "a mere failure to act." Langdon, 524 F. App'x at 176. On the contrary, "[f]ailing to punish students . . . and failing to refer assaults to [law enforcement] are plainly omissions rather than affirmative acts."

---

[6] See Langdon v. Skelding, 524 F. App'x 172, 176 (6th Cir. 2013) (affirming dismissal of state-created danger claim based on state officials' alleged failure to investigate or report allegations of child abuse, finding that "[t]he facts alleged merely show[ed] that the defendants did not do enough to investigate the complaints of abuse, and this [was] a mere failure to act"); Engler v. Arnold, 862 F.3d 571, 576 (6th Cir. 2017) (affirming dismissal of state-created danger claim, explaining: "A state official's failure to investigate or report allegations of child abuse does not constitute an affirmative act.").

Stiles ex rel. D.S. v. Grainger Cnty., Tenn., 819 F.3d 834, 855 (6th Cir. 2016) (affirming grant of summary judgment to school-associated defendants on state-created danger claim based on their alleged knowledge of but failure to adequately address students' bullying and harassment of another student). Just as a state official who is allegedly aware of child abuse does not commit an affirmative act by failing to investigate further or to report his or her suspicions, the school employees in this case have not committed affirmative acts by failing to act in the manner that Plaintiffs insists they should have. See Langdon, 524 F. App'x at 176; Engler, 862 F.3d at 576. Each of these allegations states only "a failure to act," which is "not enough" to plausibly establish a necessary element of a state-created danger claim. Lipman, 974 F.3d at 744.

Plaintiffs have failed to plausibly plead that Defendants violated a substantive due process right based on any of the factual allegations listed above, which entitles Defendants to immunity. Wesby, 138 S. Ct. at 589. Plaintiffs' only claims against Kubina, Karpinski, Morgan, and Fine are based on allegations that these Defendants failed to search E.C.'s backpack, to discipline him, to submit child abuse reports, or to contact the school liaison officer or other members of law enforcement. See Br. in Supp. Resp. at 49–54. The Court grants Defendants' motion as to these claims, and it dismisses Kubina, Karpinski, Morgan, and Fine from this suit.

As to other Defendants, certain bases require dismissal in part. Among the allegations against Ejak and Hopkins are that they failed to search E.C.'s backpack or report information on E.C. to law enforcement or other school officials. See id. at 13–15. As to Wolf and Throne, the bases include that they failed to discipline E.C. or contact CPS or law enforcement. See id. at 49–50. The Court dismisses Plaintiffs' state-created danger claims against these Defendants based on such allegations.

**2. Affirmative Acts: Increase to Risk of Harm**

To plead that a defendant committed an actionable affirmative act, a plaintiff must also allege that he or she was "safer <u>before</u> the state action than he [or she] was <u>after</u> it." <u>Lipman</u>, 974 F.3d at 744 (punctuation modified, emphasis in original). Allegations suffice to meet this standard if a plaintiff asserts that "the state took some action that increased the chances that a private actor would cause the plaintiff harm." <u>Id.</u> at 747. However, a state actor does not necessarily increase the risk that a private actor will cause harm by temporarily intervening in the private actor's conduct. "When an official intervenes . . ., then later returns the person to a situation with a preexisting danger, the intervention does not satisfy the affirmative act requirement for state-created danger"—so long as the official's actions did not increase the preexisting risk. <u>Walker v. Detroit Pub. Sch. Dist.</u>, 535 F. App'x 461, 465 (6th Cir. 2013) (punctuation modified).

For example, school officials do not commit affirmative acts by breaking up a fight between students, even if that intervention fails to prevent one of the participants in the fight from returning after school with a firearm and shooting into a crowd. <u>Id.</u> at 466 (finding plaintiffs had failed to establish affirmative act where "there was no evidence presented that, by breaking up the fight, school officials <u>created</u> or <u>greatly increased</u> the risk" presented by shooter) (emphasis in original); <u>see also</u> <u>McQueen v. Beecher Cmty. Sch.</u>, 433 F.3d 460, 466 (6th Cir. 2006) (affirming grant of summary judgment where teacher did not commit affirmative act by leaving students unsupervised and one student shot another student because "[t]his danger existed irrespective of [teacher's] location"). Similarly, police officers do not commit affirmative acts by failing to do enough to prevent private actors from harming other people—even if those private actors are known threats—as long as the officers' actions do not increase the risks already posed by the private actors.[7]

---

[7] In <u>Reilly v. Ottawa Cnty., Mich.,</u> the Sixth Circuit affirmed the dismissal of a state-created danger claim where police failed to take into custody a man to whom an arrest warrant had been mailed,

Plaintiffs point to two categories of alleged affirmative actions taken by Hopkins and Ejak. The Court considers whether Plaintiffs have plausibly alleged that either of these categories of actions increased the risk that E.C. would commit a shooting.

**a.  Handing E.C. Backpack and Returning Him to Class**

Plaintiffs submit that Hopkins and Ejak had E.C. "safely in custody and confined securely in the counseling office" where he "posed no risk of danger to anyone," but then they "took the affirmative steps of . . . writing him a pass, handing him the backpack containing his gun and bullets, and returning him to class."  Br. in Supp. Resp. at 12.

Plaintiffs have not plausibly alleged that the act of returning E.C. to class with his backpack increased the risk that E.C. would harm other people.  All facts indicate that E.C. came to school on November 30, 2021 prepared to commit a shooting.  The risk that E.C. would do so was "a preexisting danger."  Walker, 535 F. App'x at 465.  By directing E.C. back to his classroom with the backpack that E.C. had brought from home, Hopkins and Ejak did no more than "return[]" the student body to the already-extant state of risk.  Id.  Just as a police officer does not increase the risk that a private actor will harm other people by detaining the actor and then letting him go—

_____

although they knew he had threatened and stalked his former girlfriend and violated a personal protection order. No. 20-2220, 2021 WL 3929324, at *1–*3, *6 (6th Cir. Sept. 2, 2021).  The man subsequently shot and killed his former girlfriend. Id. at *3.  The Sixth Circuit determined that plaintiffs failed to allege that "defendants took any affirmative action that exposed [the victim] to any danger to which she was not already exposed." Id. at *6.  Similarly, in Brooks v. Knapp, an officer's "failure to do anything other than to detain" a man, and the police's "depart[ure] from the scene of a domestic violence call without having taken steps to reduce the risk of harm," did not constitute affirmative acts where the man subsequently killed his wife, even though police had received reports that the man was threatening violence and violating a personal protection order. 221 F. App'x 402, 407 (6th Cir. 2007) (affirming grant of motion for judgment on the pleadings); see also Jones v. Reynolds, 438 F.3d 685, 691 (6th Cir. 2006) (affirming grant of summary judgment where police who allowed illegal drag race to occur, resulting in death of bystander, took no affirmative act "that exposed decedent to any danger to which she was not already exposed") (punctuation modified).

even if the officer has notice that the private actor may pose a danger—Hopkins and Ejak's act of holding E.C. in the counselor's office and then returning him to class did not increase the risk already presented by E.C.  See Brooks, 221 F. App'x at 407.

Plaintiffs refer the Court to M.S. by Covington v. Hamilton Cnty. Dep't of Educ., 756 F. App'x 510 (6th Cir. 2018).  In M.S., the Sixth Circuit reversed the dismissal of a state-created danger claim against a school principal and school district where the principal—aware that the driver of a school bus engaged in dangerous driving—allegedly "instruct[ed]" students to board the bus and "assist[ed] students onto [the] bus," and a subsequent bus crash injured and killed multiple students.  Id. at 516–518.  But M.S., an unpublished opinion, adds little persuasive value to the issue presented here.  The principal in M.S. is distinguishable from the dean of students and school counselor before this Court.  Defendants in this case—rather than "instruct" eventual victims of a tragedy to place themselves in danger—are alleged to have held a private actor in their office and then returned him to his previous position.  On this charge, they are less like the M.S. principal and more like state officials who were found not to have committed actionable affirmative acts by temporarily isolating private actors and then releasing them, thus restoring the preexisting state of risk without increasing it.[8]

---

[8] See Ryan v. City of Detroit, Mich., 698 F. App'x 272, 283 (6th Cir. 2017) (affirming grant of summary judgment where police questioned husband but allowed him to leave their presence and where husband subsequently shot and killed his wife because defendants "at most returned [wife] to the same level of danger she faced before the state action"); Brooks, 221 F. App'x at 407; Koulta v. Merciez, 477 F.3d 442, 446 (6th Cir. 2007) (reversing denial of summary judgment where officers' decision to allow drunk driver back on road before accident did not increase existing risk); Bukowski v. City of Akron, 326 F.3d 702, 709 (6th Cir. 2003) (finding at summary judgment stage that plaintiffs had failed to establish that police had affirmatively acted when they picked up a mentally disabled woman and then—in accordance with her requests and finding that they had no authority to detain her—returned her to the residence of a man who subsequently raped her, determining that "the government was merely returning a person to a situation with a preexisting danger"); Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003) (reversing denial of motion for summary judgment where police officers did not increase pedestrian's risk of being hit by car because the place where they dropped him off—the "parking lot of an open convenience

It is possible that, "[w]ith the benefit of hindsight," "the school officials may wish they had handled the [threat posed by E.C.] differently." Walker, 535 F. App'x at 466. However, it is not sufficient for Plaintiffs to plead an affirmative act by submitting that, "if school officials had intervened more effectively, the shooting may have been averted." Id. Plaintiffs fail to state a state-created danger claim on the theory that Hopkins and Ejak increased the risk of a shooting by returning E.C. to class.

### b. Threatening to Report E.C.'s Parents to CPS in E.C.'s Presence

Plaintiffs argue that, during the meeting with E.C. and his parents, Hopkins and Ejak "threatened E.C. and his parents" with demands that EC receive counseling within 24 hours and stated that they would report E.C.'s parents to CPS if the parents did not obtain counseling. Br. in

---

store"—was not more dangerous than the place where they had picked him up—the "shoulder of a dark, foggy, two-lane highway"—and the "safe place [in] the back seat of the patrol car" was "not the proper comparison" because the controlling question is "whether [plaintiff] was safer before the state action than he was after it) (emphasis in original); see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 201 (1989) (finding no substantive due process violation against officers and social workers for not removing abused child from father's custody, stating: "That the State once took temporary custody of [child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.").

Other cases cited by Plaintiffs are distinguishable because they featured acts that plausibly increased the risk of harm, not acts that—like Hopkins and Ejak's decision to remove E.C. from and then return him to class—temporarily removed the risk and then restored the status quo of risk. See A.L. v. Ann Arbor Pub. Sch., No. 10-cv-10354, 2011 WL 87262, at *9 (E.D. Mich. Jan. 11, 2011) (finding that plaintiffs adequately pleaded affirmative act where defendants removed student's adult escort and student subsequently suffered abuse); see also M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ., 1 F.4th 436, 449 (6th Cir. 2021) (stating that it was a "close call" whether teacher's act of calling student's parent after fight and handing phone to fake police officer was an affirmative act, based on inference "that [student] was safer [from unlawful handcuffing] before [teacher] handed [fake officer] the phone," but nonetheless affirming grant of summary judgment based on plaintiffs' failure to plausibly plead culpability).

Supp. Resp. at 14, 15. Plaintiffs allege that "[t]he meeting itself worsened the situation and affirmatively increased and [sic] the danger of harm at Oxford High School because the meetings placed direct pressure on EC, who was obviously in [a] state of suicidal and homicidal ideation and experiencing a mental health crisis." Id. In Plaintiffs' view, the meeting "directly subjected E.C. to the shame, fear, humiliation, and embarrassment of having his parents ignore, ridicule, and embarrass him, thus increasing the risk of violence upon his release from the office to the school environment." Id. at 14 (citing St. Juliana Compl. ¶ 113). According to their pleadings, "Hopkins and Ejak's actions in threatening to call CPS in E.C.'s presence, and thereby threatening to remove E.C. from his home, exacerbated E.C.'s distress . . . , and therefore created and increased the danger that E.C. would act on his violent ideation." Mueller Am. Compl. ¶ 193.[9]

As a matter of pleading, it is plausible that a state official's statements can increase the risk of harm by prompting a private actor to commit violence. The plaintiffs in Lipman adequately stated a state-created danger claim by alleging that caseworkers interviewed a young woman about her abuse in the presence of her abusers without removing the woman from her abusers' household, where subsequent continued abuse resulted in the woman's death. 974 F.3d at 730–731, 746–747

---

[9] See also Franz Am. Compl. ¶¶ 103, 156(o) (alleging that Hopkins and Ejak advised in E.C.'s presence "that a failure to attend counseling within 48 hours would result in the school contacting Child Protective Services" and that Defendants increased risk to OHS students by "[i]nterviewing [E.C.] in front of his parents, knowing that interview would accelerate the violence planned"); Asciutto Am. Compl. ¶ 86 ("Hopkins and/or Ejak decided that, if EC did not obtain counseling within 48 hours through his parents' assistance, then the school would contact CPS. But, the action taken by Hopkins and/or Ejak added fuel to the fire and emboldened EC—who was clearly mentally distraught and having homicidal ideations—to follow through with his plans."); Myre Compl. ¶¶ 88, 114(g) (alleging that Hopkins advised E.C.'s parents that he would follow up if they did not take E.C. to counseling within 48 hours and that Defendants increased risk to OHS students by "[i]nterviewing E.C.'s [sic] in front of his parents, knowing that interview would accelerate the violence planned"); St. Juliana Compl. ¶¶ 89, 140 (alleging that Hopkins "stated that he wanted [E.C.] seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Service" and that Ejak and Hopkins's affirmative acts increased risk of danger).

(finding it a reasonable inference that "interviewing [victim] in front of her alleged abusers and asking about the source of her injuries increased her risk of further abuse").

Taking all of Plaintiffs' allegations as true, as it must at this stage, the Court finds that Plaintiffs' pleadings on this claim withstand Defendants' motion for judgment on the pleadings. Plaintiffs allege that Hopkins and Ejak pushed E.C. closer to violent action by threatening to report his parents to CPS in the immediate future in E.C.'s presence.[10]   On the face of Plaintiffs' pleadings, the dean and counselor "added fuel to the fire" by stating in front of E.C. that E.C.'s parent must comply with the school's directives at once, or else risk the serious consequences of being reported to law enforcement and potentially seeing their family broken apart.  Asciutto Am. Compl. ¶ 86.  It is a "reasonable inference" that statements made to family members in the intimate setting of a counselor's office on a sensitive subject like proper parental care could be emotionally charged enough to affect the participants' future actions.  See Lipman, 974 F.3d at 746.  Plaintiffs have plausibly alleged that Hopkins and Ejak increased the risk that a mentally unstable teenager— suspected of harboring violent thoughts—would harm others when they threatened his parents with this imminent ultimatum in that teenager's presence.[11]

---

[10] Though Plaintiffs indicate in certain parts of their briefing that Hopkins was the one to demand counseling and threaten a call to CPS, see Br. in Supp. Resp. at 14, they attribute these actions to both Hopkins and Ejak in other parts of their briefing, see id. at 22.  Multiple complaints attribute these statements to both Defendants.  See Franz Am. Compl. ¶ 103; Asciutto Am. Compl. ¶ 86. The Court construes these allegations as applicable to both Hopkins and Ejak.

[11] Defendants submit that the Reilly court rejected the argument that a "threat[]" made to a private actor could increase the risk that the actor would harm others.  See Reply in Supp. Mot. at 6 (citing Reilly, 2021 WL 3929324, at *5).  However, Reilly did not consider the alleged impact of police's "threats" to arrest the dangerous private actor, as characterized by Defendants; on the contrary, the court considered and rejected arguments that the police had acted affirmatively by "provid[ing] reassurances . . . that he would not be arrested."  2021 WL 3929324, at *5.

Defendants also consider it "unsettling" that a state actor's efforts to help could be characterized as constitutional violations.  See Reply in Supp. Mot. at 6 (quoting Mays v. Franklin Cty. Comm'rs, 437 F.3d 579, 584–586 (6th Cir. 2006)) (declining to find substantive due process violation that

Having found that Plaintiffs plausibly alleged that Hopkins and Ejak committed affirmative acts, the Court next considers allegations as to their culpability before it addresses the supervisory liability of Wolf and Throne and the liability of Oxford Community Schools under Monell v. Dep't of Soc. Serv., 436 U.S. 658 (1978).

### 3.  Culpability[12]

To have the requisite culpability for a state-created danger claim, "[a]n official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."  Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ., 954 F.3d 925, 933 (6th Cir. 2020) (punctuation modified).  To draw such an inference, "a

---

would "discourage law enforcement officers from responding to requests for assistance").  They may ultimately be correct.  But Mays was decided at the summary judgment stage, and the court's determination that the plaintiffs' theory was "unsettling" relied on the parties' opportunity to produce "evidence."  Mays, 437 at 586.  Plaintiffs have made sufficiently plausible allegations to get the same opportunity.  If factual development demonstrates that Ejak and Hopkins's actions constituted a violation of substantive due process, then it is not "unsettling" to disincentivize that behavior.

Defendants further take issue with Plaintiffs' statement that E.C. "may not" have acted violently if Hopkins and Ejak had not threatened him, suggesting that this language insufficiently alleges a causal connection between Defendants' actions and E.C.'s actions.  See Reply in Supp. Mot. at 7 (quoting Br. in Supp. Resp. at 22).  However, the Court looks to the Plaintiffs' pleadings to assess the plausibility of their allegations, and Plaintiffs have sufficiently alleged that Hopkins and Ejak's act of "[i]nterviewing E.C.'s [sic] in front of his parents. . . accelerate[d] the violence planned."  Myre Compl. ¶ 114(g); see also Franz Am. Compl. ¶¶ 103, 156(o); St. Juliana Compl. ¶¶ 89, 140.

Additionally, Defendants cite Walker, 535 F. App'x at 465 to argue that "conclusory speculation" cannot withstand a motion to dismiss.  However, the allegations relating to the encounter in this case are more like the allegations in Lipman than the "conclusory statements" in Walker, 535 F. App'x at 465 (rejecting argument that merger of schools containing rival gangs increased risk of harm).

[12] As Plaintiffs note, see Br. in Supp. Resp. at 36, Defendants do not dispute the second element of a state-created danger claim: that "the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large."  Lipman, 974 F.3d at 744 (punctuation modified).  Accordingly, the Court proceeds to consider the parties' arguments as to the third element of Plaintiffs' claim: whether "the state knew or should have known that its actions specifically endangered the plaintiff."  Id. (punctuation modified).

public official must know of more than a <u>general</u> risk of harm. The official must know of the <u>specific</u> risk that later develops." <u>Id.</u> at 934 (emphasis in original). Then, "[h]aving drawn the inference, the official next must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights," <u>id.</u> at 933 (punctuation modified)—i.e., the official's response must constitute "callous disregard" or "conscience shocking behavior," <u>id.</u> at 935 (punctuation modified).

Defendants argue that Plaintiffs have failed to sufficiently allege that Defendants drew the inference of the specific harm presented by E.C.—that is, the risk that he would physically harm others—given that E.C. "had no disciplinary history or history of violent behavior that would suggest he posed a potential danger to other students." Br. in Supp. Mot. at 29–34. However, this argument disregards specific facts allegedly known to Defendants that could plausibly indicate that E.C. posed a risk of initiating a school shooting, including E.C.'s graphic drawing of people suffering from gunshot wounds alongside EC's explicit calls for help.

Defendants also contend that Plaintiffs have failed to allege that Defendants "actually drew the inference" that EC posed a risk of endangering other students. <u>Id.</u> at 33 (quoting <u>Jackson</u>, 954 F.3d at 934). Plaintiffs retort that they have "allege[d] extensive facts giving rise to Defendants' knowledge that it was dangerous for them to return E.C. to school on the morning of the shooting." Br. in Supp. Mot. at 38.

The Court is satisfied that Plaintiffs have sufficiently alleged facts supporting an inference that Hopkins and Ejak were aware that E.C. "presented a substantial risk of deadly harm to others." <u>St. Juliana</u> Compl. ¶ 92. For example, Plaintiffs allege that Hopkins doubted E.C.'s characterization of his drawing as related to a video game—asserting, "[t]his does not sound like a video game"—and they allege that Hopkins considered E.C. suicidal. <u>See id.</u> ¶¶ 65–73. According to Plaintiffs' allegations, Ejak was also present in the same meeting, and both

individuals received reports on E.C. in the weeks leading up to the shooting. Plaintiffs have plausibly alleged that Hopkins and Ejak were aware of facts from which they inferred that E.C. posed the specific risk of violent behavior that subsequently materialized. See Jackson, 954 F.3d at 933–934; see also Guertin v. State, 912 F.3d 907, 927 (6th Cir. 2019) (reversing dismissal of deliberate indifference claims against state officials based on Flint water crisis, explaining that extent of defendants' subjective knowledge had to be "fleshed out during discovery and [was] not appropriate to resolve at the motion-to-dismiss posture").

Defendants further argue that Defendants' conduct falls short of the "conscience-shocking" bar. Id. at 34–43. Throughout their argument on culpability, Defendants rely almost entirely on case law decided at the summary-judgment stage.[13] Resolving this issue at the pleading stage is problematic, given that "the determination of whether conduct shocks the conscience is fact specific." Bartynski v. City of Highland Park, Mich., No. 21-10049, 2022 WL 390892, at *4 (E.D. Mich. Feb. 8, 2022) (denying motion to dismiss substantive due process claim) (citing Ewolski, 287 F.3d at 510 (explaining that conscious-shocking analysis "depends upon the facts and circumstances of the individual case")); M.S. by Covington, 756 F. App'x at 517 (reversing grant

---

[13] See M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ., 1 F.4th 436, 454 (6th Cir. 2021); Jackson, 954 F.3d at 928; Domingo v. Kowalski, 810 F.3d 403, 416 (6th Cir. 2016); Gohl v. Livonia Pub. Sch. Sch. Dist., 836 F.3d 672, 685 (6th Cir. 2016); McQueen, 433 F.3d at 466; Bukowski, 326 F.3d at 709; Ewolski v. City of Brunswick, 287 F.3d 492, 517 (6th Cir. 2002).

The cases cited by Defendants that were decided at the motion-to-dismiss stage are distinguishable because either (i) the harm at issue fell far short of the conscience-shocking standard, see Lillard v. Shelby Cnty. Bd. of Educ., 76 F.3d 716, 726 (6th Cir. 1996) (dismissing due process claims based on teacher's one-time slap of student and rubbing of student's stomach); or (ii) the lack of specificity of plaintiffs' allegations established that plaintiffs had failed to plausibly allege that defendants could infer a substantial and specific risk of harm, see Drinkard v. Michigan Dep't of Corr., No. CIV. 12-14598, 2013 WL 3353935, at *4 (E.D. Mich. July 3, 2013); A.L., 2011 WL 87262, at *10.

of motion to dismiss shock-the-conscience claim because that inquiry "demands an exact analysis of circumstances") (punctuation modified).

In this case, the full circumstances of the encounter in the counselor's office, including the details of the alleged threats, are not of record.  What is of record are the allegations that Hopkins and Ejak—aware of facts indicating that E.C. presented an imminent risk—acted affirmatively to increase that risk without attending to the appropriateness of preventing E.C. from acting out in the immediate future.  Plaintiffs say this was "callous disregard."  Whether they can substantiate that theory must await discovery, but at the pleading stage their allegations are sufficient to withstand dismissal.[14]

Based on their allegations, Plaintiffs are entitled to proceed to discovery to learn what evidence supports their contention that Ejak and Hopkins's failure to immediately address a known risk of danger rose to the level of conscience-shocking.  There may be "some cases in which a court could determine that a state actor's actions did not shock the conscience at the motion-to-

---

[14] The circumstances alleged here stand in contrast to the facts in <u>Jackson</u>, where the Sixth Circuit—finding at the summary-judgment stage that school officials had <u>not</u> acted with "callous disregard for the safety" of their students—emphasized that those school officials had implemented a "Safety Plan" to address the known risk of a student lighting matches by requiring that student to sit at the front of the bus.  954 F.3d 925, 935–936 (punctuation modified).  Similarly, other courts have found that defendants lacked a mindset of "callous disregard"—<u>after</u> the opportunity for discovery—upon consideration of whether those officials took appropriate action in response to known risks.  <u>See, e.g.</u>, <u>A.P. by & through Pyscher v. A.P.</u>, 598 F. Supp. 3d at 598, 608 (E.D. Mich. 2022) (granting summary judgment to school official defendants on state-created danger claim based on student abuse where school official "investigated and responded to each complaint," "informed a school safety liaison" of reported bullying, and spoke with students and parents about "inappropriate behavior"); <u>see also</u> <u>Hensley v. Lack</u>, 928 F.2d 404 (6th Cir. 1991) (finding no "callous disregard" in context of Eighth Amendment deliberate indifference claim based on prison officials' alleged failure to protect plaintiff from assault by another incarcerated individual where "there was no evidence of any opportunity to prevent the attack" and "no inaction on the defendant's part").

dismiss stage"; however, "this is not that case." M.S. by Covington, 756 F. App'x at 517. Plaintiffs have sufficiently pleaded state-created danger claims against Hopkins and Ejak.

The Court next considers (i) supervisory liability for Throne and Wolf, (ii) Plaintiffs' claim against the school district under Monell, and (iii) whether the allegedly violated constitutional rights were "clearly established."

## 4. Supervisory Liability for Throne and Wolf

Plaintiffs submit that Throne and Wolf are liable for state-created danger claims because they actively encouraged constitutional violations such that a supervisory liability framework applies. See Br. in Supp. Resp. at 44–45.[15] This theory requires a showing that Throne and Wolf "encouraged . . .[,] participat[ed] in . . . [,] authorized, approved or knowingly acquiesced in" the constitutional violation. Doe ex rel. Doe v. City of Roseville, 296 F.3d 431, 440 (6th Cir. 2002).

---

[15] Plaintiffs argue that Wolf and Throne are liable both (i) because supervisory liability applies and (ii) because they committed their own affirmative acts. See Br. in Supp. Resp. at 44–45. As to the latter theory, however, even if Wolf and Throne committed affirmative acts, Plaintiffs make no effort to argue that Wolf and Throne were aware of facts allowing them to infer the specific risk that E.C. might physically harm other students. See Jackson, 954 F.3d at 933–934. Plaintiffs do not deny Defendants' assertion that Wolf and Throne "had no knowledge of or report concerning E.C." Br. in Supp. Mot. at 44. Plaintiffs' briefing makes no argument that the principal and superintendent knew who E.C. was, nor that they were informed of E.C.'s behavior in the final days before the shooting. Instead, Plaintiffs' culpability arguments are specific to Hopkins and Ejak; these arguments are entirely inapplicable to the principal and superintendent, who had no alleged knowledge of the November 30, 2021 meeting in the counselor's office. See Br. in Supp. Resp. at 37–39 (arguing that Plaintiffs sufficiently alleged culpability because of "facts that caused Defendants to know . . . that they were creating a serious danger when they released [E.C.] from the office and returned him to school," and that "Hopkins and Ejak . . . specifically knew that E.C. was suicidal" and had presented concerning behavior during class) (emphasis added). Plaintiffs have not satisfactorily alleged that Wolf and Throne were aware of facts from which they inferred the specific risk at issue. See Jackson, 954 F.3d at 933–934. Accordingly, Plaintiffs have not plausibly pleaded that Wolf and Throne were liable for substantive due process violations for their own affirmative acts, and the Court proceeds by considering their liability only under a supervisory liability theory.

Plaintiffs point to their allegations that (i) Throne "discouraged" students, parents, and staff from reporting suspected threats; (ii) Wolf "directed" staff to tell students to stop reporting and sharing information on threats; (iii) both Throne and Wolf promoted a policy, practice, or custom of misrepresenting and minimizing risks of school violence; (iv) both Throne and Wolf communicated to students and parents that there were no threats to school safety; and (vi) both Throne and Wolf encouraged and authorized unconstitutional acts by adopting a policy of concealing information from law enforcement, adopting a policy of not properly disciplining students, and acquiescing in Ejak and Hopkins's unconstitutional conduct. See Br. in Supp. Resp. at 44–48 (citing Ossege Compl.; Asciutto Am. Compl.; G.J. Am. Compl.; Mueller Am. Compl.).

Plaintiffs' only plausibly alleged substantive due process violation is that Hopkins and Ejak increased the risk of danger posed by E.C. through threats allegedly made during their encounter with E.C. and his family.  Plaintiffs have not plausibly alleged that Wolf and Throne did anything to encourage, authorize, approve, or acquiesce in those actions.  On the contrary, Plaintiffs' issue with Wolf and Throne's statements appears to be that the school administration downplayed the seriousness of a potential danger.  Wolf and Throne's statements could not have encouraged Hopkins and Ejak to act in the manner that Plaintiffs consider violative of the Constitution—that is, to demand in E.C.'s presence that E.C.'s parents provide E.C. with counseling or else risk being reported to CPS, thus pushing E.C. to lash out violently.  Wolf and Throne cannot have "acquiesced" in the supposed violations where they are not alleged to have known that Hopkins and Ejak held the meeting with E.C. and his parents, never mind that Hopkins and Ejak threatened to report E.C.'s parents to CPS.  And no allegations indicate that Wolf or Throne approved or authorized their staff members' statements to E.C. and his parents at any time.  Plaintiffs make no effort to explain how Wolf and Throne's statements connect to their single surviving constitutional claim.

Because it is not plausible that any of Wolf or Throne's statements "encouraged," "authorized," "approved," or "acquiesced in" the allegedly unconstitutional conduct of Hopkins and Ejak, Plaintiffs have not adequately pleaded that Wolf and Throne are liable under a supervisory liability theory. Roseville, 296 F.3d at 440. The Court grants Defendants' motion as to Wolf and Throne and dismisses these two Defendants.

### 5. Monell Liability

Plaintiffs assert claims against the school district, Defendant Oxford Community Schools, based on Monell. As Plaintiffs observe, see Br. in Supp. Resp. at 54, the only argument Defendants present against Plaintiffs' Monell claim in their motion is that there is no underlying constitutional violation. See Br. in Supp. Mot. at 49–50. However, as discussed, Plaintiffs have adequately pleaded that Hopkins and Ejak violated Plaintiffs' substantive due process rights.[16]

"[A] local government can be sued under § 1983 only when a policy or custom of that government caused the injury in question." Lipman, 974 F.3d at 747. Plaintiffs have alleged that Oxford Community Schools maintained policies, procedures, and customs including:

- "failing or choosing not to train staff and administrators for how to respond where the student is suicidal or is displaying homicidal tendencies, where the student presents a threat of harm to himself/herself or others"; and

- "failing or choosing not to train staff and administrators in proper methods to conduct a student risk assessment."

---

[16] Defendants also argue that these claims fail because Plaintiffs have not adequately alleged that the constitutional rights violated were clearly established. See Br. in Supp. Mot. at 49–50. The Court addresses this argument in the following section.

In their reply, Defendants present additional arguments against Plaintiffs' Monell claim. See Reply in Supp. Mot. at 17–19. However, a reply is not a proper place to raise an argument for the first time. See, e.g., Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time . . . in replies to responses."). Therefore, the Court will not address these additional arguments.

Br. in Supp. Resp. at 55–56; see also Ossege Compl. ¶ 151 (No. 22-11113, Dkt. 1); Asciutto Am. Compl. ¶¶ 134–150; Franz Am. Compl. ¶¶ 174–187.

These allegations amount to a claim that the district failed to train staff-members to properly manage students who evince warning signs like those presented by E.C. A failure-to-train theory of Monell liability requires that Plaintiffs plead: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006).

Plaintiffs have sufficiently pleaded that (i) the training was "inadequate for the tasks that [Ejak and Hopkins were] required to perform," see, e.g., Franz Am. Compl. ¶¶ 176–177; (ii) this inadequacy resulted from "deliberate indifference," see, e.g., Ossege Compl. ¶ 154; Asciutto Am. Compl. ¶ 140; and (iii) the inadequacy was closely related to or actually caused Ejak and Hopkins's alleged constitutional violation, see, e.g., Asciutto Am. ¶ 145. At the pleadings stage, "without the benefit of discovery," Plaintiffs have provided sufficient allegations "to draw the reasonable inference" that the school district's customs and policies would support a Monell claim for a violation of substantive due process rights. Lipman, 974 F.3d at 748.

Plaintiffs have sufficiently alleged that Hopkins, Ejak, and Oxford Community Schools violated Plaintiffs' substantive due process rights. The Court next considers whether the constitutional rights allegedly violated are clearly established.

### 6. Qualified Immunity Defense Based on "Clearly Established" Rights

Government officials are entitled to qualified immunity on constitutional claims if the rights those officials allegedly violated are not "clearly established." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (punctuation modified). Defendants submit that it is not clearly established that any of the Defendants' alleged actions violated any clearly established rights, entitling them

to qualified immunity.  See Br. in Supp. Mot. at 44–48.  Plaintiffs, conversely, argue that Plaintiffs'

right to be free from state-created dangers generally—and their right to be free from the specific

risk that school officials unleash on them a "suicidal student" who was a known risk to their bodily

health more specifically—were clearly established, and that they have properly alleged the same.

See Br. in Supp. Resp. at 9–10.

Analyzing whether an alleged constitutional violation is clearly established "is sometimes

difficult on the pleadings, since that inquiry may turn on case-specific details that must be fleshed

out in discovery."  Myers v. City of Centerville, Ohio, 41 F.4th 746, 758 (6th Cir. 2022) (affirming

denial of qualified immunity at pleadings stage) (punctuation modified).  "Absent any factual

development beyond the allegations in a complaint, a court cannot fairly tell whether a case is

obvious or squarely governed by precedent . . . ."  Moderwell v. Cuyahoga Cnty., Ohio, No. 20-

3879, 2021 WL 1897949 (6th Cir. May 12, 2021) (punctuation modified).  Thus, it is "generally

inappropriate" for a district court to grant a motion based on qualified immunity at the pleadings

stage.  Wesley v. Campbell, 779 F.3d 421, 433 (6th Cir. 2015).

Plaintiffs' allegations—asserting that Defendants took actions that endangered Plaintiffs'

bodily security—suffice to survive a qualified immunity defense at the pleadings stage.  See id.

Whether the rights at issue are clearly established is ultimately a question that requires factual

development.  Wesley, 779 F.3d at 433.

At this time, the Court denies Defendants' qualified immunity defense based on the

pleadings as to Plaintiffs' state-created danger claims against Hopkins, Ejak, and Oxford

Community Schools.  This is without prejudice to Defendants' right to renew the issue of immunity

at the summary judgment stage.

**B.  Prospective Injunctive Relief Based on Procedural Due Process Claims**

Certain Plaintiffs bring Fourteenth Amendment procedural due process claims for injunctive relief against Defendants Oxford Community Schools and Weaver.  See St. Juliana Compl. ¶¶ 156–167; G.J. Am. Compl. ¶¶ 219–233; Mueller Am. Compl. ¶¶ 312–325; Watson Compl. ¶¶ 198–208 (No. 22-cv-11959, Dkt. 1).  Plaintiffs contend that students "are to this day subjected to inferior and unsafe educational resources, including being forced to attend online classes instead of returning to Oxford High School," and that "Defendants have not implemented the injunctive relief requested by Plaintiffs, including cessation of the policies, practices, and customs that caused the shooting, provision of proper training in how to handle suicidal and dangerous student behavior, proper training on risk assessment, and proper training on searches." Br. in Supp. Resp. at 59.

To adequately plead a procedural due process claim, Plaintiffs "must allege facts showing (1) that [they were] deprived of a constitutionally recognized liberty or property interest; and (2) that [they] did not receive the required process."  Bright v. Gallia Cnty., Ohio, 753 F.3d 639, 656 (6th Cir. 2014) (affirming dismissal of procedural due process claims).

Defendants submit that Plaintiffs have failed to allege how they were deprived of any due process of law."  Br. in Supp. Mot. at 51.  The Court agrees.  Each complaint presenting a procedural due process claim alleges that Defendants "have failed to remedy the unconstitutional policies and customs that caused the shooting to occur."  St. Juliana Compl. ¶ 164; Mueller Am. Compl. ¶ 322; G.J. Am. Compl. ¶ 228; Watson ¶ 205.  Plaintiffs do not allege that they were deprived of any particular process, like notice, the opportunity for a pre-deprivation hearing, or the opportunity for a post-deprivation hearing.  As demonstrated by the case law on which they rely, Plaintiffs must identify a process allegedly required by law to properly assert this cause of action. See Goss v. Lopez, 419 U.S. 565, 584 (1975) (finding that suspension of students "without a hearing, either before or after the suspension," violated procedural due process rights); Patrick v.

Success Acad. Charter Sch., Inc., 354 F. Supp. 3d 185, 219 (E.D.N.Y. 2018) (finding that student alleging placement in inferior alternative education program following suspension adequately alleged he was deprived of due process because he "was not given a disciplinary hearing at any time in connection with that suspension"). Having failed to make any allegations as to the "required process" they were denied, Plaintiffs have not properly pleaded a procedural due process claim. Bright, 753 F.3d at 656.

Plaintiffs' claims for injunctive relief appear to sound in substantive due process, "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." Does v. Munoz, 507 F.3d 961, 964 (6th Cir. 2007) (punctuation modified). To plead such a claim, however, Plaintiffs must identify the "fundamental rights or liberty interests" of which they were deprived, and the "list of fundamental rights is short." Id. (punctuation modified).

Plaintiffs explicitly rely on "state law" to assert Oxford students' "interest in their educational status" and school officials' obligation "to create and maintain a safe educational environment." Br. in Supp. Resp. at 58 (citing Lansing Sch. Educ. Ass'n v. Lansing Bd. of Educ., 792 N.W.2d 686, 702 (Mich. 2010) (finding that teachers had standing to seek injunctive relief under state law to expel students who had allegedly assaulted them)). But substantive due process claims cannot be based on rights created under state law. See Young v. Twp. of Green Oak, 471 F.3d 674, 684 (6th Cir. 2006) ("[A]reas in which substantive rights are created only by state law . . . are not subject to substantive due process protection under the Due Process Clause because substantive due process rights are created only by the Constitution.") (punctuation modified).

And there is no recognized constitutional right to an education. See San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying

it is implicitly so protected."); Handberry v. Thompson, 446 F.3d 335, 352 (2d Cir. 2006) ("The Fourteenth Amendment does not protect a public education as a substantive fundamental right."); Horen v. Bd. of Educ. of Toledo City Sch. Dist., 594 F. Supp. 2d 833, 844 (N.D. Ohio 2009) ("There is no federal constitutional right to education . . . ."). The Supreme Court has declined to expressly resolve "whether a minimally adequate education is a fundamental right." Papasan v. Allain, 478 U.S. 265, 285–286 (1986). While a recent Sixth Circuit panel recognized that the Constitution does establish a fundamental right to a basic minimum education, Gary B. v. Whitmer, 957 F.3d 616, 642 (6th Cir. 2020), that decision was vacated with the granting of rehearing en banc, 958 F.3d 1216 (6th Cir. 2020), following which the matter was settled, see Gary B. v. Whitmer, No. 16-cv-13292 (E.D. Mich.), 6/11/20 Order (Dkt. 132) (granting motion to dismiss appeal as moot based on settlement agreement). Plaintiffs do not present any allegations to argue that they were denied a federal right to a minimally adequate education here.

Having failed to identify any fundamental right or liberty interest protected by the Constitution, Plaintiffs have not adequately pleaded a substantive due process claim for injunctive relief. See Munoz, 507 F.3d at 964. Because Plaintiffs have not stated a claim for injunctive relief under any theory of due process, the Court dismisses these claims.

### III. CONCLUSION

For the reasons explained above, the Court grants in part and denies in part Defendants' motion for judgment on the pleadings (Dkt. 107). Plaintiffs' state-created danger claims survive against Hopkins, Ejak, and Oxford Community Schools. The Court grants Defendants' motion as to Fine, Kubina, Karpinski, Morgan, Throne, and Wolf, and it dismisses these Defendants. The Court also grants Defendants' motion as to Plaintiffs' due process claims for injunctive relief.

Additionally, the Court grants Defendants' motions for leave for the parties to file excess pages in support of their motion and response (Dkt. 108) and for Defendants to file excess pages

in support of their reply (Dkt. 124).  The Court denies Defendants' motion to stay discovery (Dkt.

109).

      SO ORDERED.

Dated:  May 12, 2023                          s/Mark A. Goldsmith
     Detroit, Michigan                     MARK A. GOLDSMITH
                                      United States District Judge